# No. 22-11462

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

PAUL OSSMANN,

*Plaintiff-Appellant,*

v.

MEREDITH CORPORATION,

*Defendant-Appellee,*

---

On Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:19-cv-03200-SDG

---

## OPENING BRIEF FOR APPELLANT

---

Jack Rosenberg
5425 Glenridge Drive Ste 53
Atlanta, GA 30342
(404) -343-1091
jackrosenberg2@gmail.com

Marc N. Garber
Alan H. Garber
THE GARBER LAW FIRM, P.C.
4994 Lower Roswell Road, Suite 14
Marietta, Georgia 30068-5648
(678) 560-5066
mngarber@garberlaw.net
ahgarber@garberlaw.net

*Counsel for Plaintiff-Appellant*

No. 22-11462

*Paul Ossmann v. Meredith Corporation*

## AMENDED CERTIFICATE OF INTERESTED
## PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellant-plaintiff Paul Ossmann certifies that the persons and entities listed below have an interest in the outcome of this case—with an asterisk (*) marking previously unlisted persons and entities:

1)    Baker & Hostetler LLP (attorney for appellee)

2)    Barnum, Eric Leroy (attorney appellee)

3)    Garber, Alan H. (attorney for appellant)

4)    Garber, Marc N. (attorney for appellant)

5)    Gray Hawkeye Stations, Inc. (affiliate of appellee)*

6)    Gray Media Group, Inc. (affiliate of appellee)*

7)    Gray Television, Inc. (parent corporation of appellee [NYSE: GTN and GTN-A])*

8)    Grimberg, Hon. Steven D. (United States District Judge, Northern District of Georgia)

9)    Hawkeye Acquisition, Inc. (affiliate of appellee)*

10)   Larkins III, Hon. John K. (United States Magistrate Judge, Northern District of Georgia)

No. 22-11462

*Paul Ossmann v. Meredith Corporation*

## AMENDED CERTIFICATE OF INTERESTED
## PERSONS AND CORPORATE DISCLOSURE STATEMENT
### (*continued*)

11) Meredith Corporation [NYSE: MDP] (appellee)

12) Ossmann, Paul (appellant)*

13) Robinson, Mitchell (attorney for appellee)

14) Rosenberg, Jack (attorney for appellant)

15) The Garber Law Firm, P.C. (attorney for appellant)

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant's counsel requests oral argument.  Oral argument will aid the Court in deciding this appeal, because this appeal presents the important question of whether a document central to an employer's termination decision that expressly treats the employee's race, compared to the races of his colleagues, as a negative factor favoring termination is sufficient evidence of discriminatory intent, in violation of 42 U.S.C. § 1981, to preclude summary judgment.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT ............................ C-1

STATEMENT REGARDING ORAL ARGUMENT ................................. i

TABLE OF CONTENTS ............................................................. ii

TABLE OF CITATIONS .......................................................... vii

STATEMENT OF JURISDICTION ............................................... x

STATEMENT OF THE ISSUES ................................................... 1

STATEMENT OF THE CASE ...................................................... 3

   I.  Course of Proceedings and Dispositions Below ............................. 3

   II.  Statement of the Facts ........................................................ 6

       A.   Meredith Required Its Written Disciplinary Warnings to Identify the Policy Being Violated ......................................... 6

       B.   On May 15, 2017, Meredith Gives Ossmann a Written Warning for "Exercising Poor Judgment"—*Not* for Violating Its Sexual Harassment Policy ................................ 6

       C.   Ossmann Received No Written Warning after a November 17, 2019 Meeting with His Supervisor and the HR Director Because They Said He Did Not Violate Meredith's Sexual-Harassment Policy ................................... 8

       D.   On April 4, 2019, Plaintiff Denied Making Any of the Inappropriate Comments Reported by a Female Coworker ..................................................................... 10

# TABLE OF CONTENTS
## (continued)

**Page**

E.     Meredith's Final Decisionmaker Considers Ossmann's
       Race in Approving His Termination ..................................... 12

    E.1.   CBS46's HR Director Sent an Internal EEO
       Analysis Requesting Approval to Fire Ossmann to
       the Final Decisionmaker at Meredith Corporate
       Headquarters ............................................................. 12

    E.2.   The Final Decisionmaker Received and Reviewed
       the EEO Analysis—Her Only Source of
       Information for Deciding Ossmann's Firing ............... 13

    E.3.   The Internal EEO Analysis Required the Final
       Decisionmaker to Consider Comparative Race
       Data in Deciding Ossmann's Proposed Dismissal ....... 15

        (a) A Race-Conscious Decision is Made ....................... 15

        (b) No Affirmative Action Plan or Justification .......... 20

    E.4.   The EEO Analysis Identified Only Two
       Performance Concerns for Ossmann that Both
       Occurred Prior to His August 2017 Promotion .......... 21

    E.5.   No Testimony or Document Specified Bock's Own
       Legitimate, Non-Discriminatory Reason for
       Approving Ossmann's Firing ....................................... 23

STANDARD OF REVIEW ........................................................ 24

SUMMARY OF THE ARGUMENT ....................................... 25

# TABLE OF CONTENTS
## (continued)

**Page**

ARGUMENT AND CITATIONS TO AUTHORITIES ............................ 34

I.   THE DISTRICT COURT ERRONEOUSLY GRANTED
     SUMMARY JUDGMENT ON OSSMANN'S § 1981
     TERMINATION CLAIM BECAUSE THE EEO ANALYSIS
     IS DIRECT EVIDENCE OF RACE DISCRIMINATION ........ 35

II.  THE DISTRICT COURT ERRONEOUSLY GRANTED
     SUMMARY JUDGMENT ON OSSMANN'S § 1981
     TERMINATION CLAIM BECAUSE MEREDITH DID NOT
     SATISFY ITS *MCDONNELL DOUGLAS* BURDEN OF
     PRODUCTION WITH ADMISSIBLE EVIDENCE OF
     BOCK'S SPECIFIC REASON FOR DISCHARGING
     OSSMANN ................................................................. 39

     A.  A Defendant's *McDonnell Douglas* Burden
         of Production ...................................................... 40

         A.1.  The Reason Must Be the Ultimate
               Decisionmaker's Own ................................. 41

         A.2.  Circumstantial Evidence Not Allowed ...................... 43

     B.  Meredith Did Not Satisfy Its *McDonnell
         Douglas* Burden ................................................. 44

III. THE DISTRICT COURT ERRONEOUSLY GRANTED
     SUMMARY JUDGMENT ON OSSMANN'S § 1981
     TERMINATION CLAIM BECAUSE BOCK'S OWN
     PURPORTED REASON WAS A PRETEXT ............................ 46

     A.  A Plaintiff's *McDonnell Douglas* Burden to Rebut the
         Defendant's Legitimate, Non-Discriminatory Reason ........ 47

# TABLE OF CONTENTS
## (continued)

**Page**

    B.  Bock's Explanation was Pretext Because Race Played an Impermissible Role in Her Decision ............................... 48

IV.  THE DISTRICT COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT ON OSSMANN'S § 1981 TERMINATION CLAIM UNDER A CAT'S PAW THEORY BECAUSE THE ATLANTA MANAGERS' REASON FOR REQUESTING OSSMANN'S FIRING WAS A PRETEXT ....... 53

    A.  The District Court Applied the Cat's Paw Theory to the Wrong Claim .............................................................. 54

    B.  The Cat's Paw Theory with Multiple Recommenders ......... 55

    C.  The "Work Rule" for Proving Pretext ................................. 56

    D.  One Atlanta Manger's Explanation for Requesting Ossmann's Firing was a Pretext for Race Discrimination ............................................................. 57

        D.1.  The December 6, 2017 Violation That Wasn't ........... 57

        D.2.  The Undocumented April 4, 2019 Violation .............. 59

        D.3.  The April 15, 2017 Poor-Judgment Warning ............ 61

V.  THE DISTRICT COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT ON OSSMANN'S § 1981 TERMINATION CLAIM BECAUSE HIS CIRCUMSTANTIAL EVIDENCE PRESENTED A CONVINCING MOSAIC OF RACE DISCRIMINATION ........ 64

# TABLE OF CONTENTS
## (continued)

**Page**

VI.    THE DISTRICT COURT ERRONEOUSLY GRANTED
SUMMARY JUDGMENT ON OSSMANN'S GEORGIA
BREACH-OF-CONTRACT CLAIM AND STATE-LAW
DAMAGE THEORIES ................................................................ 69

CONCLUSION ......................................................................... 72

CERTIFICATE OF COMPLIANCE .......................................... xi

CERTIFICATE OF SERVICE .................................................. xii

*ADDENDUM* "*A*" – Internal EEO Analysis for Ossmann's
termination [Doc. 71-4] ........................................................ xiii

# TABLE OF CITATIONS

**Page**

## SUPREME COURT

*Bostock v. Clayton Cty., Georgia,*
  140 S. Ct. 1731 (2020) ........................................................................ 35

*McDonald v. Santa Fe Trail Transp. Co.,*
  427 U.S. 273 (1976) ............................................................................ 34

*McDonnell Douglas Corp. v. Green,*
  411 U.S. 792 (1973) .................................................................. *passim*

*Ricci v. DeStefano,*
  557 U.S. 557 (2009) ............................................................................ 49

\* *Texas Dep't of Cmty. Affs. v. Burdine,*
  450 U.S. 248 (1981) .................................................. 40, 41, 42, 43, 44,
                                                                     45, 46, 47, 48, 50

## ELEVENTH CIRCUIT

*Bonner v. City of Prichard,*
  661 F.2d 1206 (11th Cir. 1981) (en banc) ........................................... 36

*Combs v. Plantation Patterns,*
  106 F.3d 1519 (11th Cir. 1997) ..................................................... 47, 51

*Damon v. Fleming Supermarkets of Fla., Inc.,*
  196 F.3d 1354 (11th Cir. 1999) ............................................... 47, 48, 56

*Earley v. Champion Int'l Corp.,*
  907 F.2d 1077 (11th Cir.1990) ..................................................... 35, 38

# TABLE OF CITATIONS
## (continued)

**Page**

\* *Holland v. Gee,*
  677 F.3d 1047 (11th Cir. 2012)................................................. 36, 37, 38

\* *Increase Minority Participation by Affirmative*
  *Change Today of Nw. Fla., Inc. (IMPACT) v. Firestone,*
  893 F.2d 1189 (11th Cir. 1990)...................................................... 45, 46

 *Jenkins v. Nell,*
  26 F.4th 1243 (11th Cir. 2022) ........................................ 34, 64, 65, 69

 *Jeter v. Credit Bureau, Inc.,*
  760 F.2d 1168 (11th Cir. 1985).................................................... 62, 63

 *Jones v. Gerwens,*
  874 F.2d 1534 (11th Cir. 1989)...........................................................56

 *Ramirez v. Sloss,*
  615 F.2d 163 (5th Cir. 1980).................................................. 36, 37, 38

\* *Smith v. Lockheed-Martin Corp.,*
  644 F.3d 1321 (11th Cir. 2011).................................... 24, 44, 46, 48,
                                                              50, 58, 64, 66

 *Stimpson v. City of Tuscaloosa,*
  186 F.3d 1328 (11th Cir. 1999).................................................... 55, 56

 *Turnes v. AmSouth Bank, NA,*
  36 F.3d 1057 (11th Cir. 1994).................................................... 40, 46

 *United States v. Wilson,*
  788 F.3d 1298 (11th Cir. 2015).................................................... 53, 67

## TABLE OF CITATIONS
### (continued)

**Page**

\* *Walker v. Mortham,*
  158 F.3d 1177 (11th Cir. 1998) ................................................ 40, 42, 45

*Walker v. Prudential Prop. & Cas. Ins. Co.,*
  286 F.3d 1270 (11th Cir. 2002) ................................................ 42, 43, 47

*Wright v. Southland Corp.,*
  187 F.3d 1287 (11th Cir. 1999) ............................................................ 44

*Ziyadat v. Diamondrock Hosp. Co.,*
  3 F.4th 1291 (11th Cir. 2021) ............................................................ 34

## OTHER AUTHORITIES

*Roberson v. Allen,*
  66 S.E. 542, 543 (Ga. Ct. App. 1909) ................................................ 69

*Williamson v. Handy Button Mach. Co.,*
  817 F.2d 1290 (7th Cir. 1987) ............................................................ 51

## STATUTES AND RULES

28 U.S.C. § 636(b)(1)(C) ............................................................ 70

42 U.S.C. § 1981 ........................................................ *passim*

Fed. R. Civ. P. 8 ........................................................ 71

Fed. R. Civ. P. 12 ........................................................ 71

Fed. R. Civ. P. 56 ........................................................ 24, 29, 46, 58

11th Cir. R. 3-1 ........................................................ 71

## STATEMENT OF JURISDICTION

Plaintiff-appellant brought this race discrimination action under 42 U.S.C. § 1981.  Doc. 1 at 1; Doc. 11 at 1.[1]  The district court had original subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under federal law, and 28 U.S.C. § 1343, as this action was commenced to recover damages under an Act of Congress providing for the protection of civil rights.  The district court had supplemental jurisdiction over Plaintiff's related Georgia state-law claims pursuant to 28 U.S.C. § 1367(a).

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.  Plaintiff timely appeals from a final judgment on all claims by the district court after granting Defendant's motion for summary judgment.  The district court granted summary judgment on March 31, 2022, and entered a final judgment on April 1, 2022.  Docs. 95, 97.  Plaintiff filed his notice of appeal on April 27, 2022.  Doc. 100.

---

[1] All record references, including to transcripts, are to the document number and page number that appear in the header generated by the district court's electronic filing system.

## STATEMENT OF THE ISSUES

Plaintiff, a white male, was the chief meteorologist at Defendant's CBS46 TV station in Atlanta until his firing. He was replaced by an Hispanic female three weeks later. Plaintiff challenges the district court's grant of summary judgment on his termination claim under 42 U.S.C. § 1981 because Defendant's dismissal decision took race into account and on his Georgia breach-of-contract claim for the same reason. The appeal presents five issues:

(1)    Did the district court erroneously grant summary judgment by ruling that an internal EEO Analysis, which made Plaintiff's race a negative factor in the termination decision, was not direct evidence.

(2)    Did the district court erroneously grant summary judgment by ruling that Defendant satisfied its *McDonnell Douglas* burden of production to offer admissible evidence specifying its final decisionmaker's own non-discriminatory reason for approving Plaintiff's firing.

(3)    Did the district court erroneously grant summary judgment, even assuming Defendant carried its burden of production, by ruling

that Plaintiff failed to demonstrate that the final decisionmaker's
explanation was a pretext for race discrimination.

(4)   Did the district court erroneously grant summary judgment,
where the final decisionmaker was a "cat's paw" for the managers
who recommended Plaintiff's firing, by ruling that the managers'
reason for their request was not a pretext for race discrimination.

(5)   Did the district court erroneously grant summary judgment by
ruling that Plaintiff's circumstantial evidence did not establish a
convincing mosaic of Defendant's race discrimination.

(6)   Did the district court erroneously grant summary judgment on
Plaintiff's Georgia breach-of-contract claim and related state-law
damage theories because Defendant's decision break the contract
was based on Plaintiff's race.

## STATEMENT OF THE CASE

Plaintiff-appellant Paul Ossmann, a white male, filed this action against Defendant Meredith Corporation after it fired him as the chief meteorologist at CBS46 TV in Atlanta and replaced him with an Hispanic female three weeks later. Following discovery, the district court granted Meredith's motion for summary judgment on Ossmann's claims of race discrimination in his termination in violation of 42 U.S.C. § 1981 and breach of contract under Georgia law.[1]  Ossmann appeals.

## I. Course of Proceedings Below

On July 15, 2019, Paul Ossmann filed this action against Meredith Corporation. Doc. 1. Ossmann—the former chief meteorologist at Meredith's Atlanta-based CBS46 TV—alleged race-discrimination claims under 42 U.S.C. § 1981 for (i) hostile work environment, (ii) disparate disciplinary treatment, and (iii) termination, plus Georgia tort claims of intentional infliction of emotional distress and ratification. Doc. 1 at 7-10. In response to Meredith's partial motion to dismiss, Ossmann filed an amended complaint that retained

_____

[1] Ossmann also alleged § 1981 claims of disparate discipline and hostile work environment. Doc. 11 at 7-8. Both claims were abandoned in the district court and are not part of this appeal. *See infra*, at 5-6.

his three § 1981 claims, added a Georgia breach-of-contract claim, and dropped his two Georgia tort claims.  Doc. 5; Doc. 11 at 7-9.  Meredith then answered by denying liability.  Doc. 14.

Discovery commenced on September 13, 2020, and closed on March 15, 2021.  Doc. 37.  On March 26, 2021, the magistrate judge held a discovery hearing after which Meredith was ordered to produce the internal EEO Analysis [Doc. 71-4] that its final decisionmaker used to decide whether to approve Ossmann's firing.  Doc. 57 at 6, 19.  Meredith had withheld the EEO Analysis from discovery on grounds of attorney work product.  Doc. 57 at 6, 14.

On April 14, 2021, Meredith moved for summary judgment.  Doc. 62.  The motion was referred to the magistrate judge for a final report and recommendation ("R&R").  On June 7, 2021, Ossmann filed his response opposing Meredith's motion, along with a notice abandoning his § 1981 hostile-work-environment claim.  Docs. 70, 71.

On January 7, 2022, the magistrate judge issued the R&R, recommending that Meredith's motion be granted as to all claims.  Doc. 79.  Ossmann timely objected to the R&R, focusing only on his § 1981 termination claim and Georgia breach-of-contract claim.  Doc. 87 at 1,

11, 15, 50, 70; *id.* at 11 & 50 (relying on R&R's finding that Ossmann made his prima facie *McDonnell Douglas* case on his § 1981 termination claim).  Ossmann abandoned his § 1981 disparate-discipline claim by not objecting to its recommended dismissal.  *See* 11th Cir. R. 3-1.

The district court adopted, with modifications, the R&R and granted Meredith's summary judgment motion.  Doc. 95.  The district court modified the R&R three ways.  By sustaining Ossmann's objection that the final decisionmaker was a vice president at Meredith's Iowa corporate headquarters named Kristin Bock—*not*, as the R&R reported, the two CBS46 managers in Atlanta who requested corporate's approval to fire Ossmann.  *Id*. at 6-7.  By sustaining Ossmann's objection that Bock, the final decisionmaker, had in fact received and reviewed the EEO Analysis containing the race data on Ossmann and the other weather-team members.  *Id*. at 7-8.  And by sustaining Ossmann's objection to the R&R's exclusion under the sham-affidavit rule of nine paragraphs in his declaration that support his cat's-paw argument.  *Id*. at 19, 20-21 (Doc. 71-3 ¶¶ 12-15, 23, 25, 27-28, 31).

On April 1, 2022, the clerk entered a final judgment.  Doc. 97.  Ossmann timely filed his notice of appeal on April 27, 2022.  Doc. 100.

## II.  <u>Statement of the Facts</u>

Meredith hired Ossmann at CBS46 in Atlanta as a meteorologist in 2012, promoted him to chief meteorologist in August 2017, fired him from that position on April 8, 2019, and replaced him three weeks later on May 1, 2019, with Jennifer Valdez, an Hispanic female.  Doc. 62-1 at 3; Doc. 14 ¶¶ 4, 10; Doc. 71-4 at 2 ¶ 4.  These facts are undisputed.

## II.A.  **Meredith Required Its Written Disciplinary Warnings to Identify the Policy Being Violated**

Meredith required its employees to sign all written disciplinary warnings to protect both the company and the employee.  Doc. 71-3 ¶ 17(d).  Meredith required the employee's signatures to make sure a written record existed confirming that the employee was told face-to-face by their supervisor (a) what conduct was at issue, (b) what policy violation occurred, if any, as a result, and (c) what could happen if future warnings were issued, and to make sure the employee received a copy of the written warning.  Doc. 71-3 ¶ 17.

## II.B.  **On May 15, 2017, Meredith Gives Ossmann a Written Warning for "Exercising Poor Judgment"—*Not* for Violating Its Sexual Harassment Policy**

On May 5, 2017, Ossmann met with his then-supervisor Frank Volpicella and CBS46 HR Director Laurel Benenguer to discuss

comments Ossmann allegedly made to news team members.  Doc 62-12 at 2.  Ossmann acknowledged saying "cockblocked" to a female meteorologist about a scheduling issue.  Doc 62-12 at 2; Doc. 71-3 ¶¶ 19-20.  He "denied making the other comments."[2]  Doc. 62-12 at 2; Doc. 71-3 ¶¶ 19-20.

Volpicella issued a written warning to Ossmann, dated May 15, 2017, for "Exercising Poor Judgment" in using the word cockblocked.  Doc 62-12 at 2; Doc. 71-3 ¶¶ 19-20.  But *not* for any of the comments he denied making.  Doc 62-12 at 2; Doc. 71-3 ¶¶ 20-21.

The 05/15/17 warning did *not* say Ossmann violated Meredith's sexual harassment policy.  Doc 62-12 at 2; Doc. 71-3 ¶¶ 18-21.  Neither supervisor Volpicella nor the HR Director Berenguer ever told Ossmann he was being disciplined for violating Meredith's sexual harassment policy.  Doc. 71-3 ¶¶ 20-21.  And the memo's subject line confirms that Ossmann was being disciplined only for using poor judgment:

---

[2] The other comments allegedly included telling the meteorologist he had a dream about the two of them having sex and telling an African American female employee that his first "three-way" was with a Black woman.  Doc. 62-4 ¶ 15.

  

# Memo

To:        Paul Ossmann
From:      Frank Volpicella
Cc:        Personnel File
Date:      May 15, 2017
Subject:   Written Warning: Exercising Poor Judgment

Doc. 62-12 at 2.

Ossmann countersigned the 05/15/17 warning, as required.  Doc

62-12 at 2; Doc. 71-3 ¶ 17(d).  This "poor judgment" warning turned out

to be the only written disciplinary warning Ossmann received while at

CBS46.  Doc. 62-8 at 9:1-:17, 11:23-:25; Doc. 71-3 ¶¶ 22-25.[3]

## II.C.  Ossmann Received No Written Warning after a November 17, 2019 Meeting with His Supervisor and the HR Director Because They Said He Did Not Violate Meredith's Sexual-Harassment Policy

On November 17, 2017, Ossmann met with his new supervisor,

Steve Doerr, and HR Director Berenguer about his on-line interactions

with a female news producer.[4]  Doc. 62-8 at 10:20-11:15; Doc. 71-3 ¶ 22.

---

[3] The district court ruled Doc. 71-3 ¶¶ 23 & 25 were not excludable under the sham-affidavit rule, as the R&R reported.  Doc. 95 at 20-21.

[4] The producer said Ossmann wrote he masturbated while thinking about her, wanted to have sex with her, and asked her for nude photos.

Ossmann said that, at her prompting, they had mutually exchanged personal Facebook messages outside of work. *Id*. (preceding cites). Meredith did not prohibit off-duty relationships between team members. Doc. 62-15 at 55:6-:11.

At the end of the November 17 meeting, Doerr told Ossmann that he had not violated any company policies. Doc. 71-3 ¶ 23. Doerr also told Ossmann that he would not be receiving any written warning. *Id*.

Ossmann received no written disciplinary warning from the November 17 meeting. Doc. 62-8 at 9:1-:17; Doc. 71-3 ¶ 25.[5] And, consistent with Doerr's decision, the so-called "Final Written Warning" from this meeting, dated 12/06/17, is *unsigned*—and the record contains no evidence that Ossmann refused to sign. Doc 62-13 at 2. Under the company's policy, the *unsigned* 12/06/17 write-up means Ossmann committed no violation of the sexual-harassment policy, he was not told of any policy violation, and he was never presented with the warning itself. Doc. 71-3 ¶ 17. Ossmann first saw a copy of the 12/06/17 warning after filing this action. Doc. 62-8 at 9:1-:17; Doc. 71-3 ¶ 25.

---

[5] The district court ruled that Doc. 71-3 ¶ 25 was not excludable under the sham-affidavit rule, as the R&R reported. Doc. 95 at 20-21.

## II.D.  On April 4, 2019, Plaintiff Denied Making Any of the Inappropriate Comments Reported by a Female Coworker

On Thursday, April 4, 2019, a female producer complained about comments Ossmann allegedly made to her.[6]  Doc. 62-4 ¶ 26.  Later that day, supervisor Doerr and HR Director Berenguer met with Ossmann about the allegation.  Doc. 71-3 ¶ 26.

At the meeting, Ossmann admitted that he had complimented the producer's work by telling her she was doing a great job and the way she handled herself in the newsroom was professional, after which she thanked him.  Doc. 62-8 at 49:23-50:3; Doc. 71-3 ¶ 27.[7]  Ossmann, however, denied saying:  "I wanted to let you know I look at you all the time."; "You're very attractive and that's attractive to me."; "You're so pretty, put together."; "You don't flaunt it. Don't put it out there."; "You're not all a selfie kind of person."; "I wasn't going to go all Joe Biden on you."  Doc. 71-3 ¶ 28.[8]  Also, during the meeting, Doerr did not

---

[6] Ossmann reportedly said that he looks at her all the time, she is so pretty and put together, she carries herself well, and she is very attractive and that is attractive to him.  Doc. 62-4 ¶ 26.

[7] The district court ruled that Doc. 71-3 ¶ 27 was not excludable under the sham-affidavit rule, as the R&R reported.  Doc. 95 at 20-21.

[8] The district court ruled that Doc. 71-3 ¶ 28 was not excludable under the sham-affidavit rule, as the R&R reported.  Doc. 95 at 20-21.

mention and Ossmann did not acknowledge the existence of any alleged "Final Written Warning," dated December 6, 2017 (or any other date), because there was never any final written warning.  Doc. 62-8 at 9:1-:17, 11:23-25, 13:14-90:2; Doc. 71-3 ¶¶ 23-25, 30-31.

Following the April 4 meeting, no memorandum was prepared stating that Ossmann's alleged comments violated Meredith's sexual harassment policy.  *See* Doc. 62-4 ¶¶ 30-32.  The creation of such documents was required, however, whenever an employee was found to have violated company policy.  Doc. 62-4 ¶ 22.  Another instance of supervisor Doerr and HR Director Berenguer not issuing written discipline occurred after meeting with African American news anchor Sharon Reed when she denied a news producer's accusation of making comments that violated Meredith's anti-harassment policy.  Doc. 62-14 at 130:3-:17, 131:8-:20.

Ossmann was sent home after the April 4 meeting.  Doc. 71-1 ¶ 47.  Four days later, on Monday, April 8, 2019, Doerr told Ossmann that he had been fired.  Doc. 71-1 ¶ 48.  His contract had 28 months remaining at a $125,000 annual salary.  Doc. 62-6 at 2.

## II.E. Meredith's Final Decisionmaker Considers Ossmann's Race in Approving His Termination

### II.E.1. CBS46's HR Director Sent an Internal EEO Analysis Requesting Approval to Fire Ossmann to the Final Decisionmaker at Meredith Corporate Headquarters

Before Ossmann could be fired, CBS46 General Manager Lyle Banks and News Director Steve Doerr in Atlanta were required to *request* and *receive* approval from Meredith's Des Moines, Iowa corporate headquarters. Doc. 62-14 at 165:20-166:2; Doc. 62-21 at 8 (Resp. No. 5); Doc. 95 at 7. The final decisionmaker for Ossmann's firing was Kandis Bock at the corporate headquarters, *not* Banks or Doerr. Doc. 95 at 6-7. Bock was Meredith's Local Media Group Vice President of Human Resources. Doc. 62-14 at 23:8-:17.

On Friday, April 5, 2019, at the request of Banks and Doerr, CBS46 HR Director Berenguer prepared "a recommendation … for approval to proceed with termination." Doc. 62-21 at 8 (Resp. No. 5); Doc. 62-14 at 13:17-:19. Berenguer had participated in the discussion between Banks and Doerr about Ossmann's alleged policy violations as a basis for seeking his dismissal and requesting corporate to approve it. Doc. 62-14 at 75:16-:23, 76:20-77:2, 164:9-:11. Later on April 5,

Berenguer emailed the written recommendation to Bock at Meredith corporate.  Doc. 95 at 7-8; Doc. 62-14 at 13:17-:19.

The recommendation was actually an internal "EEO Analysis" completed on an HR template that had been in use for at least the last 14 years.[9]  Doc. 62-14 at 59:25-60:16, 180:23-181:20.  Meredith required a completed EEO Analysis for Ossmann because all terminations, restructures, reorganizations, job eliminations (but not promotions) required corporate approval.  Doc. 62-14 at 75:8-:12; Doc. 71-4 at 1.

At that point, having delivered the EEO Analysis to Bock, there was nothing for Banks, Doerr, and Berenguer to do but "wait for questions, approval, or denial."  Doc. 62-14 at 165:20-166:2.  Bock never contacted CBS46 with any questions.  Doc. 62-14 at 175:1-:6.

### II.E.2.  *The Final Decisionmaker Received and Reviewed the EEO Analysis—Her Only Source of Information for Deciding Ossmann's Firing*

On Friday, April 5, 2019, Bock received the EEO Analysis by email from Berenguer—who, at some point, also sent a copy to in-house counsel Josh Pila.  Doc. 62-14 at 13:12-:19.  In her email to Bock, unlike

---

[9] The EEO Analysis [Doc. 71-4] is Addendum "A" to this brief.

her email to Mr. Pila, Berenguer did *not* include any other information

or material about Ossmann's proposed firing:

```
1        Q     Did you include anything regarding their
2    approvals on an e-mail to anyone?
3        A     Only on the e-mail in which I submitted this
4    to Mr. Pila.
```

Doc. 62-14 at 76:1-:4.

Bock was one of only four Meredith employees—but the only one

at corporate—identified as having "knowledge" of Plaintiff's firing:

Banks, Doerr, and Berenguer in Atlanta and Bock at corporate. Doc.

62-21 at 5 (Resp. No. 2). In-house counsel was not included on that list.

*Id.* And Bock was the only Meredith employee at corporate identified as

being involved in the decision to terminate Ossmann. *Id.* at 7 (Resp.

No. 6).[10]

---

[10] Meredith admitted that "the individuals involved in *making the decision* to terminate Plaintiff's employment were Lyle Banks, Laurel Berenguer, Jeff Holub, Steve Doerr, Karen Araiza, and *Kandis Bock*." Doc. 62-21 at 8 (Resp. No. 6) (emphasis added). Banks, Berenguer, Doerr, Holub, and Araiza were all Atlanta-based employees of CBS 46. Doc. 62-2 ¶ 97 (Banks); Doc. 62-14 at 171:3-:12 (Araiza); Doc. 62-15 at 16:4-17:2 (Holub); Doc. 74-1 ¶ 1 (Doerr). Bock was the *only* employee who worked at corporate. Doc. 62-14 at 13:7-:19.

The EEO Analysis was *received* and *reviewed* by Bock.  Doc. 95 at 8.  The EEO Analysis was Bock's sole source of information for deciding whether to approve or deny Ossmann's termination.  Doc. 62-14 at 13:12-:19, 76:1-:4, 175:1-:6; Doc. 62-21 at 5 (Resp. No. 2).  Pursuant to the EEO Analysis, Bock made the final decision to approve Ossmann's firing.  Doc. 95 at 6-7.  And Bock emailed her approval to Banks, Doerr, and Berenguer on Monday, April 8, 2019.  Doc. 62-14 at 41:10-:13, 174:11-:18.

### II.E.3.  The Internal EEO Analysis Required the Final Decisionmaker to Consider Comparative Race Data in Deciding Ossmann's Proposed Dismissal

The EEO Analysis did much more than just tack a policy violation to an employee's name and say "now, please approve his firing."  Doc. 71-4.  The EEO Analysis, as it had for 14 years, put Ossmann's race and the races of his weather-team colleagues front and center.[11]  *Id.*

**(a) <u>A Race-Conscious Decision is Made.</u>**  The EEO Analysis listed Ossmann's race in *two* places, using "W" for white or spelling it out.  Doc. 71-4 at 2, 4; Doc. 62-14 at 41:20-:25.  In *two* more places, it listed the races of Ossmann's five CBS46 weather-team counterparts—

---

[11] The EEO Analysis also included gender and age data.  Doc. 71-4.

as his "comparables"— using "B" for Black, "H" for Hispanic, and "W" for white or spelling them out.  Doc. 71-4 at 3, 4; Doc. 62-14 at 162:16-163:10.  And the EEO Analysis included a color-coded chart—called a "Risk Analysis—that juxtaposed Ossmann, identified only by his race, in the far-right column to all weather-team members, identified only by their races, in middle column, and to all other CBS46 news employees, by their races, in the left column.  Doc. 71-4 at 4.

Here is the race data Meredith required for Bock on Ossmann, his colleagues, and the CBS46 news staff:

| Employee | Title | Race | Sex | Grade | Adjusted Hire / Orig Hire | Service Years | DOB / Age |
|---|---|---|---|---|---|---|---|
| Paul D Ossmann | Anchor/Reporter Weather | W | M | E12 | 1/19/2012 | 7.21 | 6/18/1957 - 61 |

Doc. 71-4 at 2.

| Comparables (if applicable) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Alexandra Warsh | Reporter/Anchor WGCL | W | F | P18 (inacti | 9/29/2015 | 3.52 | 10/12/1968 - 50 |
| Ella Dorsey | Anchor/Reporter Weather | W | F | E12 | 1/27/2016 | 3.19 | 5/2/1991 - 27 |
| Jennifer I Engelhard | Anchor/Reporter Weather | H | F | E12 | 6/16/2008 | 10.81 | 11/4/1980 - 38 |
| Molly McCollum | Anchor/Reporter Weather | W | F | E12 | 5/7/2018 | 0.91 | 2/21/1992 - 27 |
| Rodney Harris | Reporter/Producer | B | M | N08 | 10/5/2009 | 9.51 | 4/20/1986 - 32 |

Doc. 71-4 at 3.

Attorney Work Product                    Draft

**News - WGCL-TV, Atlanta**

Risk Analysis:
Largest Risk Categories:

| | Total Employees in News Dept = 105 | | Impacted Employees = 6 (Compared to 1) | | Impacted Unplaced Employees = 1 (Compared to Impacted Group) | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **RACE** | | | | | | |
| White | 51 | 49% | 4 | 8% | 1 | 100% |
| Black | 41 | 39% | 1 | 2% | 0 | 0% |
| Hispanic | 6 | 6% | 1 | 17% | 0 | 0% |
| Asian* | 2 | 2% | 0 | 0% | 0 | 0% |
| Two + Races | 2 | #DIV/0! | 0 | 0% | 0 | #DIV/0! |
| Not Spec | 3 | 3% | 0 | 0% | 0 | 0% |
| | 105 | | 6 | | 1 | |
| | | | | | | |
| **GENDER** | | | | | | |
| Female | 44 | 42% | 4 | 9% | 0 | 0% |
| Male | 61 | 58% | 2 | 3% | 1 | 100% |
| | 105 | | 6 | | 1 | |
| | | | | | | |
| **AGE** | | | | | | |
| 40 + | 61 | 58% | 2 | 3% | 1 | 100% |
| under 40 | 44 | 42% | 4 | 9% | 0 | 0% |
| | 105 | | 6 | | 1 | |
| | | | | | | |
| **AGE** | | | | | | |
| 50 + | 32 | 30% | 2 | 6% | 1 | #DIV/0! |
| under 50 | 73 | 70% | 4 | 5% | 0 | #DIV/0! |
| | 105 | | 6 | | 0 | |

Doc. 71-4 at 4.

The EEO Analysis's inclusion of race, gender, and age data was not done benignly to collect employee demographics, however. Meredith designated this data to be "necessary" and "required" for deciding whether to approve termination, reorganization, and restructuring requests:

- 17 -

```
16        Q    Okay.  Thank you.
17             All right.  I'd like to go back to this
18   EEO -- what is the title again?
19        A    EEO analysis template.
20        Q    What is the purpose of that?
21        A    I would say it's to -- sorry.  I was
22   catching on the chair -- it's to gather the
23   information necessary to evaluate a request.  Then it
24   goes to corporate.
```

Doc. 62-14 at 72:17-:24 (underscore added); Doc. 71-4 at 1.

```
10        Q    Ms. Berenguer, sitting here today, can you
11   point -- you know what the question is.  Can you point
12   to any place where you're supposed to put in
13   comparables with age, race, sex in it?  Yes or no?
14   Can -- can you point to it?  Yes or no?  It's simple.
15        A    Yes.
16        Q    Where?
17        A    The temp -- the template itself, to
18   accurately complete it requires that.
```

Doc. 62-14 at 59:10-:18 (underscore added); Doc. 71-4 at 1.

The EEO Analysis required—as a condition for approving or

denying Ossmann's dismissal—that Bock, as the final decisionmaker,

use the race, gender, and age data on the color-coded "Risk Analysis" to

determine if Ossmann's proposed dismissal would adversely impact any "protected category of employee" versus "non-protected employees." Doc. 71-4 at 2 ¶ 10. The EEO Analysis asked:

| 10 | In reviewing the existing and proposed organizational charts, is a particular protected category of employee being impacted by the restructure at a higher percentage rate than similarly situated non-protected employees? Conduct a Risk Analysis as appropriate (Tab 4). Reference Risk Analysis | | | | | | | | | |

*Id.* (underscore added).

Ossmann's race—applying Meredith's formula to the Risk Analysis data—put him in the majority "non-protected" category as one of four whites on the six-person CBS46 weather team versus the two minority "protected" Black and Hispanic members [4 ÷ 6 = 67% white]. *Id.* at 4. So Ossmann's firing, if approved, would not negatively impact the weather team's racial balance—and did not after its approval—by decreasing the number of its minority-protected employees. *Id.* at 4. Had the employee up for dismissal been Black or Hispanic, their firing— according to Meredith's formula—would have hurt the weather team's racial balance by decreasing its minority-protected representation from 33% [2 ÷ 6] to 17% [1 ÷ 6]. *Id.* at 2, 4.

Not so for Ossmann. Under Meredith's formula, Ossmann's race was a negative factor that favored his termination. *Id.*

Conversely, the gender and age data favored Ossmann by putting him in minority-protected categories. On gender, he was one of only two men out of six total on the team. *Id.* On age, he was one of two over age 40 out of six total. *Id.*

**(b) <u>No Affirmative Action Plan or Justification</u>.** The EEO Analysis's required use of race (and gender and age) data was not pursuant to an affirmative action plan, as Meredith never identified one to justify Ossmann's dismissal. Doc. 14 at 1-4. Nor was Bock's approval of Ossmann's firing pursuant to the EEO Analysis allegedly done based on any affirmative action plan or to remedy any past discrimination. *Id.*

Also, Meredith offered no evidence below that, at the time of Ossmann's firing, Meredith was using race, gender, and age data to remedy past discrimination of any kind. And Meredith offered no evidence below that the company was facing any disparate-impact liability that made race-, gender-, and age-conscious action necessary to avoid or remedy that liability.

The EEO Analysis, according to HR Director Berenguer, required the comparative race data

to ensure that Defendant was "being equitable" when discharging employees, including with regard to race[.]

Doc. 79 at 24. As a result, the EEO Analysis made the approval or denial of Ossmann's requested dismissal subject to a race-based calculation that disfavored Ossmann. *Id.*; Doc. 71-4 at 2 ¶ 10 & 4.

### II.E.4. *The EEO Analysis Identified Only Two Performance Concerns for Ossmann that Both Occurred Prior to His August 2017 Promotion*

The EEO Analysis for Ossmann's dismissal was prepared by Berenguer based on her discussions with Banks and Doerr. Doc. 62-14 at 75:16-:23, 166:6-:11. She described the managers' rationale for requesting corporate's approval as:

| Prepared by and Date: Laurel Berenguer on April 5, 2019 | | | | | |
|---|---|---|---|---|---|
| Location: WGCL-TV, Atlanta | | | | | |
| Business Rationale:  Discharge for Policy Violation Sexual Harassment/Hostile Environment | | | | | |

Doc. 71-4 at 2.

Berenguer then identified three "performance concerns" involving female co-workers that happened on April 5, 2016, May 15, 2017, and—although still eight months away—December 6, 2019:

| 11 | Are there documented performance concerns with the impacted employee?  Provide copies of written documentations. List on spreadsheet. | | | | | |
|---|---|---|---|---|---|---|
| | Provide chronology with dates of conversations management had with employee and topics discussed. | | | | | |
| | April 5, 2016 - Employee was coached by EP Alex Spearman for participating in conversations of a sexual nature with co-workers. | | | | | |
| | May 15, 2017 - Employee received a written warning for exercising poor judgment in using the term "cockblocked" | | | | | |
| | December 6, 2019 - Employee received a final written warning for exercising poor judgment in sending highly inappropriate FaceBook messages to a female producer | | | | | |
| | May, 2018 - Employee received a notice of a concerning level of sick leave usage. | | | | | |

*Id.* ¶ 11.

Missing from Berenguer's list of concerns, obviously, was Ossmann's alleged April 4, 2019 violation. *Id.* Even though—as Meredith tells it—Doerr and Berenguer supposedly found that Ossmann's April 4 comments violated the company's sexual harassment policy; prompted the two of them to suspend Ossmann; triggered Banks, Doerr, and Berenguer to ask corporate to fire Ossmann; required the EEO Analysis's creation and transmission to Bock; and resulted in Ossmann's firing. Doc. 62-2 ¶ 47; Doc. 62-14 at 75:16-:23; Doc. 71-4.

So—from Bock's point of view—here was CBS46 management asking her to approve Ossmann's discharge based on events occurring at least four months *before* Meredith promoted him almost two years earlier, plus a third event predicted to occur eight months later. Doc. 71-4 at 2 ¶¶ 4, 11. Waiting to fire someone for almost two years for reasons that occurred *prior to* a promotion is suspicious on its face. Relying on a hypothetical future event is nonsensical. Still, Bock had no questions about any of this information. Doc. 62-14 at 175:1-:6.

In the district court, Meredith never cited the April 5, 2016 incident as a reason that CBS46 managers Banks and Doerr requested Ossmann's discharge. Doc. 62-1; Doc. 62-2. Meredith relied exclusively

on (i) the 05/15/17 *poor-judgment* warning, (ii) the 12/06/17 *unsigned*

warning, and (iii) the 04/04/19 *unlisted* incident.  Doc. 62-1 at 9-11; 62-2

¶¶ 26, 36, 39, 41, 47; Doc. 74 at 2, 3; Doc. 92 at 2-3.  Yet incidents (ii)

and (iii) were *not* listed anywhere on the EEO analysis that Bock used

to approve Ossmann's dismissal.  Doc. 71-4 ¶ 11.

### II.E.5.  *No Testimony or Document Specified Bock's Own Legitimate, Non-Discriminatory Reason for Approving Ossmann's Firing*

The EEO Analysis sent to Bock, as the final decisionmaker, was

not written by her.  Doc. 71-4 at 2.  The EEO Analysis contains no

statement or notation added by or attributable to Bock specifying why

she approved Ossmann's firing.  Doc. 71-4 at 2-4.

The record contains no testimony from anyone that specifies

Bock's *own* reason for approving Ossmann's dismissal was his alleged

policy violations, or the CBS46 manager's business rationale, or the

performance concerns in the EEO Analysis.  And the record contains no

documents prepared by or attributable to Bock, or anyone else,

specifying that Bock's *own* reason for approving Ossmann's firing was

in any way performance-based or policy-violation-related.

## STANDARD OF REVIEW

Grants of summary judgment are reviewed *de novo*.  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1327 n. 23 (11th Cir. 2011).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  All the evidence, all factual conflicts created by the parties' evidence, and all reasonable inferences from the evidence must be viewed in the light most favorable to the non-movant.  *Smith*, 644 F.3d at 1327 n. 23.

## SUMMARY OF THE ARGUMENT

1.    The district court erroneously granted summary judgment on Ossmann's § 1981 termination claim by ruling that the internal EEO Analysis on which the final decisionmaker relied to approve Ossmann's firing was *not* direct evidence.  The EEO Analysis expressly made Ossmann's race a factor for deciding his firing.  It required the final decisionmaker to compare his race to the races of his five weather-team colleagues to determine if Ossmann's proposed firing would negatively impact the weather team's racial balance.  Based on Meredith's formula, Ossmann's race put him in the majority-unprotected, while his gender and age put him in minority-protected categories.  As a result, the EEO Analysis made Ossmann's race a negative factor that favored his firing, which—combined with the final decisionmaker's reliance on it—made the EEO Analysis direct evidence.

2.    The district court erroneously granted summary judgment on Ossmann's § 1981 termination claim because Meredith failed to satisfy its burden of production under the *McDonnell Douglas* framework.  First, Meredith did not offer any admissible evidence that clearly and specifically identified the final decisionmaker's *own* reason

for approving Ossmann's firing.  The proffered reason must be the
actual decisionmaker's own because, to prove purposeful discrimination
under § 1981, a plaintiff must show it was the actual decisionmaker
who acted with animus and whose explanation is pretext.  Second,
inferences drawn from circumstantial evidence cannot be used to satisfy
an employer's *McDonnell Douglas* burden.  But that is what the district
court did to find Meredith carried its burden.  As a result, Meredith
failed to carry its burden of production.

3.    The district court erroneously granted summary judgment
on Ossmann's § 1981 termination claim by ruling the business rationale
and performance concerns listed in the EEO Analysis were Bock's
legitimate *McDonnell Douglas* reason for approving Ossmann's firing—
an argument Meredith itself never made—because it was a pretext.

The EEO Analysis, if not direct evidence, was still powerful
affirmative proof that Ossmann's race was an impermissible factor in
Bock's firing decision, which proves pretext.  Bock received and relied
on the EEO Analysis as her sole source of information.  She approved
Ossmann's firing pursuant to the EEO Analysis.  Ossmann's race and
the races of his colleagues were identified.  The EEO Analysis required

that Ossmann's race be compared to the races of his colleagues. While the same is true of his gender and age data, under Meredith's formula in the EEO Analysis, only Ossmann's race was a negative factor favoring his dismissal. Also, pursuant to the EEO Analysis, Bock was required to consider Ossmann's race irrespective of any legitimate reason she may have also harbored. So the EEO Analysis, on its own, created the unavoidable inference of race discrimination that shows Bock's reason to be pretextual.

Next, the only performance concerns on the EEO Analysis involving female colleagues were two and three years old. And those two violations occurred prior to Ossmann being promoted to chief meteorologist. Given that the old violations were insufficient to prevent Ossmann's promotion, their use to fire Ossmann two years later is obviously suspicious and clear proof of pretext.

Further, the district court drew the inference that Bock, by reviewing the EEO Analysis, adopted as her legitimate reason the business rationale and the two old policy violations from 2016 and 2017 in the EEO Analysis. The problem with the district court's inference, however, is that—in its filings below—Meredith specified that its *only*

non-discriminatory reason for Ossmann's firing was three very specific harassment-policy violations dated May 15, 2017, December 6, 2017, and April 4, 2019. Only one of those violations appears on the EEO Analysis. That makes the EEO Analysis itself proof of pretext because it shows Meredith's explanation in the district court was actually a materially different explanation than the one the district court inferred for Bock.

4. The district court wrongly granted summary judgment on Ossmann's § 1981 termination claim under the "cat's paw" theory with Bock, the ultimate decisionmaker at corporate, accepting the Atlanta managers' recommendation to fire Ossmann without investigation. The district court's first error was applying Ossmann's "cat's paw" objection to the R&R to his abondoned disparate-discipline claim instead of his termination claim—contrary to Ossmann's objection. Applying the "cat's paw" theory to Ossmann's termination claim shows that the district court erroneously found (i) the Atlanta managers' explanation was not pretext because they had a mistaken good-faith belief that Ossmann committed the three specific violations Meredith listed in its filings, and (ii) the managers' rationale was not pretext because

Ossmann's evidence did not raise a fact dispute that he committed these same three violations under the "work rule" test for proving pretext.

Under the cat's paw theory, all recommending managers must be free from racial animus. Here, the evidence shows that at least one of the requesting Atlanta managers, Steve Doerr, knew Ossmann did not commit the three harassment policy violations that Meredith specified.

*First*, Doerr himself told Ossmann he did not commit the alleged 12/06/17 violation. Doerr's admission was corroborated by the unsigned 12/06/17 warning. The district court, however, violated Rule 56 by wrongly crediting Doerr's version of their conversation about the 12/06/17 violation over Ossmann's version. Properly crediting Ossmann's testimony means Doerr—as one of the recommending managers—could not, and did not, have had a mistaken good-faith belief that Ossmann committed the three violations cited by Meredith. Ossmann's testimony also created a material fact dispute under the "work rule" for proving the managers' rationale for their request to fire Ossmann was pretext.

*Second*, Doerr knew Ossmann did not violate the harassment policy on April 4, 2019. Doerr and HR Director Berenguer interviewed Ossmann on that date. He denied any wrongdoing. But Berenguer— after consulting with Doerr and Banks about asking corporate to approve Ossmann's firing—did not identify the April 4, 2019 incident as a harassment-policy violation on the EEO Analysis. Nor did Doerr prepare a memorandum memorializing that he found Ossmann violated the harassment policy on April 4, 2019, which Meredith requires for policy violations.

The absence of 04/04/19 violation on the EEO Analysis—given Doerr's coordination with Berenguer and Banks on the approval request—combined with Doerr's non-preparation of a 04/04/19 write-up permit the reasonable inference that Doerr found Ossmann had *not* violated Meredith's harassment policy in April 2019. That inference means Doerr did not mistakenly believe Ossmann committed the three policy violations Meredith listed. And this evidence creates a material fact dispute under the "work rule" for proving the managers' pretext.

*Third*, Ossmann's written warning dated 04/15/17 for "Exercising Poor Judgment" did not mention any violation of Meredith's

harassment policy.  And, according to Meredith's write-up policy, all written discipline was required to specify the policy violation involved—something Doerr would know as a high-level manager.  This evidence allows the reasonable inferences that (i) the 04/15/17 memo did not discipline Ossmann for violating Meredith's harassment policy, and (ii) Doerr knew the 04/15/17 memo did not find an harassment policy violation because, as a senior manager responsible for disciplining on-air staff, Doerr would have known Meredith's write-up policy.

So, again, Doerr could not have had a mistaken good-faith belief that Ossmann committed the three policy violations Meredith specified below.  Also, the 04/15/17 memo combined with the testimony about Meredith's write-up policy create a material fact dispute under the "work rule" for proving pretext, because a reasonable jury could find that from the memo itself that Ossmann committed no policy violation.

*Finally*, only three weeks after securing Ossmann's dismissal, Banks and Doerr promoted the Hispanic female to replace Ossmann. The close temporal proximity between Ossmann's firing and the promotion of his successor further demonstrates that Atlanta manger's business rationale was a pretext for race discrimination.

5.    The district court erroneously granted summary judgment on Ossmann's § 1981 termination claim because Ossmann's circumstantial evidence established a convincing mosaic of race discrimination.  Bock's reliance on the EEO Analysis, which made Ossmann's race a negative factor, was itself sufficient evidence of Meredith's impermissible use of race to preclude summary judgment. Next, the only performance issues listed on the EEO Analysis were two- and three-year-old incidents that had not prevented Ossmann's promotion, so they cannot legitimately justify his firing two years later. Meredith gave conflicting accounts of the EEO Analysis's origin to keep from producing it.  Meredith claimed Ossmann was fired for committing three specific harassment-policy violations—but (i) the 04/15/17 discipline memo for Ossmann did not say he violated Meredith's harassment policy, (ii) Ossmann was told by management he did not commit the alleged 12/06/17 violation, (iii) the 12/06/17 write-up is unsigned, (iv) no write-up was issued for Ossmann's alleged 04/04/19 violation, and (v) the EEO Analysis did not list any alleged 04/04/19 violation, even though Meredith claims it triggered his dismissal.  The mosaic evidence shows that Meredith discriminated based on race.

6.    The district court erroneously granted summary judgment on Ossmann's Georgia breach-of-contract claim and state-law damage theories.  The evidence of Meredith's § 1981 violation proves an actionable breach of contract under Georgia law.  Also, the district court clearly erred in deeming Ossmann's damage theories waived by not referring to them in an R&R objection.  The R&R did not recommend their dismissal.  So Ossmann had nothing to which he had to object.

## ARGUMENT AND CITATION TO AUTHORITIES

Ossmann contends he was terminated in violation of 42 U.S.C. § 1981, which affords a federal remedy against intentional race discrimination in the making and enforcement of employment contracts. *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022). The test for intentional discrimination in § 1981 cases is the same as in Title VII discriminatory treatment cases. *Id.* The plaintiff may prove discriminatory intent using direct or circumstantial evidence. *Id.* In circumstantial evidence cases, the plaintiff may establish race discrimination using the four-part *McDonnell Douglas* burden-shifting framework or the convincing-mosaic standard. *Id.*

To prevail under § 1981, a plaintiff must prove "the discriminatory conduct had a determinative influence on the injury." *Ziyadat v. Diamondrock Hosp. Co.*, 3 F.4th 1291, 1297-98 (11th Cir. 2021) (quotation omitted). This means that, although legitimate grounds for the challenged decision existed, the decision would not have been made "but for" the plaintiff's race. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 282 n. 10 (1976); *see Ziyadat*, 3 F.4th at 1297.

> [But-for] causation is established whenever a particular outcome would not have happened "but for" the purported cause. In other

words, a but-for test directs us to change one thing at a time and see if the outcome changes.  If it does, we have found a but-for cause. . . .

*Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1739 (2020) (Title VII gender case).

## I.    THE DISTRICT COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT ON OSSMANN'S § 1981 TERMINATION CLAIM BECAUSE THE EEO ANALYSIS IS DIRECT EVIDENCE OF RACE DISCRIMINATION

The district court incorrectly rejected Ossmann's argument that the EEO Analysis was direct evidence of race discrimination.  Doc. 95 at 9-10.  The EEO Analysis made Ossmann's race a negative factor in deciding the termination decision, final decisionmaker Bock was required to consider this factor, and she relied on the EEO Analysis in making the termination decision.

In discrimination cases, direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption.  *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir.1990).  Direct evidence of unlawful discrimination, which may include documents, includes "only the most blatant remarks, whose intent could be nothing other than to discriminate" on an improper

basis.  *Id.*  When a plaintiff presents direct evidence of race

discrimination, summary judgment must be denied.  *Id.*

In *Ramirez v. Sloss,* 615 F.2d 163 (5th Cir. 1980),[12] the plaintiff

alleged the defendant did not hire him because of his alienage.  The

defendant had a written policy of hiring only United States citizens.  *Id.*

at 166.  And the decisionmaker told the plaintiff about the policy when

he applied for a job.  *Id.*  This Court held that the policy combined with

the comment constituted direct evidence of discrimination.  *Id.* at 169.

In *Holland v. Gee*, 677 F.3d 1047 (11th Cir. 2012), a pregnancy

discrimination case, the defendant argued that the district court

incorrectly ruled that some of the decisionmaker's testimony was direct

evidence of discrimination.  She had testified: "Concerned [sic] with her

pregnancy was *part of* my reasoning.  It was not the official reasoning,

but it was certainly *part of* what I felt was—was right."  *Id.* at 1058

(emphasis added).  The decisionmaker also testified: "'And *part of that*

*consideration* in your mind was her pregnancy?' Ms. Sterns responded,

'Yes.'"  *Id.* (emphasis added).  *Holland* held that these remarks were

---

[12] Decisions of the former Fifth Circuit rendered before October 1, 1981, are binding in the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc)

direct evidence of discrimination because, if believed, would prove that the plaintiff's pregnancy "was a motivating factor for the decision…." *Id.* at 1059.

Here, as in *Ramirez*, 615 F.2d at 169, and *Holland*, 677 F.3d at 1058-59, Ossmann's race was a negative factor that was part of Bock's decisionmaking process. The EEO Analysis required Bock, in making her decision, to compare Ossmann's race to the races of his five weather-team colleagues to determine if his dismissal, if approved, would adversely impact the weather team's racial balance. Doc. 71-4 at 2 ¶ 10, 4.

But Ossmann's race put him the majority-unprotected category. *Id.* So his proposed dismissal would *not* negatively affect the team's racial mix by decreasing the relative percentage of employees in the minority-protected category. *Id.* That made Ossmann's race a negative factor favoring his dismissal. Conversely, under Meredith's methodology, Ossmann's gender and age put him in minority-protected categories—factors that did not favor his dismissal. *Id.*

Moreover, Bock used the EEO Analysis to make her decision. Corporate approval was required for Ossmann's dismissal. Doc. 95 at 7.

Bock was the only corporate official involved in the firing decision.  Doc. 62-21 at 8 (Resp. No. 6).  Bock received the EEO Analysis.  *Id*. at 7.  She reviewed it.  *Id*.  The EEO Analysis was her sole source of information for deciding Ossmann's firing.  Doc. 62-14 at 175:1-:6.

At bottom, the EEO Analysis made Ossmann's race a negative factor that was "part of" Bock's required decisionmaking process.  *Holland*, 677 F.3d at 1059.  Bock approved Ossmann's firing in reliance on the EEO Analysis.  *Compare Earley*, 907 F.2d 1077, 1082 (holding RIF-related documents were not direct evidence because "[n]one of the documents relate to specific actions taken towards plaintiffs because of plaintiffs' age.").  These facts, when taken together, make the EEO Analysis direct evidence of race discrimination.  *Ramirez*, 615 F.2d at 169.

The district court's summary judgment on Ossmann's § 1981 termination claim should be vacated.  And the case remanded for trial.

## II.    THE DISTRICT COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT ON OSSMANN'S § 1981 TERMINATION CLAIM BECAUSE MEREDITH DID NOT SATISFY ITS *MCDONNELL DOUGLAS* BURDEN OF PRODUCTION WITH ADMISSIBLE EVIDENCE OF BOCK'S SPECIFIC REASON FOR DISCHARGING OSSMANN

The district court incorrectly ruled on Ossmann's § 1981 termination claim that Meredith met its *McDonnell Douglas* burden to produce a legitimate, non-discriminatory reason for Bock's decision. Doc. 95 at 11-13. Summary judgment should have been denied.

The district court found that Ossmann made a prima facie *McDonnell Douglas* showing of discrimination on his § 1981 termination claim. The burden of production then shifted to Meredith. But Meredith did not offer any evidence specifying Bock's *own* legitimate reason for approving Ossmann's firing—because Meredith insisted Bock was not the actual decisionmaker.

Despite Meredith's lapse, the district court used circumstantial evidence to find that Meredith's *McDonnell Douglas* burden was met. The district court said that because Bock received and reviewed the EEO Analysis that listed a business rationale and supporting incidents, a reasonable inference may be drawn—*in Meredith's favor*—that Bock

adopted the rationale and incidents as her non-discriminatory reason. *Id*. at 13. The district court analysis was incorrect, however.

## A. A Defendant's *McDonnell Douglas* Burden of Production

The *McDonnell Douglas* burden-shifting framework allows a plaintiff to prove unlawful discrimination with circumstantial evidence. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). First, the plaintiff must establish a prima facie case of intentional discrimination. *Id*. A valid prima facie case creates the presumption that intentional discrimination has occurred. *Id*.

To rebut the presumption, the defendant must offer admissible evidence that shows the adverse employment action was taken for a legitimate, nondiscriminatory reason. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). If the defendant fails to meet its burden, the plaintiff's presumption of discrimination goes unrebutted, requiring the denial of summary judgment. *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1061 (11th Cir. 1994).

While a defendant's *McDonnell Douglas* "burden is not 'onerous,' neither is it a mere formality." *Walker v. Mortham*, 158 F.3d 1177, 1183-84 (11th Cir. 1998) (quoting *Burdine*, 450 U.S. at 253). The

defendant's evidence of its legitimate, non-discriminatory reason *must*
be sufficient to allow the trier of fact to conclude the challenged decision
had not been motivated by a discriminatory animus. *Burdine*, 450 U.S.
at 257. Next, "the defendant's explanation of its legitimate reasons
must be clear and reasonably specific." *Id*. at 258. The defendant's
evidence of its legitimate reason must "frame the factual issue [of
discriminatory intent] with sufficient clarity so that the plaintiff will
have a full and fair opportunity to demonstrate pretext." *Id*. at 255-56.
And, although the defendant's burden is only one of production, and not
persuasion, the proffered reason itself must be sufficient to justify a
judgment for the defendant. *Id*. at 255.

### A.1. *The Reason Must Be the Ultimate Decisionmaker's Own*

Under *Burdine*, 450 U.S. at 257, the defendant's proffered
justification must be the ultimate decisionmaker's own reason, not
someone else's. That is because, to prove unlawful discrimination, a
plaintiff must prove it was the actual decisionmaker who acted with
discriminatory intent:

> Discrimination is about actual knowledge, and real intent, not
> constructive knowledge and assumed intent. When evaluating a
> charge of employment discrimination, then, *we must focus on* the
> actual knowledge and actions *of the decision-maker*.

*Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002) (emphasis added) (quotation omitted).

For this reason, *Burdine* requires that the defendant's evidence of its legitimate reason must be sufficient to allow the trier of fact to conclude the challenged decision had *not* been motivated by a discriminatory animus. 450 U.S. at 257. The only way a defendant can satisfy this standard is if its evidence specifically describes the actual decisionmaker's *own* non-discriminatory reason. *See id*. at 258.

This Court made that very point in *Walker v. Mortham*, 158 F.3d at 1181 n. 8. There, the Court explained that if a defendant's non-discriminatory reason in a promotion case was the relative qualifications of the applicants, the defendant "must include the fact that *the decision-maker* knew that the promoted individual's qualifications were superior at the time the decision was made." *Id*. (quotation omitted) (emphasis added).

*Walker v. Mortham* then held an employer's burden of production requires proof of the actual decisionmaker's *own* legitimate reason:

> The defendant cannot testify in abstract terms as to what might have motivated *the decision-maker*; it must present specific

evidence regarding *the decision-maker's* actual motivations with regard to each challenged employment decision.

*Id.* (emphasis added).

The phrase "the decision-maker's actual motivations" does not, however, mean—as *Burdine*, 450 U.S. at 257, makes clear—that the defendant must *persuade* the factfinder that the decisionmaker was actually motivated by the proffered reason. Rather, a defendant must offer evidence of its decisionmaker's actual motivation because, as *Burdine* requires, the defendant's evidence must be sufficient for a factfinder to conclude the challenged decision was not the product of discriminatory animus but some other reason. *Id.* And only evidence that shows the actual decisionmaker's *own* intent will be sufficient, because only the actual decisionmaker's intent matters in a race discrimination case. *Walker v. Prudential Prop.*, 286 F.3d at 1274.

### A.2. <u>Circumstantial Evidence Not Allowed</u>.

Equally important, an employer may not rely on circumstantial evidence to carry its *McDonnell Douglas* burden of production. Inferences will not satisfy *Burdine*'s "clear and reasonably specific" requirement because inferences cannot ensure the plaintiff will have a full and fair opportunity to prove pretext:

It is difficult to understand how a claimed articulation by circumstantial evidence could meet the carefully stated requirements of *Burdine* that the reasons given are to be given "with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of defendant's evidence should be evaluated by the extent to which it fulfills these functions." We construe the Court's language to require evidence of a sort that will give a fair opportunity to cross-examine the defendant's witnesses as to the actual reason which is testified to.

*Increase Minority Participation by Affirmative Change Today of Nw. Fla., Inc. (IMPACT) v. Firestone*, 893 F.2d 1189, 1195 n. 5 (11th Cir. 1990) (quoting *Burdine*, 450 U.S. at 255-56). Conversely, a plaintiff may rely entirely on circumstantial evidence to prove every facts needed to establish unlawful discrimination. *Burdine*, 450 U.S. at 252-53; *Smith*, 644 F.3d at 1346.

## B. Meredith Did Not Satisfy Its *McDonnell Douglas* Burden

The district court found that Ossmann made a prima facie showing of race discrimination on his § 1981 termination claim. Doc. 95 at 11 (citing Doc. 79 at 56). Ossmann showed that (1) he held a position for which he was qualified, (2) he was fired from that position, and (3) he was replaced by a person of another race. *Wright v. Southland Corp.*, 187 F.3d 1287, 1290 & n. 3 (11th Cir. 1999). Meredith then assumed the burden of production. *Burdine*, 450 U.S. at 253.

Meredith's ultimate decisionmaker was Bock in corporate. The question then is what admissible evidence did Meredith offer of Bock's "actual motivations" for approving Plaintiff's firing. *Walker v. Mortham*, 158 F.3d at 1181 n. 8. The answer is none. Meredith made the strategic choice not to offer any testimony or documents describing Bock's own clear and specific non-discriminatory reason for firing Ossmann, because—despite the sworn admissions in its interrogatory responses—Meredith argued Bock was not the final decisionmaker, the Atlanta managers were. Doc. 95 at 6-7. Meredith's choice is fatal here.

First, the district court inference that the business rationale listed on the EEO Analysis became Bock's when she reviewed it was never Meredith's explanation. Doc. 62-21 at 7-8 (Resp. No. 5). The record thus contains no clear and specific evidence—as required by *Burdine*, 450 U.S. at 255-56—showing Bock's actual motivation was the EEO Analysis's business rationale. *Id.* No record evidence specifying Bock's actual motivation means Meredith failed to satisfy its burden of production. *Id.*

Second, the district court relied on circumstantial evidence of Bock's receipt and review of the EEO Analysis to draw an inference that

her legitimate reason was the rationale on the EEO Analysis.  Doc. 95 at 12-13.  That was clear error.  Circumstantial evidence cannot be used to satisfy an employer's burden of production.  *IMPACT*, 893 F.2d at 1195 n. 5.

Third, the district court's inference from the circumstantial evidence that Meredith met its burden of production violated Rule 56.  Although the EEO Analysis listed a business rationale, nothing required Bock to accept it.  But the EEO Analysis did require Bock to base her decision, approval or denial, on the comparative race, gender, and age data for Ossmann and his colleagues.  The district court's inference improperly favoring Meredith over Ossmann means Meredith failed to meet its burden of production.  *Smith*, 644 F.3d at 1327 n. 23.

Therefore, Meredith did not sufficient admissible evidence to satisfy its burden of production under *Burdine*, 450 U.S. at 256.  The judgment should be vacated.  *Turnes*, 36 F.3d at 1061.

## III.  THE DISTRICT COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT ON OSSMANN'S § 1981 TERMINATION CLAIM BECAUSE BOCK'S OWN PURPORTED REASON WAS A PRETEXT

The district court, even if the inference that Bock adopted the EEO Analysis's business rationale were sufficient, clearly erred in

granting summary judgment on Ossmann's § 1981 termination claim.

The business rationale that the district court assigned to Bock,

although different from Meredith's explanation below, was still a

pretext for race discrimination.  Doc. 95 at 13.

### A.  A Plaintiff's *McDonnell Douglas* Burden to Rebut the Defendant's Legitimate, Non-Discriminatory Reason

If a defendant carries its burden of production, the burden shifts

back to the plaintiff.  *Burdine*, 450 U.S. at 253.  The plaintiff must then

establish by a preponderance of the evidence that the defendant's

reason was not the true reason for the challenged employment decision

but instead a pretext for discrimination.  *Id*. at 256.

A plaintiff can make this showing two ways.  By affirmative

evidence that race played an impermissible role in the decision.  *Id*.  Or

by showing the proffered legitimate reasons are unworthy of credence,

*id*., with proof of "such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions … that a reasonable factfinder could

find them [the reasons] unworthy of credence."  *Combs v. Plantation*

*Patterns,* 106 F.3d 1519, 1538 (11th Cir. 1997).

Either way, the plaintiff's pretext evidence must focus on the

actual decisionmaker's own actions and intent.  *Damon v. Fleming*

*Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1362-66 (11th Cir. 1999); *see Walker v. Prudential Prop.*, 286 F.3d at 1274.

## B. Bock's Explanation was Pretext Because Race Played an Impermissible Role in Her Decision

*First*, Bock's use of the EEO Analysis, if not direct evidence, is "a significant piece of circumstantial evidence" that shows race played an impermissible role in her decision. *Damon,* 196 F.3d at 1362. That alone proves proves pretext. *See Burdine*, 450 U.S. at 256.

In *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011), a grant of summary judgment was reversed because the final decisionmaker received and reviewed a document, called a decision matrix, central to the challenged decision that identified the plaintiff's race as a pertinent factor and the employer failed to explain why including race was legitimate. *Id.* at 1346. *Smith* held that the decisionmaker's review of the matrix created an inference of race discrimination so strong that a jury must decide the case. *Id.*

> Therefore, although the district court entirely ignored this fact, Lockheed's injection of race into its decision-making process yields an *unavoidable inference* that the employee's race impacted the discipline determination, and it is a jury's province to decide whether race actually bore on the decision to terminate Mitten.

*Id.* (emphasis added) (footnotes omitted).

Here, the EEO Analysis is a more powerful piece of circumstantial proof than the decision matrix in *Smith*. Bock received and reviewed the EEO Analysis. Doc. 95 at 6-8. The EEO Analysis was central to her decision. *Id*. She approved Ossmann's firing pursuant to the EEO Analysis. *Id*. Ossmann's demographic data, and his colleagues', was not only identified on it. Doc. 71-4 at 2, 4. The EEO Analysis required Bock to consider the data, including his race. *Id*. Under Meredith's formula, Ossmann's race—unlike his gender and age—was a negative factor favoring his dismissal. *Id*.

Meredith offered no evidence that explains how Ossmann's race could be a legitimate consideration. No affirmative action plan. Doc. 14. No evidence—let alone "a strong basis in evidence"—that Meredith faced disparate-impact liability for race discrimination. *Ricci v. DeStefano*, 557 U.S. 557, 585 (2009). The only explanation for Meredith's use of race, gender, and age was "to ensure that Defendant was 'being equitable' when discharging employees, including with regard to race." Doc. 79 at 24. That is not a legitimate justification. *Ricci*, 557 U.S. at 585.

Bock's use of the EEO Analysis to decide Ossmann's firing was affirmative evidence proving race played an impermissible role in her decision sufficient to prove pretext. *Burdine*, 450 U.S. at 256. He use of the EEO Analysis also "created an *unavoidable inference* that the employee's race impacted the … determination, and it is a jury's province to decide whether race actually bore on the decision." *Smith*, 644 F.3d at 1346 (emphasis added).

The district court, however, refused to draw a favorable inference from the evidence for Ossmann under *Smith*. Doc. 95 at 13. The district court said *Smith* was a convincing-mosaic case, not a *McDonnell Douglas* case, so the case was inapposite. *Id*.

The point of *Smith*, however, is that a reasonable inference of race discrimination arises—as a matter of evidence, not legal methodologies for proving discrimination—when the decisionmaker uses a document that makes the employee's race (or other protected characteristic) pertinent to the challenged decision. *Smith*, 644 F.3d at 1346. Bock's use of the EEO Analysis falls within *Smith*, *id*., and means Ossmann presented sufficient evidence of pretext to deny summary judgment.

In addition, at the time of Ossmann's firing, Meredith's practice of using race data in discharge decisions had existed for at least 14 years. Doc. 62-14 at 180:23-181:20.  When the evidence is sufficient to let "a jury decide[] that an employer makes use of race in its everyday decisions … it is permissible to infer that race also explains other disparate treatment." *Williamson v. Handy Button Mach. Co.*, 817 F.2d 1290, 1294-95 (7th Cir. 1987).  Given Meredith's practice the past 14 years regarding race, a jury could reasonably infer that Bock's decision approving Ossmann's discharge was impermissibly based on his race. *Id.*

*Second*, the record contains additional, substantial evidence demonstrating that Bock's purported business rationale was pretext. *See Combs*, 106 F.3d at 1538.

The only performance issues listed on the EEO Analysis that involved female colleagues were *two*-year-old and *three*-year-old events by April 2019.  Doc. 71-4 ¶ 11.  Worse, those two violations happened at least four months *before* Ossmann's promotion to chief meteorologist. *Id.* ¶¶ 4, 11.  Suddenly, violations that did *not* justify denying Ossmann a promotion were now supposed to justify his dismissal two years later.

As nothing about those violations changed, Bock's purported reliance on them is proof of pretext.

Also, the EEO Analysis also included a third incident slated to happen six months in the future. No employer can rely on a *prediction* of bad behavior half-a-year away as a legitimate basis for imposing discipline.

Next, Bock's non-discriminatory reason—according to the district court—was the business rationale in the EEO Analysis of "sexual harassment policy violation/sexual harassment" and the two incidents listed under performance concerns. Doc. 95 at 13. The problem with the explanation the district court drew is that Meredith said its *only* non-discriminatory reason for Ossmann's firing was his *three* sexual-harassment-policy violations on May 15, 2017, December 6, 2017, and April 4, 2019. *See* Doc. 62-1 at 16; Doc. 62-21 at 7-8. Only *one* of those violations, however, appears on the EEO Analysis—making Bock's purported non-discriminatory reason, according to the district court, far different from the explanation Meredith itself gave under oath.

Finally, Meredith gave conflicting accounts about the EEO Analysis's origin. In its interrogatory responses, Meredith swore

Atlanta GM Banks asked Berenguer to prepare it. Doc. 62-21 at 8 (Resp. No. 5). When pressed to produce the EEO Analysis, however, Meredith claimed it was attorney work product because in-house counsel directed Berenguer to prepare it. Doc. 57 at 14. A "jury could reasonably rely on [Meredith]'s conflicting explanations as evidence of [it]s 'consciousness of guilt.'" *United States v. Wilson*, 788 F.3d 1298, 1311 (11th Cir. 2015). That would also be proof of pretext.

The totality of Ossmann's pretext evidence demonstrated both that race played an impermissible role in his termination and that Bock's purported legitimate explanation was a pretext for race discrimination. Summary judgment should have been denied on Ossmann's § 1981 termination claim.

## IV. THE DISTRICT COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT ON OSSMANN'S § 1981 TERMINATION CLAIM UNDER A CAT'S PAW THEORY BECAUSE THE ATLANTA MANAGERS' REASON FOR REQUESTING OSSMANN'S FIRING WAS PRETEXT

The district court clearly erred in granting summary judgment on Ossmann's § 1981 termination claim under the "cat's paw" theory where Bock, the ultimate decisionmaker, accepted the Atlanta managers' recommendation without investigating. Doc. 95 at 31-34, 37. The

Atlanta managers' reason for requesting Ossmann's firing—*three* specific violations of Meredith's harassment policy—was a pretext for race discrimination.  Contrary to the district court's findings, the managers did not have a mistaken good-faith belief that Ossmann committed the three alleged violations, and—under this Circuit's "work rule" for proving pretext—Ossmann created material fact issues that he committed the three alleged violations.

## A.  The District Court Applied the Cat's Paw Theory to the Wrong Claim

The district court incorrectly applied the cat's paw analysis to Ossmann's "disparate discipline" claim instead of his termination claim.[13]  *Id.* at 37.  In his cat's-paw objection to the R&R, Ossmann (i) identified his § 1981 termination claim as the focus, (ii) stated that the R&R found he made his prima showing on the termination claim—which was *not* true of his disparate-discipline claim,[14] (iii) specifically

---

[13] In the R&R, the magistrate judge called Ossmann's disparate-treatment claim the "Disparate Discipline" claim.  Doc. 79 at 45.  His termination claim was called the "Disciplinary Discharge" claim.  *Id.* at 54.  In Ossmann's R&R objections, he used the phrase "termination-discipline claim" to emphasize that his objection focused on his *termination* claim, not the disparate-discipline claim.  Doc. 87 at 50.

[14] The magistrate judge found Ossmann could not make a prima facie showing on the disparate-discipline claim because there was no valid

cited the pages in the R&R discussing his successful prima facie showing on the termination claim, and (iv) referred to Bock, the corporate officer who terminated him, as the "cat's paw" (or rubberstamp) for the Atlanta mangers.  Doc. 87 at 50 (citing Doc. 79 at 54-56).  Also, Ossmann's objections nowhere challenged the R&R's recommendation to dismiss his disparate-discipline claim, and, in fact, nowhere used the term "disparate."  Doc. 87.

Accordingly, Ossmann is *not* making a new argument on appeal. The district court's error should not control on this point.

## B.  <u>The Cat's Paw Theory with Multiple Recommenders</u>

The cat's paw theory offers an additional method for proving but-for causation under § 1981.  It applies when a manager acting with racial animus recommends the challenged employment decision and the ultimate decisionmaker—acting without racial animus—follows the recommendation without investigating.  *Stimpson v. City of Tuscaloosa*,

---

comparator.  Doc. 79 at 53 ("because he has not shown that there are any valid comparators, Plaintiff has not established a prima facie case of discrimination in relation to his discipline").  But on the termination claim, the R&R found in Ossmann's favor on this point.  *Id*. at 54 ("In contrast to his discriminatory discipline claim, Plaintiff can establish a prima facie case of discrimination in relation to his discharge.").

186 F.3d 1328, 1331-32 (11th Cir. 1999).  To prevail under this theory, "the plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the [defendant]'s decision to terminate the employee."  *Id*. at 1332.

When multiple individuals are involved in recommending a dismissal, if any of them acted with unlawful animus, then the entire process is tainted by discrimination.  *Jones v. Gerwens*, 874 F.2d 1534, 1541 n. 13 (11th Cir. 1989).  "[N]one of the participants in the decision-making process [can] be influenced by racial bias."  *Id*.

## C.  The "Work Rule" for Proving Pretext

The "work rule" method for proving pretext applies when an employer carries its *McDonnell Douglas* burden of production with evidence that the plaintiff's work-rule violations were the reason for the challenged employment decision.  *See Damon*, 196 F.3d at 1363.  "On summary judgment, … the 'work rule' defense is arguably pretextual when a plaintiff submits evidence [ ] that she did not violate the cited work rule[.]"  *Id*.

### D. One Atlanta Manger's Explanation for Requesting Ossmann's Firing was a Pretext for Race Discrimination

Bock, ultimate decisionmaker, conducted no investigation of the recommendation of Atlanta mangers Banks and Doerr to fire Ossmann. Doc. 62-14 at 175:1-:6. That evidence is sufficient to make Bock a cat's paw of the Atlanta managers. *Stimpson*, 186 F.3d at 1332.

According to Meredith, the Atlanta managers' *only* non-discriminatory reason for Ossmann's firing were his three harassment-policy violations on May 15, 2017, December 6, 2017, and April 4, 2019. Doc. 62-21 at 7-8; Doc. 62-2 ¶¶ 26, 36, 39, 41, 47. The question then is whether this explanation, as applied to at least one of the requesting managers, was a pretext for race discrimination. The answer is yes.

The evidence established, at a minimum, that Doerr knew Ossmann did *not* commit the three policy violations. Because Doerr had no mistaken belief and his purported reason was a pretext, the termination process was tainted by discriminatory animus.

### D.1. *The December 6, 2017 Violation That Wasn't*

Doerr knew that Ossmann did not violate Meredith's harassment policy, as allegedly memorialized in the *unsigned* 12/06/17 "final" warning. Doc 62-13 at 2. The reason Doerr knew is because Doerr

himself told Ossmann, at the end of their November 17, 2017 meeting (referenced in the 12/16/17 warning) that Ossmann's on-line comments did not violate Meredith's harassment policy. Doc. 71-3 ¶ 23. And Doerr said no write-up would issue. *Id.* No written warning ever did issue. *Id.*; Doc. 62-8 at 9:1-:17.

The district court, however, credited Doerr's version of that meeting over Ossmann's. As the non-movant, Ossman was entitled to have the conflict resolved in his favor under Rule 56. *Smith*, 644 F.3d at 1327 n. 23.

Also, Ossmann's "no violation" version is corroborated by the unsigned 12/06/17 warning. Doc. 62-13 at 2. Ossmann had testified—without contradiction—that Meredith required all disciplinary warnings to be signed to verify that management had in fact found a policy violation. Doc. 71-3 ¶ 17. Meredith's unsigned warning means no policy violation occurred. But the district court ignored that inference to Meredith's benefit. *Smith*, 644 F.3d at 1327 n. 23.

Crediting Ossmann's testimony about what Doerr told him and the inference Meredith's write-up policy establishes:

- _One_, Doerr did not (and could not) have a mistaken good-faith belief that Ossmann committed the three harassment-policy violations.  Doerr himself told Ossmann he did not commit the violation listed in the unsigned 12/06/17 write-up.  And Doerr knew the 12/06/17 writeup was a nullity.  These facts make Doerr's so-called mistaken good-faith belief in Ossmann's alleged _three strikes_ false and pretextual.

- _Two_, Ossmann's testimony that Doerr said in the November 17 meeting no violation occurred also created a material fact dispute under the "work rule" test for proving Doerr's explanation was pretext.

### D.2. _The Undocumented-Unlisted April 4, 2019 Violation_

A jury could reasonably infer that Doerr also knew Ossmann did not violate the harassment policy on April 4, 2019.  Doerr and HR Director Berenguer interviewed Ossmann that day.  Doc. 71-3 ¶¶ 26-28.  Ossmann denied making any of the remarks reported by the female producer.  _Id_. ¶ 28.  Following this meeting, Doerr and Berenguer met with CBS46 GM Banks, the other Atlanta manager listed on the EEO

Analysis.  Doc. 71-4 at 2.  The three Atlanta officials discussed requesting corporate's approval to fire Ossmann.  Doc. 62-14 at 75:16-:23, 166:6-:11.  Then Berenguer, after consulting with Doerr and Banks, prepared the EEO Analysis and emailed to corporate the next day.  Doc. 62-14 at 165:20-166:2; Doc. 71-4 at 2.

But Berenguer, after discussions with Doerr and Banks, did *not* list the alleged 04/04/19 harassment-policy violation as a "performance concern" on the EEO Analysis.  *Id*.  The conspicuous absence of the 04/04/19 violation from the EEO Analysis, given Doerr's coordination with Berenguer and Bank's on the termination request, allows the reasonable inference that Doerr knew Ossmann did not violate commit the 04/04/19 policy violation.

That inference is strengthened by two other pieces of evidence.  Doerr did not prepare any memo finding Ossmann committed a policy violation on April 4, 2019, contrary to Meredith practice.  Doc. 62-4 ¶ 22.  And Doerr did not find a policy violation when news anchor Sharon Reed denied a co-worker's accusation of remarks that violated Meredith's harassment policy, as Ossmann did at the April 4 meeting.  Doc. 62-14 at 130:3-:17, 131:8-:20.

This evidence—in the light most favorable to Ossmann—yields two conclusions:

- *One*, Doerr found Ossmann did not violate the harassment policy on April 4, 2019—consequently, Doerr could not have had a mistaken good-faith belief that Ossmann committed the three policy violations identified by Meredith below.

- *Two*, the evidence just outlined about Ossmann's April 4 incident—especially, Berenguer's omission of this incident from the EEO Analysis after consulting with Doerr and Banks—creates a material fact dispute under the "work rule" for proving Doerr's reason for requesting Ossmann firing was a pretext.

### D.3. *The April 15, 2017 Poor-Judgment Warning*

Ossmann's 04/15/17 written warning for "Exercising Poor Judgment" was discussed among Banks, Doerr, and Berenguer when they considered asking corporate to approve Ossmann's dismissal. Doc. 62-14 at 75:16-:23, 166:6-:11. The 04/15/17 warning, however, included no reference to Meredith's harassment policy. Doc. 62-12 at 2.

According to Meredith's write-up policy, all written discipline was required to include the specific policy violated.  Doc. 71-3 ¶ 17.

As the senior manager responsible for disciplining on-air staff, Doerr would have known Meredith's write-up policy.  He would likewise know that Ossmann's 04/15/17 write-up did not involve the harassment policy because the memo does not refer it.

In *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168 (11th Cir. 1985), this Court reversed a grant of summary judgment because the text of a collection letter could reasonably be read by a jury in two different ways, one that supported the plaintiff's case and one that did not.  *Id.* at 1176.  The same is true here about Doerr and the 04/15/17 memo.  Given Meredith's write-up policy, and absence of any policy being named in the memo, Doerr would have understood that Ossmann was *not* disciplined for an alleged sexual-harassment-policy violation.  *Id.*

As with the alleged 12/06/17 and 04/04/19 harassment-policy violations, when the evidence is viewed in favor of Ossmann instead of Meredith:

- <u>*One*</u>, Doerr could not have had a mistaken good-faith belief that Ossmann committed the three violations identified by

Meredith, based on the company's disciplinary write-up
policy combined with the 04/15/17 memo not referring to
Meredith's harassment policy.

- *Two*, the 04/15/17 memo combined with the testimony about
  Meredith's write-up policy creates a material fact dispute
  under the "work rule" for proving pretext, because a
  reasonable jury could find that from the memo itself that
  Ossmann did *not* commit any harassment-policy violation.
  *Jeter*, 760 F.2d at 1176.

Finally, only three weeks after asking for—and getting—
Ossmann's termination, Doerr and Banks promoted an Hispanic female,
Jessica Valdez, to replace Ossmann as CBS46's chief meteorologist. No
corporate approval was required. Doc. 62-14 at 75:8-:12; Doc. 71-4 at 1.
The close temporal proximity between Ossmann's firing and Doerr's
involvement in promoting his successor further demonstrates that
Doerr's purported legitimate explanation for recommending Ossmann's
dismissal was a pretext for race discrimination.

Based on evidence, the district court's finding that Doerr had a
mistaken good-faith belief that Ossmann committed the three violations

Meredith specified was clearly erroneous.  As was the district court's
finding that Ossmann failed to raise a fact dispute under the "work
rule" for proving pretext that he did not commit the three alleged policy
violations.  Because the explanation of at least one of the Atlanta
managers involved in Ossmann's firing was a pretext for race
discrimination, summary judgment should have been denied.

## V.  THE DISTRICT COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT ON OSSMANN'S § 1981 TERMINATION CLAIM BECAUSE HIS CIRCUMSTANTIAL EVIDENCE PRESENTED A CONVINCING MOSAIC OF RACE DISCRIMINATION

The district court clearly erred in granting summary judgment on
Ossmann's § 1981 termination claim, irrespective of the direct evidence
and *McDonnell Douglas* issues.  Ossmann presented a convincing
mosaic of circumstantial evidence establishing his discharge was race-
based.  Doc. 95 at 34-37.  The judgment should be vacated.

A plaintiff will survive summary judgment if he presents a
"convincing mosaic of circumstantial evidence" that would allow a jury
to infer intentional discrimination.  *Smith*, 644 F.3d at 1329.  Evidence
for a convincing mosaic may include, among other things, "suspicious
timing, ambiguous statements ..., and other bits and pieces from which

an inference of discriminatory intent might be drawn," and proof "that the employer's justification is pretextual." *Jenkins*, 934 F.3d at 1250 (quotation omitted).

Ossmann's mosaic includes circumstantial evidence that:

(1)    Bock's reliance on the EEO Analysis injected Ossmann's race into the decision-making process by making it a negative factor;

(2)    Bock's purported non-discriminatory reason for approving Ossmann's discharge was a pretext for race discrimination;

(3)    The EEO Analysis did not list Ossmann's alleged 04/04/19 violation as a performance concern, even though Meredith claims it triggered his dismissal;

(4)    Meredith gave conflicting accounts of the EEO Analysis's origin to keep from producing it.

(5)    Meredith's explanation that Ossmann was fired for committing three specific harassment-policy differs from Bock's purported rationale.

(6)    Meredith's explanation was a pretext for race discrimination because fact issues exist under the "work rule" for proving pretext.

*First*, Bock's use of the EEO Analysis was itself sufficient circumstantial evidence that race was a factor here to preclude summary judgment.  The EEO Analysis made Ossmann's race a negative factor in her decision-making process  Therefore, Meredith's

> injection of race into its decision-making process yields an *unavoidable inference* that the employee's race impacted the … determination, and it is a jury's province to decide whether race actually bore on the decision to terminate [Ossmann].

*Smith*, 644 F.3d at 1344 (emphasis added).

*Second*, Ossmann's evidence of pretext is also part of the mosaic.  Bock's purported business rationale was untrustworthy.  The most recent performance issues for Ossmann on the EEO Analysis were two-year-old and three-year-old incidents.  Both occurred four months before Ossmann's promotion to chief meteorologist.  Neither was considered serious enough to stop his promotion.  To now claim these incidents suddenly morphed, two years later, into justifications for Ossmann's firing is implausible on its face.  Also, the EEO Analysis listed an

alleged performance problem for Ossmann that would not happen for six more months, which obviously cannot be a legitimate justification.

*Third*, the EEO Analysis did not list any alleged 04/04/19 harassment-policy violation for Ossmann as a "performance concern." That omission alone also demonstrates pretext. Meredith claims this violation triggered the EEO Analysis's preparation, the Atlanta managers' request for approval to fire Ossmann, and ultimately Ossmann's dismissal. By not listing the violation, the EEO Analysis contradicts the central thesis of Meredith's explanation.

*Fourth*, Meredith's conflicting accounts about the EEO Analysis's origin proves discriminatory intent. In its interrogatory responses, Meredith used the benign term "recommendation"—not EEO Analysis— and swore Atlanta GM Banks told Berenguer to prepare it. Doc. 62-21 at 8. But facing a motion to compel after its existence became known, Meredith said the EEO Analysis was attorney work product because in-house counsel directed Berenguer to prepare it. Doc. 57 at 14. A "jury could reasonably rely on [Meredith]'s conflicting explanations as evidence of [it]s 'consciousness of guilt.'" *United States v. Wilson*, 788 F.3d 1298, 1311 (11th Cir. 2015).

*Fifth*, the evidence shows Meredith's explanation in its interrogatory response that Ossmann was fired for committing three specific harassment-policy was a pretext for race discrimination. Only one of these three violations is on the EEO Analysis. That shows the reason Meredith gave for Ossmann's dismissal is different from Bock's purported rationale, which proves pretext.

*Sixth*, Ossmann evidence established Meredith's three-specific-violations explanation to the district court was pretext. Atlanta manager Doerr told Ossmann that he did not commit the 12/06/17 violation. The purported 12/06/17 warning was unsigned and never presented to Ossmann, which under Meredith policy means no violation occurred. Ossmann's 04/15/17 write-up does not say the company's harassment-policy was violated, only that he used poor judgment. Finally, the alleged 04/04/19 violation was not listed as a "performance concern" on the EEO Analysis, which raises a fact issue as to its commission. And just three weeks after Ossmann's firing, the requesting managers replaced him with an Hispanic female.

Considering all the evidence, Ossmann established a convincing mosaic of discrimination sufficient to survive summary judgment on his

§ 1981 termination claim.  *Jenkins*, 934 F.3d at 1251.  The case should

be remanded for a trial on his termination claim.  *Id.*

## VI. THE DISTRICT COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT ON OSSMANN'S GEORGIA BREACH-OF-CONTRACT CLAIM AND STATE-LAW DAMAGE THEORIES

The district court clearly erred in granting summary judgment on

Ossmann's Georgia breach-of-contract claim.  Doc. 95 at 38-39.  The

district court also erroneously ruled that Ossmann's related state-law

damage theories were waived because, even though the R&R contains

no mention of, reference to, or recommendations about them, Ossmann

should have made an objection anyway.  *Id.* at 39.

**Breach of Contract**.  Under Georgia law, if one party to a

contract is deprived of its benefits by the other party's unlawful conduct

in breaking their agreement, then the victim has stated a claim for

breach of contract.  In *Roberson v. Allen*, 66 S.E. 542 (Ga. Ct. App.

1909), the plaintiff stated a breach-of-contract claim where he was

deprived of its benefits from "the landlord's unlawful conduct in

breaking his contract."  *Id.* at 543.

Ossmann's contract claim is derivative of the § 1981 termination

claim.  The evidence establishes Meredith broke its contract with

Ossmann, and deprived him of its benefits, based on unlawful § 1981 race discrimination. That constitutes an actionable breach under Georgia law. *Id*. If this Court vacates the judgment on Ossmann's § 1981 termination claim, the breach-of-contract claim should also be remanded for trial.

**State-Law Damage Theories**. The district court granted summary judgment on Ossmann's damage theories because (i) the R&R recommended granting Meredith's summary judgment motion, (ii) Ossmann's complaint pled his damage theories as "claims," [Doc. 11 at 10-21 (Cts 5-7)] and (iii) Ossmann did not include an objection to the R&R that referred to the state-law damage theories themselves. Doc. 95 at 39.

The district court was incorrect for several reasons.

First, 28 U.S.C. § 636(b)(1)(C)—which governs R&R objections—requires objections to be made only to "proposed findings and recommendations." Here, the R&R *nowhere* cited, referred to, made findings on, or recommended judgment on any of Ossmann's state-law damage theories. Doc. 79. Under § 636, there was nothing in the R&R to which Ossmann was required to object. By not objecting to a *non-*

finding and *non*-recommendation, Ossmann could not waive his state-law damage theories.  *See* 11th Cir. R. 3-1.

Second, the reason the R&R made no recommendations on Ossmann's damage theories is that Meredith's motion did *not* request summary judgment on the damage theories and its supporting brief did *not* argue for judgment on the damage theories.  Docs. 62, 62-1.  Just the opposite.  Meredith's brief expressly stated that summary judgment was *not* requested on the damage theories:

> Meredith notes for record purposes that Counts 5, 6, and 7 of Plaintiff's Amended Complaint relate to damages and are *not* separate causes of action.  As such, Meredith has *not* addressed them here.

Doc. 62-1 at 9 n. 1 (emphasis added) (citations omitted).  To penalize Ossmann, as the district court did, after Meredith disavowed seeking judgment on the damage theories would result in a windfall for Meredith.

Finally, under the Federal Rules of Civil Procedure, which govern pleadings in federal court, that Ossmann's complaint called his state-law damage theories "claims" does not make them substantive claims under the rules.  The Federal Rules treat damage theories as a type of relief, not as a "claim" subject to dismissal.  *See* Fed. R. Civ. P. 8, 12.

Accordingly, no objection to the R&R was necessary to preserve

Ossmann's state-law damage theories.  They should remain available.

## CONCLUSION

Plaintiff-Appellant respectfully requests that the Court vacate the

district court's summary judgment and remand the case for trial.

Respectfully submitted,

**/s/ _Marc N. Garber_**
Marc N. Garber
Georgia Bar No. 283847
mngarber@garberlaw.net
Alan H. Garber
Georgia Bar No. 283840
ahgarber@garberlaw.net
THE GARBER LAW FIRM, P.C.
4994 Lower Roswell Rd Ste 14
Marietta GA 30068-5648
(678) 560-5066 (phone)
(678) 560-5067 (facsimile)

Jack Rosenberg
State Bar No. 614475
jackrosenberg2@gmail.com
5425 Glenridge Drive Ste 53
Atlanta, GA 30342
(404) 404-343-1091 (phone)
(404) 343-1397 (facsimile)

_Attorneys for Plaintiff-Appellant_

## **CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 37(f), this document contains 12,562 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because this document was prepared with a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

Dated: July 7, 2022.

*/s/ Marc N. Garber*
Marc N. Garber

## **CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that foregoing document was filed with the Clerk of Court using the CM/ECF system pursuant to 11th Cir. R. 25-3, which will automatically serve a copy on all counsel of record in this case.

Dated:  July 7, 2022.

/s/ *Marc N. Garber*
Marc N. Garber

# _ADDENDUM "A"_

# Internal EEO Analysis
# for Ossmann's Termination
# [ Doc. 71-4 ]

**EEO Analysis 2016 Instructions**
Termination / Restructure / Reorganization

**CHECKLIST: Secure the following.**
Request and obtain in writing from the business unit a business rationale/justification for the termination/restructure/reorganization.
Financial data such as sales revenue numbers and/or market data may be relevant.

Obtain existing and proposed Organizational Charts, if applicable.

Obtain copies of all documented poor performance issues - memos, performance appraisals.
If impacted employee received good memos/appraisals these should also be included.

Obtain copies of prior two performance appraisals.  May also need for any identified comparables.

Job Descriptions of impacted employee and comparable employees may be required.

Secure copy of Job Descriptions for upgraded or downgraded newly created positions, if applicable.

Prepare EEO Analysis Spreadsheet with answers to all FAQs (See Tab 2).

Run an EEO Stats Report of the impacted department, if applicable.

Conduct a group EEO Analysis if more than one employee is impacted in a particular department (See Tab 3), if applicable.

CONFIDENTIAL

MEREDITH_000284

To: Law Department
Attorney Work Product

**Prepared by and Date:** Laurel Berenguer on April 5, 2019

**Location:** WGCL-TV, Atlanta

**Business Rationale:** Discharge for Policy Violation Sexual Harassment/Hostile Environment

| Employee | Title | Race | Sex | Grade | Adjusted Hire / Orig Hire | Service Years | DOB / Age | Status | Salary | Weekly Salary | PSC? Employment Agreement? (Provide copy) | Performance Appraisal Ratings (Last 2 Years) | Severance (includes 2 wks notice) Estimate | Date Informed | HR Rep/Mgr | Last Day Worked | Supervisor | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paul D Ossmann | Anchor/Reporter Weather | W | M | E12 | 1/19/2012 | 7.21 | 6/18/1957 - 61 | AFR | $135,000.00 | 2596.15 | Y | 2017 - 4 2018 - 3 | N/A | TBD 4/8/2019 | L. Berenguer | 4/4/2019 | S. Doerr | |

**FAQ's: Secure answers from management.  Provide written answers below.**

1 **Who is the decision maker(s) for this action? Include title, age, gender, and years of service.**
Lyle Banks, VP/GM 63 years old, Male, 1.25 years of service and Steve Doerr, News Director, 57 years old, Male, 1.75 years of service

2 **What did the department/group look like six months ago and one year ago?  Have any recent changes been made that contradict current thinking?  Why?**
There has been no significant change in the department or group.  There has a new Assistant News Director but that does not have an impact; she is not the decisin maker or manager

3 **How long has the employee been in the impacted position?**
7.21 years

4 **What is the employee's employment history? List transfers, promotions, demotions.**
Employee was promoted to Chief Meteorologist in August, 2017

5 **Are there other open positions which may be a match for this employee?**
N/A - this is a discharge for policy violation.

6 **Has the employee engaged in any protected activity (brought employment related concerns forward) been on disability during the past two years, taken FMLA leave or had a chronic illness?**
In May, 2017 when receiving his written warning, employee expressed concerns that a co-worker was sharing criticisms about him to management.

7 **If the impacted employee has been at Meredith for under a year, were they unemployed when we hired them or did they resign a job to work for us?  Did we relocate the employee?  When?**
N/A

8 **If the department restructure involves an employee's position being upgraded or downgraded, is the employee qualified for the new position?**
**Provide Job Descriptions for the current position the impacted employee is in as well as the proposed new position.**
N/A

9 **What, if any, employees are in comparable positions (like work and/or like title) within the same department or group of the impacted employee?**
**Determine 'Why me'? = Why a particular employee is being selected over other(s) within this comparable group.**
See below

10 **In reviewing the existing and proposed organizational charts, is a particular protected category of employee being impacted by the restructure**
**at a higher percentage rate than similarly situated non-protected employees?  Conduct a Risk Analysis as appropriate (Tab 4).**
Reference Risk Analysis

11 **Are there documented performance concerns with the impacted employee? Provide copies of written documentations. List on spreadsheet.**
**Provide chronology with dates of conversations management had with employee and topics discussed.**
April 5, 2016 - Employee was coached by EP Alex Spearman for participating in conversations of a sexual nature with co-workers.
May 15, 2017 - Employee received a written warning for exercising poor judgment in using the term "cockblocked"
December 6, 2019 - Employee received a final written warning for exercising poor judgment in sending highly inappropriate FaceBook messages to a female producer
May, 2018 - Employee received a notice of a concerning level of sick leave usage.

12 **Does the impacted employee participate in Meredith's stock option award program?**
No

13 **Does the impacted employee have a personal service contract (PSC).  If yes, secure a copy.**
Yes - attached

14 **Is this a performance issue which should be dealt with in that manner or is it a restructure or position elimination?**

**To: Law Department**
**Attorney Work Product**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | No this is a policy violation | | | | | | | | | | | | | | |
| **15** | **Have other employees been in a similar circumstance and, if so, how was that handled and resolved?** | | | | | | | | | | | | | | |
| | ██████, was terminated for Sexual Harassment, January 17, 2012, after an investigation.  No prior warnings, but had been subject of an internal investigation into sexual harassment in 11 - 12/2011 | | | | | | | | | | | | | | |
| | ██████, received a written warning for exercising poor judgement/conduct unbecoming a manager in August 1, 2014, with no further incidents | | | | | | | | | | | | | | |
| | ██████, was terminated for Sexual Harrassment/Hostile Workplace Investigation, December 14, 2017 | | | | | | | | | | | | | | |
| **Comparables (if applicable)** | | | | | | | | | | | | | | | |
| Alexandra Warsh | Reporter/Anchor WGCL | W | F | P18 (inacti | 9/29/2015 | 3.52 | 10/12/1968 - 50 | APT | $66.00 | 2640.00 | N | N/A - Temp | | | |
| Ella Dorsey | Anchor/Reporter Weather | W | F | E12 | 1/27/2016 | 3.19 | 5/2/1991 - 27 | AFR | $100,000.00 | 1923.08 | Y | 2017 - 3 2018 - 4 | | | |
| Jennifer I Engelhard | Anchor/Reporter Weather | H | F | E12 | 6/16/2008 | 10.81 | 11/4/1980 - 38 | AFR | $175,000.00 | 3365.38 | Y | 2017 - 4 2018 - 3 | | | |
| Molly McCollum | Anchor/Reporter Weather | W | F | E12 | 5/7/2018 | 0.91 | 2/21/1992 - 27 | AFR | $79,000.00 | 1519.23 | Y | N/A - Hire date | | | |
| Rodney Harris | Reporter/Producer | B | M | N08 | 10/5/2009 | 9.51 | 4/20/1986 - 32 | AFR | $83,000.00 | 1596.15 | Y | 2017 - 3 2018 - 4 | | | |
| **Policies Violated or recent (prior 2 years) medical leave or accommodation requests, if applicable.** | | | | | | | | | | | | | | | |
| **See above documented issues** | | | | | | | | | | | | | | | |

CONFIDENTIAL

Attorney Work Product                                                    Draft

## News - WGCL-TV, Atlanta

Risk Analysis:
Largest Risk Categories:

| | Total Employees in News Dept = 105 | | Impacted Employees = 6 (Compared to 1) | | Impacted Unplaced Employees = 1 (Compared to Impacted Group) | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **RACE** | | | | | | |
| White | 51 | 49% | 4 | 8% | 1 | 100% |
| Black | 41 | 39% | 1 | 2% | 0 | 0% |
| Hispanic | 6 | 6% | 1 | 17% | 0 | 0% |
| Asian* | 2 | 2% | 0 | 0% | 0 | 0% |
| Two + Races | 2 | #DIV/0! | 0 | 0% | 0 | #DIV/0! |
| Not Spec | 3 | 3% | 0 | 0% | 0 | 0% |
| | 105 | | 6 | | 1 | |
| **GENDER** | | | | | | |
| Female | 44 | 42% | 4 | 9% | 0 | 0% |
| Male | 61 | 58% | 2 | 3% | 1 | 100% |
| | 105 | | 6 | | 1 | |
| **AGE** | | | | | | |
| 40 + | 61 | 58% | 2 | 3% | 1 | 100% |
| under 40 | 44 | 42% | 4 | 9% | 0 | 0% |
| | 105 | | 6 | | 1 | |
| **AGE** | | | | | | |
| 50 + | 32 | 30% | 2 | 6% | 1 | #DIV/0! |
| under 50 | 73 | 70% | 4 | 5% | 0 | #DIV/0! |
| | 105 | | 6 | | 0 | |
| **YEARS OF SERVICE** | Total | 509.41 | Total | 25.64 | Total | 7.21 |
| | Average | 4.85 | Average | 4.27 | Average | 7.21 |
| **YEARS OF AGE** | Total | 4536 | Total | 235 | Total | 61 |
| | Average | 43.20 | Average | 39.17 | Average | 61.00 |
| **ADA/FMLA/Raised Workplace Concerns** | Total Pending | | Total Pending | | none | |
| | Total Pending | | Total Pending | | 1 | |

Data includes:

*American Indian or Alaska Native  (1)

CONFIDENTIAL                                                    MEREDITH_000287