No. 22-11462

---

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**

---

PAUL OSSMANN,

*Plaintiff-Appellant,*

v.

MEREDITH CORPORATION,

*Defendant-Appellee,*

---

On Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:19-cv-03200-SDG

---

**DEFENDANT-APPELLEE'S PRINCIPAL BRIEF**

---

Eric L. Barnum
Mitchell A. Robinson
Adama K. Wiltshire
Baker & Hostetler, LLP
1170 Peachtree Street
Suite 2400
Atlanta, Georgia 30309
T:  404.459.0050
F:  404.459.5734
ebarnum@bakerlaw.com
marobinson@bakerlaw.com
awiltshire@bakerlaw.com
*Attorneys for Defendant-Appellee*
*Meredith Corporation*

## <u>AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, Appellee Meredith Corporation ("Meredith") hereby identifies the following trial judges, attorneys, persons, associations of persons, firms, partnerships, and corporations that, to Meredith's knowledge, have an interest in the outcome of this appeal:

**Counsel for Appellee:** Baker & Hostetler, LLP., Eric L. Barnum, Esq., Mitchell A. Robinson, Esq., Adama K. Wiltshire, Esq.

**Counsel for Appellant:** Jack Rosenberg, Esq., Marc N. Garber, Esq., Alan H. Garber, Esq.

**Appellee:** Meredith Corporation

**Appellant:** Paul Ossmann

**United States District Judge, Northern District of Georgia:** Hon. Steven D. Grimberg

**United States Magistrate Judge, Northern District of Georgia:** Hon. John K. Larkins III

Appellee Meredith certifies that the following is a full and complete list of all parent corporations and any publicly held corporations that own 10% or more of the stock of Meredith: Gray Media Group, Inc.; BlackRock Fund Advisors; and State Street Global Advisors. Meredith further certifies that the following is a full and complete list of its subsidiaries: WGCL-TV/CBS 46.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Consistent with Fed. R. App. P. 34(a) and the 11th Cir. R. 28-1, Appellee Meredith Corporation ("Meredith"), opposes Appellant Paul Ossmann's request for oral argument because the facts and arguments are adequately presented in the briefs and record before this Court.

031073.000013 4867-4581-2778.9

# **TABLE OF CONTENTS**

Amended Certificate of Interested Persons and
Corporate Disclosure Statement ................................................. C-1

Statement Regarding Oral Argument ......................................... i

Table of Contents ..................................................................... ii

Table of Authorities ................................................................. v

Statement of the Issues............................................................. 1

Statement of the Case............................................................... 3

    I.  STATEMENT OF FACTS........................................... 3

        A.  Ossmann Agreed Meredith Could Terminate His
            Employment for Policy Violations ................................ 3

        B.  Ossmann Knew Sexual Harassment Could Lead to
            Termination for Cause Under the Agreement................ 4

        C.  Meredith Received Three Complaints of Sexual
            Harassment   Against Ossmann .................................... 4

        D. After Receiving the Third Complaint, Meredith
           Terminated Ossmann's Employment Because of His
           Pattern of Sexual Harassment ........................................7

Standard of Review.................................................................. 10

Summary of the Argument........................................................ 11

Argument and Citations to Authorities ..................................... 15

    II.  THE DISTRICT COURT CORRECTLY HELD THERE WAS
        NO DIRECT EVIDENCE OF DISCRIMINATION BECAUSE
        MULTIPLE INFERENCES WOULD BE REQUIRED ...................... 16

III.  THE DISTRICT COURT CORRECTLY HELD OSSMANN
      COULD NOT ESTABLISH A CLAIM OF
      DISCRIMINATORY DISCHARGE BECAUSE HE COULD
      NOT DEMONSTRATE PRETEXT NOR
      OTHER CIRCUMSTANTIAL EVIDENCE OF
      DISCRIMINATION ............................................................................19

      A.  Meredith Met its Burden of Providing a Legitimate Reason
          for Ossmann's Termination ................................................................19

      B.  The District Court Correctly Held Ossmann Could Not
          Show Meredith's Reason for His Termination Was Pretext
          Under *McDonnell Douglas* and Presented No Other
          Circumstantial Evidence of Discrimination ................................... 22

      C.  Absent Bad Faith, a Routine Assertion of Privilege Is Insufficient
          to Establish Pretext ......................................................................... 27

      D.  Ossmann's Cat's Paw Analysis Fails Because He Has Presented
          No Evidence that Every Recommender's Racial Animus Was
          the "But For Cause" for Ossmann's Termination Nor Evidence
          that Bock Failed to Investigate ........................................................ 28

      E.  Ossmann Cannot Undermine Doerr and Banks' Good Faith
          Belief that Ossmann Engaged in a Pattern of Sexual Harassment
          to Establish Pretext Under the Work Rule ....................................... 32

      F.  Ossmann Cannot Establish Pretext Through a Convincing Mosaic
          by Combining Baseless Theories ..................................................... 35

IV.  SUMMARY JUDGMENT SHOULD BE AFFIRMED
     AS TO OSSMANN'S BREACH OF CONTRACT CLAIM AND
     REQUEST FOR STATE LAW REMEDIES ...................................... 37

V.   KANDIS BOCK WAS NOT THE ULTIMATE
     DECISIONMAKER .............................................................................41

CONCLUSION .................................................................................. 43

031073.000013 4867-4581-2778.9

CERTIFICATE OF COMPLIANCE ......................................................... 44

CERTIFICATE OF SERVICE ................................................................45

# TABLE OF AUTHORITIES

## CASES

*Abram v. Von Maur, Inc.*, 719 Fed. App 929 (2018) ................................. 23[1]

*Adickes v. S.H. Kress & Co.*, 398 U.S. 14 (1970) ........................................10

*Alvarez v. Royal Atlantic Developers, Inc.*,
610 F.3d 1253 (11th Cir. 2010).......................................................... 35

*Anderson v. Liberty Lobby,* 477 U.S. 242 (1986)................................... 10, 42

*Burke-Fowler v. Orange County, Fla.,* 447 F.3d 1319 (11th Cir. 2006) ......15

*Celotex Corp. v Catrett,* 477 U.S. 317 (1986).............................................. 10

*Damon v. Fleming Supermkts. of Fla., Inc.,*
196 F.3d 1354 (11th Cir. 1999)..................................10, 16, 17, 24, 33

*Dawson v. Henry Cnty. Police Dep't,*
238 F. App'x 545 (11th Cir. 2007) ................................................... 34[2]

*Earley v. Champion Int'l Corp.*, 907 F.2d 1081 (11th Cir. 1990)................16

*Ernie Haire Ford, Inc. v. Ford Motor Co.*,
260 F. 3d 1285 (11th Cir. 2001)...........................................................38

*Garside v. Osco Drug, Inc.,* 895 F.2d 46 (1st Cir.1990)............................. 31

*Griffin v. City of Jacksonville, Florida*,
762 Fed. Appx. 965 (11th Cir. 2019) ............................................. 29[3]

*Holland v. Gee*, 677 F. 3d 1047 (11th Cir. 2012).........................................18

*IMPACT v. Firestone,* 893 F.2d 1189 (11th Cir. 1990) ...............................19

*Jones v. Gerwens,* 874 F.2d 1534 (11th Cir. 1989).......................................29

---

[1] Unpublished opinion attached hereto at Tab 1.
[2] Unpublished opinion attached hereto at Tab 2.
[3] Unpublished opinion attached hereto at Tab 3.

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ............................................ 15, 16, 19, 22, 23, 29

*Macuba v. Deboer*, 193 F.3d 1316 (11th Cir. 1999) .....................................31

*Mason v. Village of El Portal*, 240 F.3d 1337 (11th Cir. 2001)....................29

*Mitchell v. USBI Co.,* 186 F.3d 1352 (11th Cir. 1999) ................................ 34

*Quinn v. Monroe County*, 330 F.3d 1320 (11th Cir. 2003).......................... 41

*Ramirez v. Sloss,* 615 F.2d 163 (5th Cir. 1980)........................................... 18

*Ramsey v. Board of Regents of Univ. Sys. of Georgia*,
    543 F. App'x 966 (11th Cir. 2013) ........................................... 25, 26[4]

*Ricci v. DeStefano*, 557 U.S. 557 (2009)...................................................... 24

*Rojas v. Fla.*, 285 F. 3d 1339 (11th Cir. 2002) ............................................ 34

*Sims v. MVM, Inc.*, 704 F.3d 1327 (11th Cir. 2013) ...............................30, 31

*Smith v. City of New Smyrna Beach*,
    588 F. App'x 965 (11th Cir. 2013) ................................................. 36[5]

*Smith v. Lockheed,* 644 F.3d 1321 (11th Cir. 2011)...................... 23, 24, 26[6]

*Staub v. Proctor Hosp.*, 562 U.S. 411 (2011)............................................... 41

*Stimpson v. City of Tuscaloosa*, 186 F.3d 1328 (11th Cir. 1999) ............... 31

*United States v. Wilson,* 788 F.3d 1298 (11th Cir. 2015)............................. 27

*Voudy v. Sheriff of Broward County Fl.*,
    701 Fed. Appx. 865 (11th Cir. 2017).............................................. 19[7]

*Walker v. Darby*, 911 F.2d 1573 (11th Cir. 1990) ..................................10, 31

*Williams v. Housing Opportunities for Persons with Exceptionalities*,
    777 Fed. Appx. 451 (11th Cir. 2019) ........................... 15, 16, 23, 30[8]

---

[4] Unpublished opinion attached hereto at Tab 4.
[5] Unpublished opinion attached hereto at Tab 5.
[6] Unpublished opinion attached hereto at Tab 6.
[7] Unpublished opinion attached hereto at Tab 7.
[8] Unpublished opinion attached hereto at Tab 8.

031073.000013 4867-4581-2778.9

## <u>STATUES</u>

Fed. R. Civ. P. 12(b)(6) ................................................................ 41

Fed. R. Civ. P. 26(a), (e)(1) .........................................................27

Fed. R. Civ. P. 37(c)(1) ............................................................... 27

Fed. R. Civ. P. 56(c) ....................................................................10

28 U.S.C. § 636(b)(1)(C) ............................................................ 40

29 U.S.C. § 621 *et seq*. ...............................................................15

42 U.S.C. § 1981......................................... 11, 13, 15, 16, 23, 27, 29, 30, 38

42 U.S.C. § 2000e *et seq*. ...........................................................15

## STATEMENT OF THE ISSUES

I.  Does a disputed question of material fact exist concerning whether Ossmann's predatory harassment of his female co-workers was a pretext for Ossmann's termination?

II.  Whether the District Court correctly held that Ossmann failed to show the EEO Analysis Form was direct evidence of discrimination because it lacked statements of discriminatory animus and multiple inferences would be required to demonstrate the sole reason for Ossmann's termination was discriminatory animus.

III.  Whether the District Court correctly held that Meredith met its burden of production when it provided written documentation and deposition testimony from persons involved in the decision-making process, establishing Ossmann was terminated because of his pattern of sexual harassment.

IV.  Whether Ossmann failed to establish pretext using the cat's paw theory because he cannot show (1) for those involved in the decision-making process, discriminatory animus was the exclusive reason for his termination; nor 2) that Ossmann proffered admissible evidence showing Bock failed to investigate his termination.

1

V.     Whether Ossmann can establish pretext under the "work rule" when he has presented no admissible evidence to undermine Doerr and Banks' good faith belief that he engaged in a pattern of sexual harassment.

VI.    Whether Meredith's assertion of privilege in a discovery dispute, absent evidence of bad faith, is sufficient to establish circumstantial evidence of discrimination.

VII.   Whether Ossmann can establish a convincing mosaic of circumstantial evidence of discrimination by combining already debunked fragments of information that could not, individually, establish pretext.

VIII.  Whether the District Court correctly held there was no breach of contract where an employment agreement gave Meredith the ability to terminate Ossmann's employment for cause, and Meredith terminated Ossmann because his pattern of sexual harassment violated Meredith's policies.

031073.000013 4867-4581-2778.9

## STATEMENT OF THE CASE[9]

### I.    STATEMENT OF FACTS [10]

#### A.    Ossmann Agreed Meredith Could Terminate His Employment for Policy Violations

On January 19, 2012, Meredith hired Paul Ossmann ("Ossmann") as a temporary weekend meteorologist. (Doc. 62-2, ¶ 7). On August 1, 2017, Meredith promoted Ossmann to chief meteorologist. (Doc. 62-2, ¶ 9). Around this time, Ossmann entered into an employment agreement with Meredith ("the Agreement"). (Doc. 62-6, Employment Agreement at MEREDITH_000101; Doc. 62-4, Berenguer Decl., ¶¶ 12-13). The Agreement permitted Meredith to terminate Ossmann's employment "for cause." (Doc. 62-6, Employment Agreement at MEREDITH_000101; Doc. 62-4, Berenguer Decl., ¶¶ 12-13). The Agreement defines "for cause" as any misconduct by Ossmann, including "a violation of the Meredith Code of Business Conduct and Ethics or Company policy . . . or conduct that would injure the good reputation of Employee, the Station or the program on

---

[9] All record references, including to transcripts and exhibits, are to the document and page number that appear in the header generated by the District Court's electronic filing system.

[10] Meredith incorporates all record evidence introduced on its behalf, including but not limited to, Meredith's Motion for Summary Judgment (Doc. 62-1), Meredith's Memorandum of Law in Support of its Motion for Summary Judgment and accompanying exhibits (Doc. 62-2; Docs. 62-3 through 62-29), Meredith's Reply in Support of its Motion for Summary Judgment (Docs. 74 through 74-4), and its Response in Opposition to Plaintiff's Objection to Report and Recommendation (Doc. 92).

031073.000013 4867-4581-2778.9

which Employee appears." (Doc. 62-6, Employment Agreement at MEREDITH_000106; Doc. 62-4, Berenguer Decl., ¶¶ 12-13). The Agreement further provides that "cause" shall be determined "at the discretion of the Employer, whose discretion shall not be exercised arbitrarily or capriciously." (Doc. 62-6, Employment Agreement at MEREDITH_000106; Doc. 62-4, Berenguer Decl., ¶¶ 12-13).

**B.    Ossmann Knew Sexual Harassment Could Lead to Termination for Cause Under the Agreement**

During his employment, Ossmann received a copy of the Employee Handbook and he understood Meredith had a policy prohibiting sexual harassment. (Doc. 62-2, ¶¶ 15-16, 18). Ossmann knew if he engaged in inappropriate conduct, he could be terminated for cause pursuant to the Agreement. (Doc. 62-2, ¶ 19). In 2018, Ossmann also received training on Meredith's Anti-Harassment policy. (Doc. 62-2, ¶ 20).

**C.    Meredith Received Three Complaints of Sexual Harassment Against Ossmann**

Meredith terminated Ossmann's employment because he demonstrated a pattern of sexual harassment towards female coworkers, which violated Meredith's policies. (Doc. 62-21, at Answer to Interrogatory No. 5) (Doerr and Banks "made the final decision to invoke the "for cause" provision in Ossmann's contract and terminate his employment for exhibiting a pattern of behavior that violated

031073.000013 4867-4581-2778.9

Meredith's sexual harassment policy.").  Within two years, three female employees complained Ossmann sexually harassed them. Those three female employees' respective complaints were that on separate occasions, Ossmann:

1) repeatedly told his colleague he was "cockblocked" during a dispute about vacation schedules, said he dreamt about having sex with his colleague, and told an African American employee that his first "three-way" was with a Black woman;

2) sent a Facebook message to a female coworker claiming he masturbated while thinking about her, mentioned he wanted to have sex with her, and asked her to send him nude pictures of herself; and

3) told a female coworker, "[n]ot to be like uncle Joe [Biden], I wanted to let you know I look at you all the time. You're pretty, put together.  You walk around and carry yourself very well. You're very attractive and that's attractive to me . . . You always look nice." (Doc. 62-4, Berenguer Declaration, ¶¶ 25-26, 40-41; Doc. 62-16, Complaint 1 Meeting Notes; Doc. 62-17, Complaint 2 Meeting Notes; Doc. 62-18, Complaint 3 Meeting Notes).

After receiving each complaint, Meredith investigated the allegations and Senior Human Resources Director, Laurel Berenguer ("Berenguer"), maintained notes of conversations with employees from her investigations. (Doc. 62-4,

Berenguer Declaration, ¶¶ 25-26, 40-41; Doc. 62-16, Complaint 1 Meeting Notes; Doc. 62-17, Complaint 2 Meeting Notes; Doc. 62-18, Complaint 3 Meeting Notes).

During meetings with Berenguer and News Director, Steve Doerr ("Doerr"), Ossmann admitted to some of the inappropriate conduct alleged. (Doc. 62-12, First Written Warning, dated May 15, 2017, at MEREDITH_000115; Doc. 62-13, Final Written Warning, dated December 6, 2017, at MEREDITH_000100; Doc. 62-8, Ossmann Deposition, 82:5-83:22; 86:14-87:15, 176:5-177:18; Doc. 62-4, Berenguer Decl., ¶¶ 20-22, 27-28, 40-41). The May 15, 2017, Written Warning indicates "[Ossmann] **acknowledged** using the term **'cockblocked' to a team member**." (Emphasis added). (Doc. 62-12, at p. 2). Ossmann was reminded that Meredith would not tolerate "behavior that could contribute to creating a **hostile work environment**." (Emphasis added). (Doc. 62-12, at p. 2). On December 6, 2017, Doerr wrote a Final Written Waring and noted "[Ossmann] **admitted** [he] had been sending the news producer Facebook messages in an **attempt to enter into an off-duty, personal relationship**" and the news producer **did not reciprocate** Ossmann's advances. (Doc. 62-13, at p. 2) (emphasis added). Doerr also recalled Ossmann's prior use of the term "cock-blocked" in May 2017, and warned that further misconduct could result in Ossmann's termination. (Doc. 62-13, at p. 2).

031073.000013 4867-4581-2778.9

**D.    After Receiving the Third Complaint, Meredith Terminated Ossmann's Employment Because of His Pattern of Sexual Harassment**

After receiving the third female employee's complaint, on April 4, 2019, Doerr told Ossmann he was suspended pending a decision from the station. (*See supra*, pg. 6; *see also* Doc. 62-2, ¶ 47).  Doerr and Station General Manager Lyle Banks ("Banks") decided to terminate Ossmann's employment because his pattern of sexual harassment violated Meredith's Discrimination and Harassment Policy to "maintain a safe workplace free from sexual harassment." (Doc. 62-21, at Answer to Interrogatory No. 5; Doc. 62-19, Employee Handbook; Doc. 62-18, Complaint 3 Meeting Notes, MEREDITH _000069; Doc. 62-14; Doc. 62-15, Berenguer Dep., 170:14-15; 171:24-25; Doc. 62-2, ¶ 50; Doc. 62-4, Berenguer Decl., ¶¶ 25-26, 40-41).

As part of the termination process, Berenguer prepared an EEO Analysis Form ("EEO Analysis Form"). (Doc. 62-4, Berenguer Decl., ¶ 42; Doc. 62-20, EEO Form). It was Berenguer's regular practice to complete an EEO Analysis Form to maintain demographic data during employment decisions, including terminations. *Id.* Berenguer explained that demographic data was included in EEO Analysis Forms for all terminations—to "ensure you're being equitable, so using comparables may include race." (Doc. 62-14, Berenguer Dep. I, 43:9-17; 51:7-53:20).

031073.000013 4867-4581-2778.9

The EEO Analysis Form for Ossmann indicated he had a pattern of workplace sexual harassment. (Doc. 62-20, EEO Analysis Form). In completing the EEO Analysis Form, the preparer is asked, "Are there documented performance concerns with the impacted employee?" In responding to this specific question, Berenguer correctly listed all documented written warnings and verbal coaching Ossmann received, including: 1) a verbal coaching Ossmann received on April 5, 2016, because he participated in conversations of a sexual nature with co-workers; 2) the May 15, 2017, written warning Ossmann received for exercising poor judgment in using the term "cockblocked;" and 3) the December 6, 2017, final warning Ossmann received because he sent highly inappropriate Facebook messages to a female producer.   (Doc. 62-20, EEO Analysis Form).  Because he had not yet been terminated nor written up for the April 4, 2019, complaint of sexual harassment, that incident was not documented and would not have been included on the EEO Analysis Form.

The EEO Analysis Form also indicated that two African American men were also terminated because they sexually harassed coworkers. (Doc. 62-20, EEO Analysis Form). The EEO Analysis Form identified Doerr and Banks as the ultimate decisionmakers for Ossmann's termination. (Doc. 62-20, EEO Analysis Form). After completion, Berenguer submitted the EEO Analysis Form to corporate for final approval and processing. (Doc. 62-14, Berenguer Dep. I, 174). There is no record

evidence that anyone from corporate reviewed the EEO Analysis Form, considered the EEO Analysis Form, or ultimately made the decision to terminate Ossmann's employment based on race. Indeed, the evidence points in the opposite direction – that misconduct led to his dismissal.

On April 8, 2019, Doerr informed Ossmann his employment was terminated. (Doc. 62-2, ¶ 48). At deposition, Ossmann admitted his employment was not terminated because of his race. (Doc. 62-2, ¶ 51). Meredith presented evidence showing non-white employees were terminated for violating Meredith's Sexual Harassment policy. (Doc. 62-2, ¶¶ 52-61; Doc. 62-20, EEO Analysis Form at MEREDITH_000200; Doc. 62-4, Berenguer Decl., ¶¶ 35- 42). On June 1, 2017, an African American man was terminated for violating Meredith's Sexual Harassment Policy. (Doc. 62-2, ¶¶ 52-56). In January 2012, a second African American man (photographer) was terminated for violating the Sexual Harassment policy. (Doc. 62-2, ¶¶ 52, 57-59). In December 2017, a third African American man (Centralcast employee) was terminated for violating the Sexual Harassment Policy. (Doc. 62-2, ¶¶ 52, 60-61).

After Ossmann's termination, Jennifer Valdez, a Hispanic woman was promoted to Chief Meteorologist and at deposition, Ossmann admitted she was qualified for the position. (Doc. 62-2, ¶¶ 101-04).

9

## <u>STANDARD OF REVIEW</u>

A district court's grant of summary judgment is reviewed *de novo. See Damon v. Fleming Supermkts. of Fla., Inc.,* 196 F.3d 1354, 1358-135 (11th Cir. 1999). Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *See Damon*, 196 F.3d at 1357-58 (internal citations omitted). The court should view the evidence and any inferences in a light most favorable to the non-movant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 14, 158-59 (1970). When the evidence supporting the non-moving party is "merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986) (internal citations omitted).

The party seeking summary judgment must first identify grounds to show the absence of a genuine issue of material fact. *Celotex Corp. v Catrett*, 477 U.S. 317, 323-24 (1986). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show a genuine issue of material fact exists. *Liberty Lobby*, 477 U.S. at 257. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

031073.000013 4867-4581-2778.9

## SUMMARY OF THE ARGUMENT

The District Court's grant of summary judgment should be affirmed. Ossmann attempts to turn a procedure meant to protect all employees into a mechanism for race discrimination. He presents no probative evidence, however, that he was treated differently than employees of color. Indeed, the evidence does just the opposite. That evidence also reveals that Ossmann engaged in inappropriate conduct with a number of female employees.

Ossmann's Brief is but the latest in a series of attempts to circumvent responsibility for three separate complaints against him of sexual harassment leading to his termination. In doing so, Ossmann is unable to satisfy the requisite "but for" causation standard for his Section 1981 claims. To fulfill Ossmann's burden, he must present admissible evidence showing that his race was the <u>exclusive</u> reason for his termination. Neither a mixed-motive nor motivating factor analysis will suffice.

Ossmann's contentions supporting his appeal are summarily baseless and conflate the record. As a preliminary matter, Ossmann's contention that the EEO Analysis Form disclosed by Meredith was direct evidence of discrimination fails because it contains no blatant or obvious statement that Ossmann was terminated solely because of his race. Reaching such a conclusion could only be inferred by stacking inference upon inference to conclude race was the sole reason for Ossmann's termination. Even if Kandis Bock was considered a decisionmaker,

11

which she was not, Ossmann must show that Bock received, reviewed, and read the entire EEO Analysis Form. Then, Ossmann must prove that although the EEO Analysis Form listed three incidents of sexual harassment of his coworkers, Bock did not consider these incidents and relied exclusively on demographic data in approving Ossmann's termination. These stacked inferences negate any assertion that the EEO Analysis Form was direct evidence of discrimination.

Second, Ossmann cannot rebut Meredith's legitimate, non-discriminatory reason for terminating his employment: three separate female coworkers filing formal complaints of sexual harassment against Ossmann. Meredith has produced, amongst other evidence, investigation notes, complaints of sexual harassment, written warnings, EEO Analysis Forms, Supplemental Answers to Interrogatories, and declarations from persons involved in the decision proving that Ossmann was terminated because of his predatory pattern of sexual harassment—nothing more.

Third, Ossmann cannot rebut Meredith's legitimate reason for his termination through pretext or a convincing mosaic of circumstantial evidence. An employer's legitimate, non-discriminatory reason for an employment action is not pretextual unless the plaintiff shows that the stated reason was false *and* that the real reason for the adverse action was impermissible discrimination. Ossmann has proffered no evidence establishing either.

031073.000013 4867-4581-2778.9

Fourth, Ossmann's cat's paw analysis fails. Under Section 1981's "but for" causation standard, Ossmann must show that <u>every person</u> involved with his termination had racial animus and that racial animus was the <u>sole</u> reason for his termination. Rather than addressing the multiple decisionmakers identified by Meredith, Ossmann poorly argues one of the multiple decisionmakers (Steve Doerr) did not recommend his termination because of Ossmann's pattern of sexual harassment even though the record testimony contradicts that assertion. Under a cat's paw theory, even if Ossmann's assertions were true, he must also proffer admissible evidence showing Bock failed to investigate the reason for Ossmann's termination. The record is void of any information regarding what Bock did or did not do after Berenguer sent the EEO Analysis Form to corporate for processing.

Fifth, Ossmann's work rule analysis is also unavailing. Ossmann cannot rebut Meredith's decision to terminate him for a pattern of sexual harassment. Whether Meredith followed its preferred procedure by including a violation of a specific policy in its written warning is immaterial. Ossmann must show the policy deviation was discriminatorily applied. There is no evidence that Meredith did not terminate non-white employees: 1) with a pattern of sexual harassment; 2) who had written warnings that did not specify policy violations; and 3) refused to sign these written warnings. Indeed, the record evidence shows that Meredith terminated employees for sexual harassment regardless of their race.

031073.000013 4867-4581-2778.9

Sixth, Ossmann's purported mosaic of circumstantial evidence is simply a compilation of debunked theories of pretext addressed by the District Court and in this Brief. Ossmann cannot posit bits and pieces of information, devoid of substance, to rebut Meredith's legitimate reason for his termination—his pattern of sexual harassment.

Seventh, this Court should affirm summary judgment as to Ossmann's breach of contract claim and his claim for damages in Counts 5-7. Ossmann's objection and this appeal are based on theories not grounded in law or fact. Even if Ossmann had presented facts or law, he still could not survive summary judgment because the evidence shows Meredith terminated Ossmann for cause as permitted by the Agreement.

Finally, while the ultimate determination granting Meredith's Motion for Summary Judgment should be affirmed, the District Court was mistaken in finding Bock to be a decisionmaker. Meredith maintains that Doerr and Banks were the ultimate decisionmakers for Ossmann's termination. Doerr and Banks investigated the complaints against Ossmann and determined he should be discharged after violating Meredith's policies. Doerr informed Ossmann his employment was terminated for cause. There is no evidence that Bock made any decisions regarding Ossmann's termination.  However, as noted above, the District Court's ultimate

14

grant of Meredith's Motion for Summary Judgment was correct and should be affirmed.

## ARGUMENT AND CITATIONS TO AUTHORITIES[11]

The District Court correctly granted summary judgment in favor of Meredith. Section 1981 prohibits intentional race discrimination in making and enforcing public and private contracts. *Williams v. Housing Opportunities for Persons with Exceptionalities*, 777 Fed. Appx. 451, 453 (11th Cir. 2019) (unpublished). Generally, discrimination claims brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, and those brought under Section 1981 use the same analytical framework. *Id.* Racial discrimination claims can be proven using direct evidence, requiring no inference or presumption, or circumstantial evidence. *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1322-23 (11th Cir. 2006). Discrimination claims based on circumstantial evidence are evaluated under *McDonnell Douglas*. *Id.*   Regardless, the plaintiff must satisfy the causation standard. To establish a claim for discrimination under Section 1981, a plaintiff must show that unlawful race discrimination was the sole, "but for" cause of the adverse

---

[11] Ossmann has abandoned his discriminatory discipline claim under Section 1981. (*See* Appellant's Brief, at p. 16 n.1; p. 18.) On June 7, 2021, Ossmann abandoned his claim of racially hostile work environment under 42 U.S.C. § 1981 and confirmed no claims were alleged under Title VII, 42 U.S.C. § 2000e *et seq.*, or the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (*See* Doc. 70). Because of this, Meredith does not provide additional discussion on these claims.

031073.000013 4867-4581-2778.9

action. A mixed motive theory will not suffice for Section 1981 claims. (*See* Doc. 95, at p. 30.) *See also*, *Williams*, 777 Fed. Appx. at 454 n. 3.

Ossmann failed to present direct evidence of discrimination, evidence sufficient to meet his burden under *McDonnell Douglas,* or any other circumstantial evidence sufficient to demonstrate pretext. Put simply, Ossmann cannot demonstrate that his race was the "but for" reason for his termination and not his extensive history of predatory sexual harassment against female coworkers. Meredith is entitled to summary judgment as a matter of law and the District Court's decision should be affirmed.

## II.    THE DISTRICT COURT CORRECTLY HELD THERE WAS NO DIRECT EVIDENCE OF DISCRIMINATION BECAUSE MULTIPLE INFERENCES WOULD BE REQUIRED

Direct evidence is evidence that, if proven – and without inference or presumption – illustrates discrimination. *See Damon*, 196 F.3d at 1358-59.  The evidence must show the "complained-of employment decision was *motivated* by the decision-maker's" discriminatory intent. *Id.* (Emphasis in original). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [race] will constitute direct evidence of discrimination." *Id.* (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1081, 1082 (11th Cir. 1990) (an example of "direct evidence would be a management memorandum saying, 'Fire Earl—he is too old.'").

Ossmann asserts the EEO Analysis Form, and nothing more, was direct evidence that Bock considered race in terminating Ossmann's employment. *See* Appellant's Opening Brief, at p. 48-51. The EEO Analysis Form contains no blatant statement akin to, "Fire Ossmann—he is White." In fact, the EEO Analysis Form suggests the opposite. The EEO Analysis Form indicates that Meredith employees of other races were similarly terminated for violations of the Company's policy prohibiting sexual harassment. Indeed, two African American employees were terminated because they sexually harassed coworkers.

Too many inferences would be required to conclude Ossmann's race was the sole reason for his termination. Ossmann's argument would essentially require this Court to illogically assume that: a) although Doerr and Banks were listed as decisionmakers on the EEO Analysis Form, Bock was the final decisionmaker; b) Bock received the EEO Analysis Form; c) Bock reviewed the EEO Analysis Form; d) Bock read the entire EEO Analysis Form; e) although the EEO Analysis Form listed three incidents of sexual harassment against Ossmann, Bock ignored these facts in approving Ossmann's termination; and f) instead, Bock relied exclusively on demographic data. (*See* Doc. 95, at pp. 8-9). These five inferences related to Bock, a witness Ossmann chose to not depose, eviscerate Ossmann's contention that the EEO Analysis Form was direct evidence of Bock's discriminatory animus. *See Damon*, 196 F.3d at 1358-59.

Ossmann's reliance on inapposite decisions is misplaced and does nothing to undercut the District Court's reasoning. In *Ramirez v. Sloss*, 615 F.2d 163 (5th Cir. 1980), no inference was required. A decisionmaker made an unequivocal statement that "it was city policy to hire U.S. citizens" <u>and</u> the city's personnel manual stated, "*all employees of the City of Brownsville shall be citizens of the United States of America.*" (Emphasis added). These two statements, without inference, confirm the city considered national origin in hiring decisions. Similarly, in *Holland v. Gee*, 677 F. 3d 1047, 1058 (11th Cir. 2012), the decisionmaker testified under oath – repeatedly – that the employee's pregnancy was a part of the reason for the adverse employment action. This repeated admission required no inference to determine that pregnancy status was considered in the adverse action.

Here, there is no evidence from Bock, Doerr or Banks supporting the position that Ossmann should be terminated solely because he is White. Instead, <u>all</u> of the evidence suggests that Bock, Doerr, and Banks uniformly saw no other option but to terminate Ossmann due to three instances of sexual harassment. The District Court's ruling that Ossmann failed to present direct evidence of discrimination was correct.

031073.000013 4867-4581-2778.9

## III.  THE DISTRICT COURT CORRECTLY HELD OSSMANN COULD NOT ESTABLISH A CLAIM OF DISCRIMINATORY DISCHARGE BECAUSE HE COULD NOT DEMONSTRATE PRETEXT NOR OTHER CIRCUMSTANTIAL EVIDENCE OF DISCRIMINATION

### A.  Meredith Met its Burden of Providing a Legitimate Reason for Ossmann's Termination

Ossmann attempts to evade, rather than address, Meredith's legitimate, non-discriminatory reason for ending his employment. Three women separately filed complaints against Ossmann for sexual harassment. Meredith investigated these complaints and believed them. For that reason alone, he was terminated. Even assuming Ossmann proffered evidence to establish a *prima facie* case based on his termination, he cannot rebut Meredith's legitimate rationale. Under the *McDonnell Douglas* framework, an employer satisfies its burden when it produces evidence of the legitimate reason for the adverse action from any person involved in the decision or other employees. (Doc. 95, at p. 12).  *See also IMPACT v. Firestone,* 893 F.2d 1189, 1194 (11th Cir. 1990) (the employer's justification is sufficient if it is based on "proof by any person who made the employment decision, *or by any other person.*").  (Emphasis added)*; c.f. Voudy v. Sheriff of Broward County Fl.*, 701 Fed. Appx. 865, 869-70 (11th Cir. 2017) (unpublished) ("No BSO employee has identified *any* reason" for the decisions and "in the absence of any statement from the employer **or** its decision makers explaining the reasons for its decision, we cannot hypothesize the employer's reasons").

031073.000013 4867-4581-2778.9

While ignored in Ossmann's Brief, Meredith produced evidence – from persons involved in the decision – demonstrating Ossmann's employment was terminated because of his pattern of sexual harassment. Meredith demonstrated that Banks, Berenguer, and Doerr were involved in the decision to terminate Ossmann's employment. (Doc. 62-21, at Supplemental Answer to Interrogatory No. 6). Meredith stated Ossmann was terminated because of his pattern of sexual harassment. (Doc. 62-21, at Answer to Interrogatory No. 5; Doc. 74, at pp. 1, 4) (Doerr and Banks "made the final decision to invoke the "for cause" provision in Plaintiff's contract and terminate his employment for exhibiting a pattern of behavior that violated Meredith's sexual harassment policy.").

In fact, Meredith produced Berenguer's Meeting Notes documenting three complaints of Ossmann's sexual harassment. (Doc. 62-4, Berenguer Declaration, ¶¶ 25-26, 40-41; Doc. 62-16, Complaint 1 Meeting Notes; Doc. 62-17, Complaint 2 Meeting Notes; Doc. 62-18, Complaint 3 Meeting Notes). Meredith also produced written warnings documenting Ossmann's pattern of sexual harassment. (Doc. 62-12, Ex. F, First Written Warning; Doc. 62-13, Ex. G, Final Written Warning; Doc. 62-14; Doc. 62-15, Ex. H, Berenguer Dep., 213:2-15). Meredith also supplied its Employee Handbook, Anti-Harassment Policy, and list of Meredith's Required Training, illustrating that Ossmann was discharged because he knowingly violated Meredith's policy against sexual harassment. (Doc. 62-19; Doc. 62-29; Doc. 62-28).

These alone satisfy Meredith's burden of production regardless of the identity of the ultimate decisionmaker.

The EEO Analysis Form is also a separate piece of evidence that satisfies Meredith's burden of production. The form specifically asked the preparer, "Are there documented performance concerns with the impacted employee?" In responding to this specific question, Berenguer correctly listed all documented written warnings and verbal coaching Ossmann received, including:1) an April 5, 2016 verbal coaching issued after Ossmann participated in conversations of a sexual nature with co-workers; 2) a May 15, 2017, Written Warning Ossmann received after he admitted to using the term "cockblocked" to a coworker; and 3) the December 6, 2017, Final Warning Ossmann received because he sent highly inappropriate Facebook messages to a female producer. (Doc. 62-20, EEO Analysis Form). The April 4, 2019, complaint of sexual harassment led to the ultimate form of discipline – Ossmann's termination. It would be nonsensical to require a written "warning" for a final employment action that severed the employment relationship between Meredith and Ossmann.

The EEO Analysis Form Ossmann attempts to rely on is admissible evidence of Meredith's legitimate reason for terminating Ossmann's employment because it identified multiple instances of Ossmann's sexual harassment. (Doc. 62-20, at p. 5). The District Court correctly identified the very same argument Ossmann makes here

031073.000013 4867-4581-2778.9

as a *non sequitur*. Ossmann cannot claim the EEO Analysis Form was direct evidence of discriminatory intent and simultaneously deny it was admissible evidence of Meredith's legitimate reason for terminating Ossmann's employment. (Doc. 95, at p. 12). The EEO Analysis Form expressly identified three incidents of sexual harassment, demonstrating Meredith's legitimate reason for Ossmann's termination was his pattern of sexual harassment. (Doc. 62-20, at p. 5). As the District Court recognized: "the EEO Analysis form is evidence of what Bock received and reviewed with respect to Ossmann's termination, and it shows that the recommended reason for his termination was that he sexually harassed his co-workers in violation of Meredith's Discrimination and Harassment Policy." (Doc. 95 at p. 13).

This Court should affirm the District Court's holding that Meredith produced sufficient evidence that it terminated Ossmann's employment because of Ossmann's predatory pattern of sexual harassment.

### B.    The District Court Correctly Held Ossmann Could Not Show Meredith's Reason for His Termination Was Pretext Under *McDonnell Douglas* and Presented No Other Circumstantial Evidence of Discrimination

Ossmann asserts that Meredith's basis for his termination was pretextual. Yet, a plaintiff cannot establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, so long as that reason is one that would motivate a reasonable employer. A reason is not pretextual unless the

22

plaintiff shows: 1) that the reason was false; and 2) that the real reason is impermissible discrimination. *See also Abram v. Von Maur*, 719 Fed. Appx. 929, 932 (2018) (unpublished).  Most importantly, any possibility of a mixed motive theory will not suffice for Section 1981 claims. (Doc. 95, at p. 30). *See Williams*, 777 Fed. Appx. at 454 n. 3.

Ossmann's reliance on *Smith v. Lockheed* is misplaced. *See* 644 F.3d 1321 (11th Cir. 2011) (unpublished).  *Lockheed* did not apply the *McDonnell Douglas* burden shifting framework; it utilized a convincing-mosaic analysis and considered various evidence. *See* Doc. 95 at 13; *Lockheed*, 644 F.3d at 1328. In *Lockheed*, it was undisputed that the decisionmakers received <u>and</u> reviewed <u>and</u> relied on the "matrices" for discipline. *Id.* at 1346. However, race data was included in matrices for White employees, but excluded in matrices for Black employees who engaged in identical conduct. *Id.* at 1339. The employer provided no explanation for the inconsistent use of demographics in disciplines and affirmatively stated there was no legitimate reason for its use. *Id.* at 1346 n.85 (decisionmaker stating, "there is no legitimate . . . business purpose for Lockheed to be 'monitoring race' during investigation, disciplinary review or policy violation."). White employees were also terminated or received harsher discipline than their Black counterparts. Lastly, there were national news reports that Lockheed allowed white supremacists' statements to go unchecked prior to a hate-crime shooting at its facility. *Id.* at 1329-32, 1344.

The *Lockheed* decisionmaker had added public pressure to discipline White employees accused of discrimination more harshly than Black employees.

Ossmann's references to *Damon v. Fleming Supermkts. of Fla., Inc.* to support the proposition that the EEO Analysis Form was circumstantial evidence of the decisionmaker's discriminatory intent are misplaced. *See* 196 F.3d 1354, 1362 (11th Cir. 1999); (Appellant's Opening Brief, at p. 61). *Damon* did not involve any document that contained demographic data. The court found that the plaintiffs presented <u>other</u> significant circumstantial evidence of age discrimination, including multiple comments from the decisionmaker to employees demonstrating his desire to employ younger persons. The decisionmaker also terminated multiple older persons who had unblemished track records—quite dissimilar to Ossmann's record of serial sexual harassment against female coworkers.

Ossmann also impermissibly expands the holding in *Ricci v. DeStefano*, 557 U.S. 557, 583 (2009). Ossmann cites *Ricci* to suggest implementation of an affirmative action plan is the only legitimate reason for including demographics in employment decisions. (Appellant's Opening Brief, at p. 62). Instead, *Ricci* holds "the standard appropriately constrains employers' discretion in making race-based decisions: It limits that discretion to cases in which there is a strong basis in evidence of disparate-impact liability*, but it is not so restrictive that it allows employers to act only when there is a provable, actual violation*." *Id. See also*, 557 U.S. 557, 583

(2009) (emphasis added). Thus, Meredith would be permitted to include demographics on termination documents even if there was no affirmative action program and no history of disparate impact, and especially where its objective was to ensure equitable treatment of its employees.

Conversely, this Court has recognized that mere collection of demographic data, by itself, is insufficient to establish pretext. In *Ramsey v. Board of Regents of Univ. Sys. of Georgia*, the plaintiff, a White male, was terminated for procurement card violations and disposing of company owned desks. *See* 543 F. App'x 966, 968 (11th Cir. 2013) (unpublished). The Vice President of Human Resources decided to recommend the plaintiff's termination to a reviewing board and requested information about the plaintiff's race. *Id.* She later requested a report listing every employee's race data, which was part of her standard query. *Id.* At deposition, the Vice President of Human Resources explained she verified race data to track employee demographics to ensure decisions did not have an adverse impact on any group. *Id.* This Court held that because the Vice President of Human Resources offered a legitimate reason for obtaining race data, and there was no evidence to contradict her explanation, that collection of race data could not establish pretext. *Id.* The employer also did not use goals, targets, nor preferences with respect to its diversity policy when making employment decisions, further weakening the plaintiff's claim of pretext. *Id.*

25

Here, there is no stacking of circumstantial evidence of discriminatory conduct as in *Lockheed*. Assuming Bock was the ultimate decisionmaker (Meredith does not concede that she was), the undisputed record does not show Bock received, reviewed, or relied on the EEO Analysis Form. Unlike in *Lockheed*, Berenguer testified it was her regular practice to fill out an EEO Analysis Form when making employment decisions, including terminations. (Doc. 62-4, ¶ 42). But like in *Ramsey*, Berenguer provided legitimate explanations of why demographic data was included in EEO Analysis Forms for all terminations—to "ensure you're being equitable, so using comparables may include race." (Doc. 62-14, Berenguer Dep. I, 43:9-17; 51:7-53:20). There is no evidence that Meredith used specific race quotas in employment decisions. To the contrary, the EEO Analysis Forms showed two African American men were terminated for sexual harassment, undercutting any argument that Meredith used race quotas in termination decisions. (Doc. 62-2, ¶¶ 52-60). This Court held the collection of race data in *Ramsey* was innocuous and insufficient to establish pretext, and it should hold the same here.

Moreover, the EEO Analysis Form was used to prevent discrimination against Ossmann. Ossmann's argument that the EEO Analysis Form's inclusion of race data makes his termination unlawful ignores the fact that the same race data was included on EEO Analysis Forms for the two Black employees who were also terminated for sexual harassment. In other words, Ossmann cannot be allowed to argue that

inclusion of his race data should have prevented only his termination. This is precisely what Section 1981 prohibits: different treatment of similarly situated individuals based on race.

### C.    Absent Bad Faith, a Routine Assertion of Privilege Is Insufficient to Establish Pretext

The District Court correctly gave no credence to Ossmann's contention that Meredith's initial withholding of the EEO Analysis Form, based on an asserted attorney-client privilege objection, demonstrates pretext. (Doc. 95, at pp. 35-36). Because the EEO Analysis Form contained no direct evidence of discrimination, withholding that document based on privilege grounds was not an effort to conceal guilt or liability. (Doc. 95, at p. 36; Section II *infra*). Even if the EEO Analysis Form were direct evidence, which it is not, Ossmann has not presented any evidence showing Meredith's routine discovery objection was done in bad faith, without substantial justification, or prejudice. *See* Fed. R. Civ. P. 37(c)(1). *See also* Fed. R. Civ. P. 26(a), (e)(1).

Ossmann has proffered no legitimate authority demonstrating that the parties' discovery disputes might be evidence of pretext or racial animus. Instead, Ossmann mistakenly relies on *United States v. Wilson*, 788 F.3d 1298 (11th Cir. 2015), a case involving theft of government funds and obstruction of criminal investigations. Neither are relevant here. The *Wilson* criminal defendant initially told authorities he did not take the boxes at issue but subsequently testified that he mistakenly took the

27

original documents. *Id.* The criminal defendant's contradictions spoke to the actual crime of obstruction, which he was accused of (i.e., did he take the boxes or not). Here, the allegedly contradictory statements made by Meredith do not speak to the alleged race discrimination. Moreover, alleged contradictions as to whom instructed Berenguer to prepare the EEO Analysis Form have no impact on the core issue of pretext. They certainly do not show that the stated reason for Ossmann's termination was false, or that the <u>actual</u> and <u>sole</u> reason for Ossmann's termination was his race. This Court should affirm the District Court's holding that Meredith's objection based on privilege is not evidence of pretext.

### D. Ossmann's Cat's Paw Analysis Fails Because He Has Presented No Evidence that Every Recommender's Racial Animus Was the "But For Cause" for Ossmann's Termination Nor Evidence that Bock Failed To Investigate.

The District Court properly granted summary judgment as to Ossmann's disparate discharge claim.[12] Even if we assume Bock was the final decisionmaker,

---

[12] Ossmann did not raise a termination claim in his cat's paw objection. Nor did Ossmann raise the cat's paw theory in his Opposition to Meredith's Motion for Summary Judgment. (Doc. 71). Instead, he included this claim – for the first time – in his Objections to the R&R. (Doc. 87, at p. 56). That alone is grounds for ruling in Meredith's favor. Moreover, Ossmann lumped both his termination and discipline claim together and argued he was entitled to an inference from his "***termination-discipline*** case plus his work-rule pretext evidence." *Id.* (emphasis added). Trying to make sense of Ossmann's new hybrid claim, the District Court ruled that Ossmann's objection regarding the cat's paw analysis to his termination claim could not pass muster, in part, because Ossmann could not establish pretext. (Doc. 95, at p. 37).

031073.000013 4867-4581-2778.9

Ossmann cannot avoid summary judgment by relying on the cat's paw theory. The cat's paw theory creates employer liability under Section 1981 "when the employer relies on an improperly motivated recommendation by a subordinate *and* does not independently investigate the recommendation." *Griffin v. City of Jacksonville, Florida*, 762 Fed. Appx. 965, (11th Cir. 2019) (unpublished) (emphasis added).[13] Neither exists here.

First, Ossmann cannot prevail on his cat's paw theory because he has not shown that discriminatory animus was the sole reason for **both** Doerr and Banks' decision to terminate. Relying on *Jones v. Gerwens*, Ossmann avers that when multiple persons recommend a dismissal, if anyone acts with unlawful animus, a plaintiff can prevail on a cat's paw theory. *See* 874 F.2d 1534 (11th Cir. 1989). But, *Jones* is inapplicable here. In *Jones*, this Court applied the cat's paw theory to a Title VII claim, which uses a "motivating factor" or a mixed-motive causation standard. Section 1981 cases require the more stringent "but for" causation standard; a mixed-motive causation standard is impermissible. (Doc. 95, at p. 30). *See,*

---

[13] Even under the more lenient *McDonnell Douglas* "motivating factor" causation standard, this Circuit has held that where multiple persons are involved in a decision, a plaintiff must prove that the majority of decisionmakers were unlawfully motivated by race. *See Mason v. Village of El Portal*, 240 F.3d 1337, (11th Cir. 2001) (holding that for Section 1983 case, which uses the *McDonnell Douglas* burden shifting framework, where only one member of a three-member majority of a five-member council was motivated by racial discrimination, it was insufficient to establish pretext.). Ossmann's analysis misses the mark under this lower causation standard.

*Williams*, 777 Fed. Appx. at 454 n.3. Under Section 1981, if even one recommender's decision was based, in part, on a non-discriminatory reason, the cat's paw theory fails because racial animus was not the "but for" reason for the adverse action. *See Sims v. MVM, Inc.,* 704 F.3d 1327, 1336 (11th Cir. 2013) (holding cat's paw theory for "ADEA requires a 'but-for' link between the discriminatory animus and the adverse employment action as opposed to showing that the animus was a 'motivating factor' in the adverse employment decision.").

To establish "but for" causation, Ossmann must show all recommenders harbored discriminatory animus and that animus was the <u>sole</u> reason for Ossmann's termination. Instead, Ossmann contends 1) only Doerr knew Ossmann did not violate Meredith's Harassment Policy; and 2) Doerr's reason for terminating Ossmann was pretext. (*See* Appellant's Opening Brief, at pp. 66-77). These arguments fail because Doerr specifically referred to Ossmann's May 2017 use of the term "cock-blocked" when he drafted the December 6, 2017 Written Warning. (Doc. 62-13, at p. 2). Doerr's knowledge of Ossmann's May and December 2019 sexual harassment informed Doerr's decision to terminate Ossmann. Regardless, Ossmann does not argue – because he cannot – that Banks' sole reason for terminating Ossmann's employment was discriminatory animus. *Id.* Ossmann must cite undisputed, record evidence showing Banks **and** Doerr harbored discriminatory animus and had no other reason, including Ossmann's pattern of predatory sexual

harassment, for moving for Ossmann's termination. *See Sims*, 704 F.3d at 1336 (holding plaintiff must prove "[plaintiff's immediate supervisor's] animus was a 'but-for' cause of, or a determinative influence on, [the] ultimate decision[maker].").

Second, even if Ossmann could show Banks' and Doerr's sole reason for Ossmann's termination was discriminatory animus, (which he cannot), Ossmann's cat's paw theory still fails. Ossmann must also proffer admissible evidence showing Bock failed to investigate the reason for Ossmann's termination. *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331-32 (11th Cir. 1999). To survive a motion for summary judgment, Ossmann is required to proffer affirmative, admissible evidence. *Macuba v. Deboer*, 193 F.3d 1316, 1322–23 (11th Cir. 1999) ("[i]nadmissible hearsay 'cannot be considered on a motion for summary judgment.'") (citing *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

Ossmann has not provided a single record cite showing Bock failed to investigate Ossmann's pattern of sexual harassment. (Appellant's Opening Brief, at pp. 66-77). To the extent Ossmann contends Berenguer's testimony suggests what Bock may or may not have done that, too, is inadequate. The cited testimony speaks solely to Berenguer's process for preparing the EEO Analysis Form and nothing

about what Bock did or did not do **after** Berenguer sent the EEO Analysis Form for processing. (Doc. 74-2, ¶¶ 42-43). Nothing indicates whether Bock told Berenguer she reviewed or relied on the EEO Analysis Forms, but did not ask additional questions, or otherwise investigate any sexual harassment allegations against Ossmann. *Id.* Ossmann's failure to proffer admissible evidence of Bock's failure to investigate the reason for his termination – a pattern of sexual harassment – is fatal to his cat's paw theory. (Doc. 62-21, at Answer to Interrogatory No. 5; Doc. 74, at pp. 1, 4) (Doerr and Banks "made the final decision to invoke the "for cause" provision in Plaintiff's contract and terminate his employment for exhibiting a pattern of behavior that violated Meredith's sexual harassment policy.").

### E.    Ossmann Cannot Undermine Doerr and Banks' Good Faith Belief that Ossmann Engaged in a Pattern of Sexual Harassment To Establish Pretext Under the Work Rule

Ossmann similarly cannot establish pretext under the work rule. Ossmann is unable to disprove Doerr and Banks' honest belief Ossmann was a serial sexual harasser. (Doc. 95, at p. 31-32). Although Ossmann attempts to mislead this Court by truncating written warnings and suggests he was disciplined only for exercising poor judgment (s*ee* Appellant's Brief, at p. 21), the written warnings indicate Ossmann was disciplined after he admitted to engaging in sexually harassing speech and conduct. (Doc. 62-12; Doc. 62-13). The May 15, 2017, Written Warning indicates Ossmann exercised poor judgment after "[He] ***acknowledged*** using the

031073.000013 4867-4581-2778.9

term *'cockblocked' to a team member*." (Emphasis added). (Doc. 62-12, at p. 2).

Ossmann was also reminded that Meredith would not tolerate "behavior that could

contribute to creating a *hostile work environment*." (Emphasis added). (Doc. 62-12,

at p. 2). On December 6, 2017, Doerr issued a written warning and noted that

"[Ossmann] *admitted* [he] had been sending the news producer Facebook messages

in an *attempt to enter into an off-duty, personal relationship*" and the news

producer *did not reciprocate* Ossmann's crude advances. (Emphasis added). (Doc.

62-13, at p. 2). Doerr also made specific reference to Ossmann's prior use of the

term "cock-blocked" in May 2017, and warned that further misconduct could result

in termination. (Doc. 62-13, at p. 2).  Regardless of the subject heading or whether

Ossmann signed these documents, the written warnings demonstrate, that at the time

they were written – and based, in part, on Ossmann's admissions – Doer and Banks

had a good faith belief that Ossmann preyed on women in the workplace.

Even if Doerr and Banks were mistaken in their honest belief that Ossmann

sexually harassed female coworkers, the work rule "does not apply to an employer

'who fires an employee under the mistaken but honest impression that the employee

violated a work rule.'" (Doc. 79, at p. 64; Doc. 95, at pp. 31-33). *See Damon v.*

*Fleming Supermkts of Fla., Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999).  The pretext

inquiry must focus on "the honesty of the employer's explanation; raising a question

about the correctness of the facts underlying that explanation without impugning the

employer's honest belief, fails to create a triable pretext issue." *See* Doc. 79, at p. 64 (quoting *Dawson v. Henry Cnty. Police Dep't*, 238 F. App'x 545, 549 (11th Cir. 2007)) (unpublished).

Ossmann argues that because he did not sign some of his written warnings, Meredith was unjustified in terminating him. Specifically, Ossmann contends that he was allegedly told that Meredith's written warning policy required reference to a specific policy violation(s) and a signature. Ossmann contends that Meredith's allegation he violated its sexual harassment policy was mere pretext because even though a description of the allegations was included, some of his written warnings did not include a specific policy and were not signed. (Appellant's Opening Brief, at pp. 69-77). Ossmann has no legal authority to support his argument. Moreover, Ossmann fails to demonstrate that: (1) he did not violate Meredith's Harassment Policy; (2) Meredith lacked a good faith belief that he engaged in a pattern of sexual harassment; or (3) the real reason for his termination was unlawful discrimination. At most, Ossmann's argument suggests Meredith did not follow its preferred procedures.

Deviation from a company procedure alone is insufficient to establish pretext. A plaintiff must also "show that the deviation from policy occurred in a discriminatory manner." *See* Doc. 79, at p. 64 n.28 (citing *Rojas v. Fla.*, 285 F. 3d 1339, 1344 n.4 (11th Cir. 2002); *Mitchell v. USBI Co.*, 186 F.3d 1352, 1355-56 (11th

Cir. 1999) (holding that "deviation from company policy [is] not evidence of discrimination, absent a nexus between deviation and employee's protected status"). Moreover, the plaintiff bears the burden of showing not only that the employer's proffered reason was untrue, but also that unlawful discrimination was the true reason for the adverse action. *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1267 (11th Cir. 2010). Ossmann fails to do both.

Ossmann has proffered no evidence showing Meredith's failure to follow its policies or procedures was done in a discriminatory manner. There is no evidence that non-white employees who violated the sexual harassment policy, failed to sign written warnings, or received written warnings that did not identify specific policy violations, were not terminated by Meredith. Ossmann also has not shown that the three complaints received by Banks and Doerr, as well as their subsequent investigation, did not support their honest belief that Ossmann engaged in sexual harassment or that the sole reason for Ossmann's termination was unlawful discriminatory animus. The lack of such evidence provides no basis for this Court to do anything other than affirm the District Court's holding that Ossmann did not establish pretext under the work rule.

### F.   Ossmann Cannot Establish Pretext Through a Convincing Mosaic by Combining Baseless Theories

Ossmann incorrectly assumes that if his theories for pretext were debunked individually, they must establish pretext collectively through a "convincing mosaic."

There are three types of evidence that may be used to establish a convincing mosaic:

"(1) suspicious timing, ambiguous statements, similar behavior directed at other

members of the protected group, and other bits and pieces from which an inference

of discriminatory intent might be drawn; (2) systematically better treatment of those

outside the protected class; and (3) pretext in the employer's justification." *See Smith*

*v. City of New Smyrna Beach*, 588 F. App'x 965, 976 (11th Cir. 2013) (unpublished).

Ossmann asserts the following information forms a convincing mosaic: (1)

Bock's alleged reliance on the EEO Analysis Form; (2) the legitimate reason for

Ossmann's termination was pretext; (3) the EEO Analysis Form did not identify one

of many evidentiary documents relied on to support Meredith's justification for his

termination[14]; (4) Meredith's routine assertion of privilege during discovery; (5)

---

[14] Ossmann goes to great lengths to convince this Court that Meredith only relied on
one document in deciding to terminate his employment. This is incorrect.  Separate
from the EEO Analysis Form, Meredith provided a number of pieces of evidence to
establish the basis for Ossmann's termination. (*See* Doc. 62-21, at Answer to
Interrogatory No. 5; Doc. 74, at pp. 1, 4) (Doerr and Banks "made the final decision
to invoke the "for cause" provision in Plaintiff's contract and terminate his
employment for exhibiting a pattern of behavior that violated Meredith's sexual
harassment policy."). As noted above, Meredith produced Berenguer's meeting
notes documenting investigation into three complaints of Ossmann's pattern of
sexual harassment. (Doc. 62-16; Doc. 62-17; Doc. 62-18). Meredith produced
written warnings documenting Ossmann's pattern of sexual harassment. (Doc. 62-
12, Ex. F, First Written Warning; Doc. 62-13, Ex. G, Final Written Warning; Doc.
62-14; Doc. 62-15, Ex. H, Berenguer Dep., 213:2-15). Meredith also produced its
Employee Handbook, Anti-Harassment Policy, and list of Meredith's Required
Training, showing Ossmann was terminated because he knowingly violated
Meredith's sexual harassment policies. (Doc. 62-19; Doc. 62-29; Doc. 62-28). Thus,

Meredith's purportedly pretextual basis for Ossmann's three alleged violations of the Sexual Harassment policy; and (6) application of the work rule. (Appellant's Opening Brief, at p. 78). Meredith has already shown why none of these establish pretext on their own. *See infra.* Section III (A)-(E). Ossmann cannot establish pretext simply by combining failed theories. Faced with the same baseless contention, the District Court correctly held "Ossmann's proffered mosaic of evidence is not sufficient to defeat summary judgment" because there was "no triable issue of fact." (*See* Doc. 95, at pp. 35-36). This Court should hold that when none of Ossmann's "bits and pieces" can individually establish pretext, merely combining them cannot overturn summary judgment.

## IV.  SUMMARY JUDGMENT SHOULD BE AFFIRMED AS TO OSSMANN'S BREACH OF CONTRACT CLAIM AND REQUEST FOR STATE LAW REMEDIES

The District Court properly accepted the magistrate's recommendation to grant summary judgment on Ossmann's breach of contract claim on two independent grounds. (Doc. 75, at pp. 70-75; Doc. 95, at p. 38). Should this Court find that either is present, summary judgment should be affirmed. First, the District Court agreed Ossmann abandoned his claim for breach of contract, and by extension any alleged damages for such claim, because his opposition was based on perfunctory statements

---

Ossmann's continued efforts to restrict Meredith's evidentiary production solely to the EEO Analysis Form must be ignored.

not grounded in law or fact. (Doc. 95, at p. 38; Doc. 75, at pp. 70-72). Ossmann's perfunctory statements continued in this appeal as he vaguely claims his breach of contract claim is linked to his Section 1981 termination claim without citing a specific fact or law. (Appellant's Opening Brief, at pp. 82-83). Second, the District Court agreed that even if Ossmann had alleged facts or law, he still could not survive summary judgment because Meredith terminated Ossmann for just cause as permitted by the contract. *Id.* at 72-75. Meredith has proffered sufficient evidence showing that, as permitted by the contract, Meredith terminated Ossmann's employment for cause – his history of sexual harassment. *Id.*

Where an employment agreement exists, and the terms of the contract are "clear and unambiguous, the contracting parties are bound to those terms and may not rewrite the contract to make it more advantageous or reasonable for one of the contracting parties." *See Ernie Haire Ford, Inc. v. Ford Motor Co.,* 260 F. 3d 1285, 1290-91 (11th Cir. 2001). In August 2017, Ossmann signed an Agreement that governed the terms of his employment. (Doc. 62-6, Employment Agreement at MEREDITH_000101; Doc. 62-4, Berenguer Decl., ¶¶ 12-13). The Agreement gave Meredith a) the right to terminate Ossmann's employment for cause; and b) discretion to determine whether cause existed. *Id.* The Agreement also defined "cause" as "a breach of any term of the Agreement," or "misconduct by the employee, including but not limited to a violation of the Meredith Code of Business

Conduct and Ethics or Company policy, unsatisfactory job performance, . . . or conduct that would injure the good reputation of the Employee, the station, or the program on which Employee appears." *Id.* Cause "shall not be exercised arbitrarily or capriciously." *Id.*

Ossmann knew his employment could be terminated for violating Meredith's policies and he was aware of Meredith's policy against sexual harassment. (Doc. 62-2, ¶¶ 15-16, 18-19). Ossmann also received anti-harassment training in March 2018. (Doc. 62-2, ¶ 20). Yet, even after signing the Agreement, Ossmann violated Meredith's policy when he made unwelcomed sexualized comments about a female co-worker's appearance on Facebook. (Doc. 62-21, at Answer to Interrogatory No. 5; Doc. 62-19, Employee Handbook; Doc. 62-18, Complaint 3 Meeting Notes, MEREDITH _000069; Doc. 62-14, Berenguer Dep., 170:14-15, 171:24-25; Doc. 62-15; Doc. 62-2, ¶ 50; Doc. 62-4, Berenguer Decl., ¶¶ 25-26, 40-41). Considering this and prior complaints of sexual harassment, Meredith terminated Ossmann's employment for cause because his ongoing sexual harassment violated Meredith's Sexual Harassment policy. Summary judgment as to Ossmann's breach of contract claim must be affirmed.

Meredith moved for summary judgment "with respect to each of Plaintiff's claims," including claims for malicious conduct, nominal damages, and litigation expenses, and Meredith requested dismissal of "Plaintiff's Complaint with

prejudice."  (Doc. 62, at p. 4; Doc. 62-1, at p. 7; Doc. 11, at Counts 5-7). By acknowledging that Counts 5-7 were not causes of action but remedies under state law, Meredith did not state it would not move for summary judgment or dismissal as to Ossmann's entire Complaint. (Doc. 62-1, at p. 8 n.1). Ossmann fails to cite to any case, because he cannot, that suggests a moving party must provide extensive briefing regarding remedies on a motion for summary judgment.

Nonetheless, the magistrate provided findings and recommendations and granted Meredith's Motion for Summary Judgment on each of Ossmann's claims. (Doc. 79, at p. 74) (holding "it is **RECOMMENDED** that Defendant's motion for summary judgment [Doc. 62] be **GRANTED**").  Ossmann was required to object to any finding or recommendation Ossmann believed was erroneous. *See* 28 U.S.C. § 636(b)(1)(C).  With respect to Counts 5-7, Ossmann failed to do so and has waived his right to appeal grant of summary judgment on these counts. Alternatively, the District Court has authority to affirm, reject, expand, or otherwise modify the magistrate's findings and recommendations. *See* 28 U.S.C. § 636(b)(1)(C) ("A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.").  At a minimum, that is precisely what happened here.

Lastly, Ossmann contends that under Federal Rules of Civil Procedure 8 and 12, damages theories, which are considered claims for relief, are not subject to

dismissal. (Appellant's Opening Brief, at p. 84). Neither of these rules state that claims for relief are not subject to dismissal. To agree with Ossmann's suggestion would make a 12(b)(6) motion to dismiss for failure to state a claim on which relief may be granted an impermissible method for disposition. *See* Fed. R. Civ. P. 12(b)(6). This Court should affirm summary judgment as to Counts 5-7.

## V.    KANDIS BOCK WAS NOT THE ULTIMATE DECISIONMAKER

Even after making all reasonable inferences in Ossmann's favor, the record evidence shows Bock was not the ultimate decisionmaker. Where a termination decision is merely rubberstamped by an employee, that person is not considered a decisionmaker. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 425 (2011) ("Where the [manager] with formal decisionmaking authority merely rubberstamps the recommendation of others, the employer . . . as actually delegated the decisionmaking responsibility to those whose recommendation is rubberstamped."); *c.f. Quinn v. Monroe County*, 330 F.3d 1320, 1328 (11th Cir. 2003) (holding county administrator was final decisionmaker because he had authority to recommend termination and also delivered the termination himself.).

The EEO Analysis Form identifies Doerr and Banks as the ultimate decisionmakers for Ossmann's termination. (Doc. 62-20, EEO Analysis Form). Doerr and Banks decided to terminate Ossmann's employment because his pattern of sexual harassment violated Meredith's Discrimination and Harassment Policy to

"maintain a safe workplace free from sexual harassment." (Doc. 62-21, at Answer to Interrogatory No. 5; Doc. 62-19, Employee Handbook; Doc. 62-18, Complaint 3 Meeting Notes, MEREDITH _000069; Doc. 62-14, Berenguer Dep., 170:14-15, 171:24-25; Doc. 62-15; Doc. 62-2, ¶ 50; Doc. 62-4, Berenguer Decl., ¶¶ 25-26, 40-41). On April 8, 2019, Doerr informed Ossmann that his employment was terminated. (Doc. 62-2, ¶ 48).

Even if we draw all inferences in favor of Ossmann, such inferences must be based on affirmative evidence showing a genuine issue of material fact. *Liberty Lobby*, 477 U.S. at 257. There is no evidence anyone from corporate, including Bock, reviewed the EEO Analysis Form, or took affirmative steps in terminating Ossmann's employment. While corporate may process termination documents, the evidence shows Doerr and Banks investigated the complaints, provided the reason for termination, and Doerr delivered the termination himself. (Doc. 62-14, Berenguer Dep., at p. 174; Doc. 62-15; Doc. 62-21, at Answer to Interrogatory No. 5; Doc. 62-19, Employee Handbook; Doc. 62-18, Complaint 3 Meeting Notes, MEREDITH _000069; Doc. 62-14, Berenguer Dep., 170:14-15, 171:24-25; Doc. 62-15; Doc. 62-2, ¶ 50; Doc. 62-4, Berenguer Decl., ¶¶ 25-26, 40-41; Doc. 62-2, ¶ 48). As a result, only Doerr and Banks can be ultimate decisionmakers.

Meredith does not stand on this argument alone. As explained *supra*, assuming Bock was the final decisionmaker, this Court should affirm summary

judgment and dismiss Ossmann's Complaint with prejudice for the reasons outlined above.

## <u>CONCLUSION</u>

For the aforementioned reasons, Appellee Meredith Corporation respectfully asks this Court to affirm the District Court's grant of its Motion for Summary Judgment.

Dated:  September 7, 2022

*/s/ Eric L. Barnum*
Eric L. Barnum
Georgia Bar No. 039305
Mitchell A. Robinson
Georgia Bar No. 457665
Adama K. Wiltshire
Missouri Bar No. 68486
Baker & Hostetler LLP
1170 Peachtree Street
Suite 2400
Atlanta, Georgia 30309
T:  404.459.0050
F:  404.459.5734
ebarnum@bakerlaw.com
marobinson@bakerlaw.com
awiltshire@bakerlaw.com

*Attorneys for Defendant-Appellee*

031073.000013 4867-4581-2778.9

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 9,550 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Rule 32-4 of the Eleventh Circuit Rules. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word, in 14-point Times New Roman font.

Dated: September 7, 2022

*/s/ Eric L. Barnum*
Eric L. Barnum

031073.000013 4867-4581-2778.9

## **CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that foregoing document was filed

with the Clerk of Court using the CM/ECF system pursuant to 11th Cir. R. 25-3,

which will automatically serve a copy on all counsel of record in this case.

Dated:  September 7, 2022

*/s/ Eric L. Barnum*
Eric L. Barnum

031073.000013 4867-4581-2778.9



Tab 1

719 Fed.Appx. 929
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or after
Jan. 1, 2007. See also U.S. Ct. of App. 11th Cir. Rule 36-2.
United States Court of Appeals, Eleventh Circuit.

Felicia ABRAM, Plaintiff-Appellant,

v.

VON MAUR, INC., Defendant-Appellee.

No. 17-10966
|
Non-Argument Calendar
|
(January 9, 2018)

**Synopsis**

**Background:** Black woman who worked as department store
manager filed suit against her employer claiming employment
discrimination and retaliation, in violation of Title VII and
§ 1981. The United States District Court for the Northern
District of Alabama, R. David Proctor, J., 2017 WL 412886,
granted employer summary judgment. Manager appealed.

**Holdings:** The Court of Appeals held that:

[1] black manager was not similarly situated to Caucasian
manager, and

[2] store's reason for terminating black manager was
legitimate and non-discriminatory.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (2)

[1]    **Civil Rights**    🔑   Disparate treatment
       Caucasian floor manager at department store
       who was not terminated despite documented
       substandard performance was not similarly

situated to black floor manager who was
terminated for poor performance, as required to
be a comparator for purposes of black manager's
claim against employer for race discrimination,
in violation of Title VII and § 1981; Caucasian
manager held different position, had different
responsibilities, and was reviewed according to
different criteria on a different scale, and the two
exhibited different strengths and weaknesses in
their respective positions. 42 U.S.C.A. § 1981(a);
Civil Rights Act of 1964 § 703, 42 U.S.C.A. §
2000e-2(a)(1).

1 Cases that cite this headnote

[2]    **Civil Rights**    🔑   Motive or intent;  pretext
       Department store's reason for terminating black
       floor manager after she refused to discipline
       black employee for conduct which did not
       warrant discipline for Caucasian employee, that
       manager's overall performance was poor, was
       legitimate and non-discriminatory, rather than
       pretext for discrimination based on race, in
       violation of Title VII or § 1981. Civil Rights Act
       of 1964 § 703, 42 U.S.C.A. § 2000e-2(a)(1); 42
       U.S.C.A. § 1981(a).

6 Cases that cite this headnote

**Attorneys and Law Firms**

**\*930** Heather Newsom Leonard, Heather Leonard, PC,
Birmingham, AL, for Plaintiff-Appellant

Tracy J. Van Steenburgh, Nilan Johnson Lewis, PA,
Minneapolis, MN, Wesley C. Redmond, FordHarrison, LLP,
Birmingham, AL, for Defendant-Appellee

Appeal from the United States District Court for the Northern
District of Alabama, D.C. Docket No. 2:15-cv-01027-RDP

Before TJOFLAT, WILLIAM PRYOR and ANDERSON,
Circuit Judges.

PER CURIAM:

I.

Felicia Abram, an African American woman and former department manager at a Von Maur store, appeals the District Court's grant of summary judgment in favor of Von Maur, Inc., in her employment-discrimination and retaliation suit brought under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a), 3. Abram was terminated for poor work performance around three weeks after complaining to her superiors about their request that she discipline an African American employee for the same type of misconduct for which a Caucasian employee was not punished. Within the intervening period, Abram received her 2013 annual performance review which stated that, for the most part, her performance was satisfactory.

Abram argues that the District Court erred in granting summary judgment on her race-discrimination claim because she established her *prima facie* case by showing that she was replaced by a Caucasian co-worker after being terminated; or, in the alternative, because the disparity in **\*931** how Von Maur treated her versus how it treated a Caucasian floor manager demonstrated that race was a factor in her termination. Abram adds that Von Maur's cited reason for terminating her—poor work performance—was a pretext for racial discrimination given her positive performance history with Von Maur.

Regarding her retaliation claim, Abram contends that the District Court erred in granting summary judgment because she made out her *prima facie* case by showing that she was terminated shortly after expressing her belief that disciplining an African American employee, but not a Caucasian employee, for the same type of misconduct would amount to unlawful racial discrimination. Abram further argues that Von Maur's justification for firing her was a pretext for retaliating against her for expressing this belief.

II.

We review a grant of summary judgment *de novo*. *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008). We must view all the evidence and factual inferences reasonably drawn therefrom in the light most favorable to the nonmoving party, and we must resolve all reasonable doubts about the facts in the nonmovant's favor. *Id.* "Mere conclusions and unsupported factual allegations are legally insufficient to

create a dispute to defeat summary judgment." *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989). Moreover, a "mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

A.

Under 42 U.S.C. § 1981(a), "[a]ll persons ... shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." In the employment context, § 1981 provides for protection against discrimination based on race. *See Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1330–34 (11th Cir. 1998). Similarly, Title VII prohibits an employer from discharging or otherwise discriminating against a person based on her race. 42 U.S.C. § 2000e-2(a)(1). We analyze § 1981 claims using the same evidentiary requirements and analytical framework as claims brought under Title VII. *See Standard*, 161 F.3d at 1330.

Where, as here, an employee attempts to prove discriminatory intent by circumstantial evidence, the claims are subject to the methods of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003). Under the *McDonnell Douglas* framework, a plaintiff establishes a *prima facie* case of race discrimination by demonstrating that she (1) is a member of a protected class, (2) was qualified for her position, (3) suffered an adverse employment action, and (4) was replaced by someone outside of her protected class or was treated less favorably than a similarly situated employee outside of her class. *Id.* To be "similarly situated" to the plaintiff, another employee, known as a comparator, must be similarly situated "in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). In cases involving discriminatory discipline, we ask "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (internal quotation marks omitted). The quantity and quality of the comparator's **\*932** misconduct, moreover, must be "nearly identical" to that of the plaintiff "to prevent courts from second-guessing employers' reasonable decisions." *Id.*; *see also Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1341 (11th Cir. 2015) ("On-the-ground determinations of the

severity of different types of workplace misconduct and how best to deal with them are exactly the sort of judgments about which we defer to employers.").

If the four *McDonnell Douglas* elements are proven but the employer articulates a legitimate, nondiscriminatory reason for its actions, the plaintiff must then show that the employer's alleged reason is a pretext for illegal discrimination. *McDonnell Douglas*, 411 U.S. at 802–04, 93 S.Ct. at 1824–25. To prove such a pretext, the plaintiff must "cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotation marks omitted). A legitimate, nondiscriminatory reason proffered by the employer is not a pretext for prohibited conduct unless the plaintiff shows that the reason is false and that the real reason is impermissible discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515–16, 113 S.Ct. 2742, 2751–52, 125 L.Ed.2d 407 (1993). Further, an employer's deviation from its company policy, standing alone, does not demonstrate discriminatory animus. *Mitchell v. USBI Co.*, 186 F.3d 1352, 1355–56 (11th Cir. 1999).

**[1]** The District Court did not err in granting summary judgment to Von Maur on Abram's race-discrimination claim. First, it properly held that Abram failed to make out a *prima facie* case of race-based discrimination because she did not identify any suitable comparators.[1] Abram asserted that Aileen Read,[2] a Caucasian floor manager who was not terminated despite documented substandard performance, was a proper comparator. Read, however, held a different position, had different responsibilities, and was reviewed according to different criteria on a different scale than Abram. The two also exhibited different strengths and weaknesses. For example, in the "goals" section of Abram's 2013 annual performance review, Abram was instructed to take positive action to build department morale. Read's review, in contrast, cited maintaining a positive environment and morale as a strength. Further, Abram was noted as being consistently tardy; Read was not. The two were thus neither similarly situated in "all relevant respects" nor did they engage in a "nearly identical" quality and quantity of misconduct. *Cf. Burke-Fowler*, 447 F.3d at 1323; *Holifield*, 115 F.3d at 1562.

[1] Abram also argued below that because a Caucasian individual took her former position, she made out a *prima facie* case of race discrimination under the *McDonnell Douglas* framework. The District Court held that this claim was not adequately presented in Abram's briefs and so it refused to acknowledge the claim. We need not review that decision because we ultimately agree with the District Court that, even assuming Abram established a *prima facie* case, Von Maur articulated a legitimate, nondiscriminatory reason for her termination which Abram failed to rebut as a pretext for discrimination.

[2] In the District Court, Abram had also identified Melissa Patton, a Caucasian store manager, as a comparator. However, she has abandoned that position on appeal.

**[2]** Next, the District Court properly held that, even assuming *arguendo* that Abram established a *prima facie* case, Von Maur articulated a legitimate, nondiscriminatory reason for her termination—poor **\*933** performance—which Abram failed to show was a pretext for discrimination. Abram's superiors had both observed problems with and received complaints about Abram's ineffective management style and substandard performance well before the event she claims led to her firing. Further, that Read was not terminated despite substandard performance does not indicate pretext, as the two are not comparators. Finally, even though Abram did not receive two disciplinary warnings before termination, as is Von Maur's policy, this deviation does not, standing alone, amount to discriminatory animus. *See Mitchell*, 186 F.3d at 1355–56. Abram thus failed to show pretext. The District Court properly granted summary judgment in Von Maur's favor on Abram's race-discrimination claim.

## B.

Section 1981 prohibits retaliation against a party who has filed a formal complaint charging racial discrimination. *See Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1411–13 (11th Cir. 1998); *see also CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457, 128 S.Ct. 1951, 1961, 170 L.Ed.2d 864 (2008) (holding that § 1981 covers retaliation claims). Title VII contains a similar protection. *See* 42 U.S.C. § 2000e-3. Because Abram's § 1981 retaliation claim, like her race-discrimination claim, depends upon circumstantial evidence,

the *McDonnell Douglas* framework governs. *See Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009).

Von Maur provided a legitimate, nondiscriminatory reason for firing Abram. For the same reasons discussed above, Abram could not, in turn, demonstrate this was a pretext for retaliation. The District Court thus properly granted summary judgment to Von Maur with respect to this claim.

III.

The District Court did not err in granting summary judgment in Von Maur's favor on both of Abram's claims.

**AFFIRMED.**

**All Citations**

719 Fed.Appx. 929, 2018 Fair Empl.Prac.Cas. (BNA) 6697

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.



Tab 2

238 Fed.Appx. 545
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter See Fed.
Rule of Appellate Procedure 32.1 generally governing
citation of judicial decisions issued on or after Jan.
1, 2007. See also Eleventh Circuit Rules 36-2, 36-3.
(Find CTA11 Rule 36-2 and Find CTA11 Rule 36-3)
United States Court of Appeals,
Eleventh Circuit.

Kenneth DAWSON, Plaintiff–Appellant,

v.

HENRY COUNTY POLICE DEPARTMENT,

Henry County, Defendants–Appellees.

No. 06–14640
|
Non–Argument Calendar.
|
July 3, 2007.

**Synopsis**

**Background:** African–American former employee sued
former employer, claiming racial discrimination under Title
VII, § 1981 and § 1983. The United States District Court for
the Northern District of Georgia granted summary judgment
for the employer, and the employee appealed.

**Holdings:** The Court of Appeals held that:

[1] neither of two white coworkers were similarly situated to
the employee, and

[2] proffered explanation for the employee's demotion and
pay reduction was not pretextual.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (2)

[1]    **Civil Rights**    🔑    Disparate Treatment

Neither of two coworkers at a county police
department, each of whom allegedly received
counseling for failing to complete an assignment
involving the safety of a child, were similarly
situated to an employee, so as to support
his Title VII claim of race discrimination
regarding his demotion and pay reduction;
a significant distinction existed between the
coworkers' failure to secure a zone for which
services have been requested where a child
resided and the employee's failure to ensure
that an actual allegation of child abuse was
investigated properly, and in any event, the
employee, unlike the coworkers, was already on
probation at the time of the relevant misconduct.
Civil Rights Act of 1964, § 701 et seq., 42
U.S.C.A. § 2000e et seq.

3 Cases that cite this headnote

[2]    **Civil Rights**    🔑    Motive or Intent;  Pretext

Proffered explanation for a county police
department employee's demotion and pay
reduction, his failure to ensure that an actual
allegation of child abuse was investigated
properly, was not a pretext for race
discrimination; there was no evidence that the
county had no real belief that his acts were
improper and merited the discipline imposed.
Civil Rights Act of 1964, § 701 et seq., 42
U.S.C.A. § 2000e et seq.

29 Cases that cite this headnote

**Attorneys and Law Firms**

**\*546**  John Derek Wales, Law Offices of John D. Wales,
Marietta, GA, for Plaintiff–Appellant.

Donald A. Cronin, Jr., O'Quinn & Cronin, McDonough, GA,
for Defendants–Appellees.

Appeal from the United States District Court for the Northern
District of Georgia. D.C. Docket No. 04–01085–CV–BBM–
1.

Before EDMONDSON, Chief Judge, DUBINA and
CARNES, Circuit Judges.

**Opinion**

PER CURIAM:

**\*\*1** Kenneth Dawson, an African–American male, appeals the district court's grant of summary judgment in favor of his former employer, Henry County Police Department ("Henry County"), dismissing his complaint alleging racial discrimination under Title VII, 42 U.S.C. § 2000e–2(a)(1) and pursuant to 42 U.S.C. § § 1981 and 1983. No reversible error has been shown; we affirm.

Dawson's discrimination claim stems from discipline imposed upon him by Henry County for incidents occurring in September 2003 and again in November 2003. In September 2003, Dawson was charged with failing to perform properly his duties when responding to a potential child abuse call involving a mother who slapped repeatedly her teenage daughter. Henry County specifically maintained that Dawson failed to comply with state law requirements that the chief aggressor be arrested and a family violence report be filed. In November 2003, Dawson was charged again with neglect of duty when he signed off on a subordinate's investigation of a report of potential child abuse although that subordinate had failed to make contact with the subject child and failed to confirm the child's welfare otherwise. After the September 2003 incident, Captain Hatch (Caucasian) recommended, and Chief White (African–American) agreed, that Dawson should be demoted to Sergeant and placed on probation. Dawson appealed the discipline imposed; it was upheld after a hearing in which Dawson was represented by counsel. So too, after the November 2003 incident, Captain Hatch recommended Dawson be demoted to Patrolman; Chief White agreed. This discipline also was upheld after a hearing.

Dawson's discrimination claims center on his allegation that the discipline imposed on him for each of these incidents— demotion and reduced pay—was greater than the discipline meted out to similarly situated Caucasian employees. Henry County moved for summary judgment arguing that Dawson failed to establish a *prima facie* case because, among other reasons, Dawson failed to meet his burden of identifying a similarly situated comparator; the County also argued that, even assuming a *prima facie* case, Henry County asserted legitimate nondiscriminatory **\*547** reasons supporting its discipline of Dawson. The magistrate judge issued a report and recommendation concluding that Henry County's motion was due to be granted: the evidence was insufficient to show that the proffered comparators were similarly situated, and

nothing in the record showed that Henry County's reasons for imposing the discipline it imposed was pretextual. After *de novo* review, the district court adopted the magistrate's recommendation and granted summary judgment dismissing Dawson's complaint.

Dawson argues on appeal, as he did in the district court, that he proffered comparators for each of the two incidents for which he was disciplined. Dawson points to Roger Stubbs, a Caucasian, who was demoted—for inadequate supervision— from Captain to Sergeant without reduction in pay. According to Dawson, the discipline he received for the September 2003 incident also was for inadequate supervision. But, as the magistrate found—and the district court agreed—the record failed to establish with sufficient specificity the conduct for which Stubbs was disciplined.

**\*\*2** The same deficiency was found with another proffered comparator, Simmons. Simmons was demoted from Deputy Chief to Detective without reduction in pay, a demotion for inadequacies in his conduct of an internal investigation. The present case's record failed to show the nature and seriousness of Simmons's investigatory shortcomings. But, according to Dawson, a jury should have been allowed an opportunity to make the requisite inferences to show comparability.

**[1]** About the November 2003 incident, Dawson argues Crawford and Savage, each of whom received counseling for failing to complete an assignment involving the safety of a child, engaged in conduct sufficiently similar to be a comparator. Crawford intended that an officer provide security to a child at a particular address when the child exited a school bus. Crawford told Savage to ensure that this matter was attended to but, in recording the assignment, he inadvertently only directed that the street upon which the child lived be patrolled. Savage made generally known the need for an officer to attend to this assignment; he failed to communicate the seriousness of the detail and failed to single out a particular officer for the assignment. The magistrate determined that neither Crawford nor Savage was similarly situated to Dawson because they—unlike Dawson—were not already on probation when the disciplined conduct occurred. The district court agreed that Dawson's probationary status rendered Crawford and Savage unacceptable comparators; it further concluded that material distinctions between the misconduct of Dawson and that of Crawford and Savage, also rendered these officers insufficiently similar to satisfy Dawson's burden of establishing a *prima facie* case.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

We review a district court's grant of summary judgment *de novo*, and we view the evidence and all reasonable factual inferences in the light most favorable to the nonmoving party. *Maniccia v. Brown,* 171 F.3d 1364, 1367 (11th Cir.1999). Absent other evidence of discrimination, summary judgment properly may be granted "[i]f a plaintiff fails to show the existence of a similarly situated employee." *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997).

Dawson misapprehends the degree of similarity necessary to show a valid comparator for purposes of satisfying the similarly-situated element of a *prima facie* **\*548** case of discrimination. [1] According to Dawson, nothing requires that the disciplined conduct be the same or nearly identical to that for which the complainant was disciplined. But as we have said, the "quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia,* 171 F.3d at 1368. [2]

[1]  No direct evidence of discrimination is alleged. Because this case is a circumstantial evidence case, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies.

[2]  We appreciate that *Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1334 (11th Cir.2000), cited by Dawson, set out a less exacting burden. But *Burke–Fowler v. Orange County, Fla.,* 447 F.3d 1319, 1323 n. 2 (11th Cir.2006), made clear that the "nearly identical" standard of *Maniccia*—a panel decision that pre-dates the *Alexander* panel decision—applies under our prior precedent rule.

The district court committed no error when it concluded that Dawson failed to show a valid comparator. Dawson's reliance on Stubbs and Simmons as comparators was not supported by the record: the misconduct for which they were punished has been shown here in only the most general of terms; no way exists to determine whether the "quantity and quality" of the misconduct was "nearly identical" to that of Dawson. *See Maniccia,* 171 F.3d at 1368. Dawson's reliance on Crawford and Savage is also flawed: as the district court observed, a significant distinction exists between (1) Crawford and Savage's failure to secure a zone for which services have been requested where a child resides; and (2) Dawson's failure to ensure that an actual allegation of child abuse was investigated properly. And even if

we were to assume comparability of the "quality" of the conduct of Crawford and Savage, we nonetheless would conclude that neither Crawford nor Savage were similarly situated because Dawson—unlike his proffered comparators—already was on probation at the time of the relevant misconduct. *See Cooper v. Southern Co.,* 390 F.3d 695, 741 (11th Cir.2004) (Title VII claimant's earlier placement in discipline program factor considered in concluding proposed comparators not similarly situated). Dawson's protestations to the contrary notwithstanding, probationary status imposed as a consequence of a disciplinary process is relevant to the "similarly-situated" analysis.

**\*\*3**  **[2]**  Even if we were to assume *arguendo* that Dawson established a *prima facie* case, the district court order is due to be affirmed: it rested on the alternative ground that Dawson failed to show that Henry County's legitimate nondiscriminatory reasons for the discipline imposed were pretextual. If Dawson preserved this issue for appeal [3]—a doubtful proposition—Dawson failed to cast sufficient doubt on Henry County's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the expressed reasons were pretext for discrimination. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir.1997).

[3]  Dawson mentions the pretext issue only in a single passing reference. Issues not substantively argued on appeal are deemed waived; a passing reference in an appellate brief is insufficient to raise an issue. *See Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1573 n. 6 (11th Cir.1989).

The same evidence offered initially to establish a *prima facie* case may be relied on for purposes of assessing the existence of pretext. *See id.* at 1528. But Dawson's comparator evidence was wanting even to establish a *prima facie* case; it is no **\*549** stronger for purposes of demonstrating "weaknesses, implausibilities, inconsistencies, or contradictions" requisite to finding pretext. *See id.* at 1538. A proffered reason is shown to be pretext for discrimination only when it is shown that the reason was false *and* that discrimination was the real reason. *Brooks v. County Comm'n of Jefferson County, Ala.,* 446 F.3d 1160, 1163 (11th Cir.2006). An employee may meet its burden on pretext by " 'either directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " *Jackson v. Ala. State Tenure Comm'n,* 405 F.3d 1276, 1289 (11th Cir.2005), *quoting Texas Dep't. of Cmty. Affairs v. Burdine,*

450 U.S. 248, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). Dawson questioned whether his employment acts constituted violations of work rules and state law as claimed by Henry County; he introduced no evidence to show that Henry County had no real belief that his acts were improper and merited the discipline imposed. The pretext inquiry focuses on the honesty of the employer's explanation; raising a question about the correctness of the facts underlying that explanation without impugning the employer's honest belief, fails to create a triable pretext issue. *See Elrod v. Sears Roebuck and Co.,* 939 F.2d 1466, 1470 (11th Cir.1991); *Cooper,* 390 F.3d at 730.

Dawson did present evidence that others he identified as comparators were disciplined differently than was he but, as we have already discussed, these proffered comparators were insufficiently similar even to meet the threshold requisite to establish a *prima facie* case; the comparator evidence also failed to show that Henry County's proffered reasons for demoting him and reducing his pay were pretextual. *See Chapman v. AI Transport,* 229 F.3d 1012, 1030 (11th Cir.2000) ("[p]rovided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.").

**\*\*4 AFFIRMED.**

**All Citations**

238 Fed.Appx. 545, 2007 WL 1893367

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.



Tab 3

762 Fed.Appx. 965
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or after
Jan. 1, 2007. See also U.S. Ct. of App. 11th Cir. Rule 36-2.
United States Court of Appeals, Eleventh Circuit.

Darrell GRIFFIN, Plaintiff-Appellant,

v.

CITY OF JACKSONVILLE, FLORIDA, Laura
Stagner, individually, Defendants-Appellees.

No. 17-13961
|
Non-Argument Calendar
|
(March 15, 2019)

**Synopsis**
**Background:** African American city employee brought
action under city and supervisor under §§ 1981 and 1983
arising out of employee's demotion after audit of grant
agreements for contract bids found employee had breached
various policies and rules. The United States District Court
for the Middle District of Florida, No. 3:15-cv-01209-HES-
MCR, granted summary judgment to city and supervisor.
Employee appealed.

**Holdings:** The Court of Appeals, Martin, Circuit Judge, held
that:

[1] Caucasian city employee who initiated purchase order was
not similarly situated to plaintiff;

[2] Caucasian city employee, who requested funding be
siphoned away from other projects to fund consulting services
contract, was not similarly situated to plaintiff;

[3] Caucasian city employee, who sent requests for funding to
be reallocated towards particular contract, was not similarly
situated to plaintiff; and

[4] employee's supervisor's actions were insufficient to confer
individual liability for § 1983 claim under cat's paw theory.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (4)

**[1]    Civil Rights    🔑    Disparate treatment**

Caucasian city employee who initiated purchase
order with private vendor, which was described
in audit of grant agreements, was not similarly
situated to African American city employee
responsible for overseeing grant agreements
for contract bids, and therefore allegedly more
favorable treatment of former could not support
latter's § 1981 claim against city, alleging
discrimination after he was demoted in response
to audit finding violations of city procurement
code with respect to grant agreements; audit
did not specifically accuse Caucasian employee
of violating procurement code or conflict of
interest policies, and Caucasian employee was
not solely responsible for awarding purchase
order. 42 U.S.C.A. § 1981.

**[2]    Civil Rights    🔑    Disparate treatment**

Caucasian city employee, who requested funding
be siphoned away from other projects to fund
consulting services contract, was not similarly
situated to African American city employee
responsible for overseeing grant agreements
for contract bids, and therefore allegedly more
favorable treatment of former could not support
latter's § 1981 claim against city, alleging
discrimination after he was demoted in response
to audit finding violations of city procurement
code with respect to grant agreements; Caucasian
employee was no longer employed with city at
time audit was finalized, and thus there was no
opportunity for city to discipline her. 42 U.S.C.A.
§ 1981.

**[3]    Civil Rights    🔑    Disparate treatment**

Caucasian city employee, who sent requests
for funding to be reallocated towards particular

contract, was not similarly situated to African American city employee responsible for overseeing grant agreements for contract bids, and therefore allegedly more favorable treatment of former could not support latter's § 1981 claim against city, alleging discrimination after he was demoted in response to audit finding violations of city procurement code with respect to grant agreements; audit did not accuse Caucasian employee of failing to follow any ordinances or policies, nor did it accuse him of breaking any conflict of interest rules, as opposed to allegations made against African American employee. 42 U.S.C.A. § 1981.

[4]    **Civil Rights** 🗝 Employment practices

City employee's supervisor's actions in allegedly failing to reveal city's "self-performance" policy when she drafted responses to audit, which accused employee of violating various policies and rules, were insufficient to confer individual liability for employee's § 1983 action under cat's paw theory; supervisor did not take any action that led to adverse action against employee but rather at most failed to save employee from adverse action. 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*966** Bryan E. DeMaggio, Matthew R. Kachergus, Camille Elizabeth Sheppard, William J. Sheppard, Elizabeth Louise White, Jesse B. Wilkison, Sheppard White Kachergus & DeMaggio, PA, Jacksonville, FL, for Plaintiff-Appellant

Wendy E. Byndloss, Craig Dennis Feiser, Sean Bryan Granat, Office of General Counsel, City of Jacksonville, Jacksonville, FL, for Defendants-Appellees

Appeal from the United States District Court for the Middle District of Florida, D.C. Docket No. 3:15-cv-01209-HES-MCR

Before ED CARNES, Chief Judge, MARTIN, and ANDERSON, Circuit Judges.

**Opinion**

MARTIN, Circuit Judge:

Darrell Griffin sued the City of Jacksonville, Florida (the "City") and Laura Stagner in her individual capacity under 42 U.S.C. §§ 1981 and 1983. Mr. Griffin claims the City discriminated against him on the basis of race when it demoted him due to actions revealed in an audit conducted by the City. He also claims Ms. Stagner discriminated against him by failing to reveal a policy that rendered his actions permissible. The District Court granted summary judgment for the City and Ms. Stagner, and Mr. Griffin timely appealed. After careful consideration, and with the benefit of oral argument, we affirm.

**I.**

Mr. Griffin, an African American male, was appointed Affordable Housing Coordinator for Jacksonville's Housing and Community Development Division (the "Division") in 2007. As the Affordable Housing Coordinator, Mr. Griffin administered grant funding from the State Housing Initiatives Partnership to developers for rehabilitation of low-incoming housing through the City's Rental Rehabilitation Program. In this role, Mr. Griffin reviewed each developer's application for compliance with the City's Procurement Code and the terms of the City's grant agreements. He would then turn over the application to the Division's finance team to determine if funding was feasible. If funding was available, the Director of the Division would approve the application, and the developer and the City would enter into a grant agreement.

Section 126.110 of the City's Procurement Code prohibited conflicts of interest **\*967** for contracts to which the City is a party. Section 126.110 was memorialized in the grant agreements as Section 12.15 (Conflict of Interest), which prohibited developers from hiring contractors or subcontractors if the developer exercised any control over the contractor or subcontractor, or if the developer had any financial interest in the contractor or subcontractor. The grant agreements also contained Section 12.19 (Procurement), which required developers to solicit a certain number of quotes or undergo a formal bidding process depending on the cost associated with the contracted work or supplies.

The Council Auditor's Office conducted an audit ("Audit #769") of the funds disbursed through the State Housing

Initiatives Partnership between October 1, 2009 and September 30, 2012. During this time, Mr. Griffin was responsible for overseeing the grant agreements that were funded through the State Housing Initiatives Partnership and the Rental Rehabilitation Program.

The preliminary findings of Audit #769 were that Mr. Griffin failed in his compliance responsibilities. In four of the nine audited grant agreements covering the period Mr. Griffin oversaw, the developer was not in compliance with Section 12.15 of the grant agreement. And in all nine of the reviewed grant agreements, developers had not solicited the number of quotes required by Section 12.19 for the contracted work.

Mr. Griffin contends he did not enforce Section 12.15 of the grant agreements because the Division had a "self-performance" policy. As he describes this unwritten policy, the City allowed not-for-profit developers who were also contractors to perform the work themselves or delegate the work to a general contractor the not-for-profit developer kept on staff. In both contexts, the developer has a financial interest in the contractor which violates Section 12.15. Mr. Griffin says the "self-performance" policy was "normal practice" in the City, and all Division employees were aware of it. But the Rental Rehabilitation Program Guidelines make no mention of the "self-performance" policy, and Mr. Griffin did not submit any written documentation showing that the "self-performance" policy was followed in the State Housing Initiatives Partnership or the Rental Rehabilitation Program. Similarly, to justify his nonenforcement of Section 12.19, Mr. Griffin also claims the Division had a policy of not following the quote requirement.

The Council Auditor's Office conducted an exit interview with Mr. Griffin in October 2014 to discuss Audit #769's preliminary findings. Mr. Griffin agreed with the preliminary findings that Sections 12.15 and 12.19 had not been followed in a number of the grant agreements he oversaw. He informed the Council Auditor's Office of the Division's "self-performance" policy but explained the "self-performance" policy was no longer in place. [1] And he did not provide any documentation of the "self-performance" policy to the Council Auditor's Office.

performance" policy is] not [the Division's] policy anymore."

Using Mr. Griffin's responses from the exit interview, the Council Auditor's Office completed a draft audit report on April 25, 2014. The draft audit report restated the audit's preliminary conclusion: Mr. Griffin allowed a number of violations of Sections 12.15 and 12.19 in the grant agreements. It also recommended "the [City] investigate **\*968** and determine whether any disciplinary action of [Mr. Griffin] would be warranted."

After the draft audit report was finalized, the City elected a new mayor, Lenny Curry, who was set to assume office on July 1, 2015. By custom, all appointed City employees are required to submit resignation letters when a new mayor is elected. Once each appointed employee submits a resignation letter, the new mayoral administration reviews each of them and determines whether to keep the employee in their appointed position. If the new administration elects to accept an appointed employee's resignation, the employee "reverts" back to the civil service position they held before their appointment if it is available.

In keeping with this practice, Mr. Griffin received an email on May 29, 2015 addressed to all appointed employees and instructing them to submit a letter of resignation to Mayor Curry's administration. The email explained that if the appointed employee wanted to stay in his appointed position under the new administration, he should include a resume along with his resignation letter. It also implied that an appointed employee could forgo submitting a resume and instead opt to revert back to his original civil service position. Mr. Griffin decided he would like to continue in his appointed position. As instructed, he submitted a resignation letter together with his resume on June 4, 2015.

In early August 2015, the Council Auditor's Office brought a copy of the draft audit report directly to Sam Mousa, Mayor Curry's Chief Administrative Officer. [2] Mr. Mousa reviewed the report and then met with Ms. Stagner, the head of the Division's finance team who was, at the time, also serving as the Interim Chief of the Division. The Division was required to submit responses to the draft audit. After receiving responses, the Council Auditor's Office would publish the audit's final results online. Mr. Mousa asked Ms. Stagner to "take the lead" on the Division's responses to the draft audit. Ms. Stagner did not give a copy of the draft audit findings to Mr. Griffin, even though draft audit findings were typically distributed to each affected program manager.

[1]    Although the auditor from the Council Auditor's Office who conducted the exit interview cannot remember Mr. Griffin mentioning the "self-performance" policy, Mr. Griffin testified he informed the auditor "that[ ] [the "self-

2    Mr. Mousa testified that the Council Auditor's Office first gave him the draft audit report in August or September 2015. But it must have been early August 2015 because, as set out later in this opinion, Mr. Mousa took documented action on the draft audit report on August 3, 2015.

Before the Division's responses to the draft audit report were finalized, Mr. Mousa met with Folks Huxford, the Acting Director of the Planning Department, which oversaw the Division. Mr. Mousa asked Mr. Huxford to present Mr. Griffin with two options: (1) either resign from his position as the Affordable Housing Coordinator or (2) be placed on administrative leave while an investigation was conducted. Mr. Huxford met with Mr. Griffin and presented Mr. Griffin with the two options, which he explained were in response to the audit. Ms. Stagner and others were also present at the meeting. Mr. Griffin opted to be placed on administrative leave and have the investigation go forward.

Mr. Mousa was responsible for reviewing the resignation letters submitted due to the change in mayoral administration. He decided whether each appointed employee would stay in their position. Mr. Mousa reviewed Mr. Griffin's resignation letter on September 3, 2015, after Mr. Griffin elected to go on administrative leave. Mr. Mousa decided to accept Mr. Griffin's resignation because of the draft audit report's findings. Mr. Mousa testified there were no other factors involved in the **\*969** decision to demote Mr. Griffin. He also said it was solely his decision to accept Mr. Griffin's resignation. As a result of having his resignation accepted, Mr. Griffin reverted back to the civil service position of Recreation, Planning and Grants Coordinator in the City's Parks, Recreation and Community Services Department. This caused his salary to decrease by $36,000.

After Mr. Mousa accepted Mr. Griffin's resignation, the Division submitted its responses to the draft audit on September 15, 2015. The Division "acknowledge[d]" the Council Auditor's Office's findings regarding Mr. Griffin's violations of Sections 12.15 and 12.19 and stated it was "currently pursuing disciplinary action against" Mr. Griffin that "may include up to termination." According to Mr. Mousa, Ms. Stagner "had nothing to do with the final decision [to] discipline" Mr. Griffin. Instead, Mr. Mousa had reached a consensus with the City's Office of General Counsel and his assistant to discipline Mr. Griffin.

After he was demoted, Mr. Griffin filed suit against the City and Ms. Stagner in her individual capacity. Mr. Griffin made a claim of race discrimination against the City and Ms. Stagner under §§ 1981 and 1983, alleging he was demoted from his position as Affordable Housing Coordinator because of his race. The City and Ms. Stagner moved for summary judgment, and the District Court granted their motion. The District Court found Mr. Griffin failed to establish a prima facie case of discrimination and Ms. Stagner was entitled to qualified immunity. Mr. Griffin then timely filed this appeal.

## II.

We review de novo the grant of summary judgment. Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1263 (11th Cir. 2010). "We will affirm if, after construing the evidence in the light most favorable to the non-moving party, we find that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." Id. at 1263–64; Fed. R. Civ. P. 56(a). "We may uphold the district court's grant of summary judgment on any basis supported by the record." McCullum v. Orlando Reg'l Healthcare Sys., Inc., 768 F.3d 1135, 1141 (11th Cir. 2014).

## III.

We first address Mr. Griffin's § 1981 claim against the City.[3] Mr. Griffin may establish discrimination through direct evidence, circumstantial evidence, or statistical proof. Alvarez, 610 F.3d at 1264. He relies solely on evidence of discrimination through comparators, which is considered circumstantial evidence. See Smith, 644 F.3d at 1327–28, 1328 n.24. We therefore apply the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[4] Alvarez, 610 F.3d at 1264.

3    Claims of race discrimination under § 1981 are analyzed in the same manner as claims brought under Title VII. Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1325 n.14 (11th Cir. 2011)

4    Establishing the elements of the McDonnell Douglas framework is not the only way to survive summary judgment in an employment discrimination case. A plaintiff may also present

"a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Smith, 644 F.3d at 1328 (quotation marks and footnote omitted). Mr. Griffin did not raise this method before the District Court, and he does not argue it on appeal. We therefore decline to consider it. See Ramirez v. Sec'y, U.S. Dep't of Transp., 686 F.3d 1239, 1249–50 (11th Cir. 2012).

Under the McDonnell Douglas framework, the "plaintiff bears the initial burden **\*970** of establishing a prima facie case, which creates a rebuttable presumption of discriminatory intent." Flournoy v. CML-GA WB, LLC, 851 F.3d 1335, 1339 (11th Cir. 2017). The "[d]efendant must then rebut that presumption by producing evidence of a legitimate, nondiscriminatory reason for its action." Id. "If [the] defendant bears its burden of production, [the] plaintiff must establish that [the] defendant's proffered reason is but a pretext for unlawful discrimination." Id.

To establish a prima facie case of discriminatory termination through circumstantial evidence under McDonnell Douglas, a plaintiff must show that: "(1) [ ]he belongs to a protected class; (2) [ ]he was subjected to adverse employment action; (3) [his] employer treated similarly situated employees outside [his] classification more favorably; and (4) [ ]he was qualified to do the job." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004).

To show the City treated similarly situated employees outside his classification more favorably, Mr. Griffin points to another audit ("Audit #779") that the Council Auditor's Office conducted. Audit #779 reviewed a purchase order and contract made between the Division and a private vendor for affordable housing development technical assistance and consulting services. The purchase order between the Division and the private vendor initially covered the time period between March 1, 2007 and September 30, 2008, and was authorized up to $85,000. The contract between the parties covered a period between April 7, 2009 and September 30, 2009 and was authorized up to $98,000.

Audit #779 found that the award of the purchase order did not comply with the City's Procurement Code. The initial award was set up as a "sole source" no-bid purchase order, meaning that it waived the City's competitive bidding requirements. "Sole source" contract awards are permissible under the City's Procurement Code only when the requesting agency believes no other vendor could perform the services. To comply with

this requirement, the award of a sole source contract had to be accompanied by a letter explaining why only one particular vendor could perform the services. Audit #779 found that the letter accompanying the award of the contract failed to properly justify why only that private vendor could perform the consulting services.

Audit #779 also found that the contract between the parties was amended four times to extend the contract end date from September 30, 2009 to September 30, 2012. To fund the extensions, money was siphoned away from other City projects, including $400,000 from a project specifically requested by one of the City's Council Members. As a result, the maximum indebtedness under the contract increased to $868,000—almost nine times larger than the amount originally authorized. Despite the increases in funding for the contract, the scope of the services governed by the contract never increased. Audit #779 found these amendments were improper and violated the City's procurement policies. And Audit #779 recommended more than $300,000 be returned to the Council Member's bond account.

Three white City employees—Kerri Stewart, Wight Greger, and John Pappas—were involved in the purchase order and contract described in Audit #779. First, Ms. Stewart initiated the purchase order with the private vendor and was considered the "point person in the decisionmaking" regarding the purchase order. Second, Ms. Greger directly requested funding be siphoned away from other projects, including the City's Council Member's project, to fund the consulting services contract. Last, Mr. Pappas sent Ms. **\*971** Greger's requests for funding to be reallocated toward the contract.

Mr. Griffin argues Ms. Stewart, Ms. Greger, and Mr. Pappas are similarly situated to him in all relevant respects. He claims Audit #779 accused them of conduct more egregious than his, but they were not disciplined in any way. Mr. Griffin argues that, as a result, a jury could infer the City treated employees outside of his classification more favorably.

To be an adequate comparator, the preferentially treated person from outside the plaintiff's protected class must be similarly situated to the plaintiff in all material respects. See Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (per curiam). To be "similarly situated," the comparator employee must have been "involved in or accused of" the same basic conduct, yet "disciplined in different ways" for that conduct. Id. "The most important factors in the disciplinary context are

the nature of the offenses committed and the nature of the punishments imposed." Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999) (quotation marks omitted).

[1] None of Mr. Griffin's proffered comparators are similarly situated to him in all material respects. See Holifield, 115 F.3d at 1562. First, Audit #779 did not specifically accuse Ms. Stewart of violating any of the City's Procurement Codes or conflict of interest policies.⁵ Although she may have been the "point person in the decisionmaking" regarding the purchase order, the ultimate decision to award the purchase award to the private vendor was made by a five-person committee at a public meeting. Because this decision was made by a five-person committee, we cannot say that any one member of that committee was solely responsible for the audit. In contrast, Mr. Griffin was solely responsible for overseeing the grant agreements, and Audit #769 specifically pointed to him as the person responsible for allowing violations of Section 12.15.

⁵    Mr. Griffin claims either Ms. Stewart or Ms. Greger sat on a subcommittee that Audit #779 accused of "[ ]partiality." But Mr. Griffin cannot say with certainty that Ms. Stewart or Ms. Greger were on the subcommittee. "Speculation does not create [a] genuine issue of fact." Hornsby-Culpepper v. Ware, 906 F.3d 1302, 1314 (11th Cir. 2018) (quotation marks and emphasis omitted). The City is therefore entitled to summary judgment on this issue.

Further, Audit #779 accused the committee of failing to justify why the private vendor was the City's only option for affordable housing development technical assistance and consulting services. If the committee had properly justified its decision, the initial sole source award may have been permissible under the City's Procurement Code. In contrast, it was never permissible in the grant agreements Mr. Griffin oversaw for quotes or bids to not be solicited. There was no waiver process to justify not soliciting these quotes or bids. Given these key distinctions, Ms. Stewart did not engage in the same conduct as Mr. Griffin. See Holifield, 115 F.3d at 1562. She is therefore not an appropriate comparator to establish discrimination by the City because she is not similarly situated to Mr. Griffin in all material respects. See id.

[2]   [3] Neither are Ms. Greger or Mr. Pappas apt comparators. When Audit #779 was finalized in March 2016, Ms. Greger was no longer employed by the City. There was thus no opportunity for the City to discipline her. She therefore could not be "disciplined in [a] different way[ ]"

than Mr. Griffin and, as a result, cannot be considered similarly situated to him. See id. Mr. Pappas is no better comparator. Audit #779 accused him only of **972** sending Ms. Greger's requests for funds to be reallocated toward the contract amendments. It does not accuse him of failing to follow any of the City's ordinances or policies. Neither does it accuse him of breaking any conflict of interest rules or quote or bidding requirements. Thus, Mr. Pappas and Mr. Griffin were not involved in the same conduct. See id.

In sum, all three of Mr. Griffin's proffered comparators are different in some material respect. And because Mr. Griffin has not shown that the City treated any similarly situated employee outside of his classification more favorably, he cannot establish a prima facie case of race discrimination under McDonnell Douglas. See Wilson, 376 F.3d at 1092. We therefore affirm the District Court's grant of summary judgment to the City.

## IV.

[4] In addition to his claim against the City, Mr. Griffin also argues Ms. Stagner discriminated against him by failing to reveal the "self-performance" policy when she drafted the audit responses. He seeks to hold her individually liable for her actions under § 1983 through a cat's paw theory of liability.

The cat's paw theory is typically understood to create employer liability under either § 1981 or § 1983 when the employer relies on an improperly motivated recommendation by a subordinate and does not independently investigate the recommendation. See Crawford v. Carroll, 529 F.3d 961, 979 n.21 (11th Cir. 2008); Quinn v. Monroe County, 330 F.3d 1320, 1327 (11th Cir. 2003); Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999) (per curiam). Under this theory of liability, an employer found to have acted in a nondiscriminatory manner can still face liability for "rubber stamp[ing]" its employee's discriminatory recommendation. Stimpson, 186 F.3d at 1332; Quinn, 330 F.3d at 1327 ("A decision-maker may serve as the conduit of the subordinate's improper motive, for example, if he merely rubber-stamps the recommendation of a subordinate." (quotation marks omitted) ).

However, Mr. Griffin does not seek to apply the cat's paw theory of liability in the typical manner against his employer, the City. Instead, he argues it can be used to hold Ms. Stagner

individually liable. Our review indicates that this Court has published an opinion allowing for individual liability under the cat's paw theory only once in Quinn. See 330 F.3d at 1327. In Quinn, a former library director sued a county and a county administrator under § 1983 for First Amendment retaliation. Id. at 1322–24. The county administrator had the power to both recommend the library director's termination and terminate her. Id. at 1328. And her termination was reviewable by the county's Career Services Council. Id. This Court held the county was not subject to municipal liability because the county administrator's acts were reviewable by the Career Services Council, but the county administrator could be individually liable for his recommendation and termination of the library director under § 1983. Id. at 1326–28.

Under our precedent, Ms. Stagner's actions are not enough to confer individual liability under the cat's paw theory. Quinn shows that cat's paw liability is appropriate only when a person took some sort of action—for example, making a termination recommendation—that led to the adverse action against the plaintiff. See id. at 1327. Ms. Stagner did no such thing. At best, we can say that she failed to save Mr. Griffin from adverse action by not raising the "self-performance" policy. The record also reveals that Mr. Mousa acted in response to the draft audit report and that the decision to demote Mr. Griffin was a product **\*973** of

a consensus reached between him, his assistant, and the City's General Counsel's Office. There is no evidence to suggest Ms. Stagner's involvement in authoring the draft audit responses influenced Mr. Mousa's decision to accept Mr. Griffin's resignation. See Crawford, 529 F.3d at 979 n.21 (suggesting cat's paw liability requires evidence of a casual connection between the person or entity who subjected a plaintiff to adverse employment action and the person or entity who rubber stamped that adverse action). As a result, Ms. Stagner did not act as a "cat's paw" whose affirmative steps influenced or were otherwise causally connected to Mr. Griffin's demotion. On these facts, Ms. Stagner cannot be held individually liable under § 1983. [6]

[6]     Because we may affirm on any basis in the record, we need not decide whether Mr. Griffin suffered an adverse employment action by the City or Ms. Stagner is entitled to qualified immunity. McCullum, 768 F.3d at 1141; Mink v. Smith & Nephew, Inc., 860 F.3d 1319, 1324 (11th Cir. 2017).

**AFFIRMED.**

**All Citations**

762 Fed.Appx. 965, 2019 Fair Empl.Prac.Cas. (BNA) 88,394

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.



Tab 4

543 Fed.Appx. 966
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or after
Jan. 1, 2007. See also U.S. Ct. of App. 11th Cir. Rule 36-2.
United States Court of Appeals,
Eleventh Circuit.

Jack A. RAMSEY, Plaintiff–Appellant,

v.

BOARD OF REGENTS OF the UNIVERSITY
SYSTEM OF GEORGIA, Dr. G.P. Peterson,
Dr. James Foley, Marita J. Sullivan, Pearl J.
Alexander, Pam Ruffin, Defendants–Appellees.

No. 13–11833
|
Non–Argument Calendar.
|
Nov. 6, 2013.

**Synopsis**

**Background:** Facilities manager brought action alleging that
state university terminated him in retaliation for reporting
his supervisor's policy violations and racially discriminated
against him. The United States District Court for the Northern
District of Georgia, Justin S. Anand, United States Magistrate
Judge, granted summary judgment to defendants on those
claims, 2013 WL 1222492. Plaintiff appealed.

**Holdings:** The Court of Appeals held that:

[1] plaintiff's speech was not constitutionally protected as
speech on a matter of public concern, and

[2] plaintiff failed to show that defendant's proffered
reason for obtaining race data after deciding to recommend
termination was pretextual.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (2)

**[1]**  **Constitutional Law** 🔑 **Discharge**
**Education** 🔑 **Retaliation; whistleblowing**
**Public Employment** 🔑 **Protected activities**

State university employee's report to university
officials, that his supervisor ordered him
to improperly use his procurement card
and improperly dispose of desks, implicated
university policies by which the employee
was obligated to abide as an employee, and
thus employee was speaking as a government
employee, and his speech was not protected by
the First Amendment as speech on a matter of
public concern, as required to satisfy element
of his claim that university terminated him
in retaliation for his constitutionally protected
speech. U.S.C.A. Const.Amend. 1.

4 Cases that cite this headnote

**[2]**  **Civil Rights** 🔑 **Motive or intent; pretext**

State university employee failed to show that
human resources official's proffered reason for
obtaining race data after deciding to recommend
that he be terminated, to keep track of employee
demographic information to ensure that her
actions were not having an adverse impact on
any particular group, was pretext for illegal
discrimination; evidence showed that defendant
did not use goals, targets, or preferences with
respect to its diversity policy when making
employment decisions.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*967** Robert Ernest Rigrish, Jessica J. Wood, Bodker
Ramsey Andrews Winograd & Wildstein, PC, Atlanta, GA,
for Plaintiff–Appellant.

Katherine Stoff, Annette M. Cowart, Romy Diane Smith,
ATtorney General's Office, State of Georgia, Atlanta, GA, for
Defendants–Appellees.

USCA11 Case: 22-11462    Document: 23    Date Filed: 09/07/2022    Page: 75 of 129

Appeal from the United States District Court for the Northern District of Georgia. D.C. Docket No. 1:11–cv–03862–JOF.

Before TJOFLAT, MARCUS and JORDAN, Circuit Judges.

**Opinion**

PER CURIAM:

Jack A. Ramsey appeals the district court's grant of summary judgment to defendants Board of Regents of the University System of Georgia, Dr. G.P. Peterson, Dr. James Foley, Marita J. Sullivan, Pearl J. Alexander, and Pam Ruffin (collectively, "Defendants"), concerning Ramsey's claims of a retaliatory firing for protected speech and racial discrimination in Defendants' adverse employment actions against him. On appeal, Ramsey argues that the district court erred in granting summary judgment to the defendants as to Ramsey's claim that he was fired in retaliation for reporting his supervisor's violations, and as to Ramsey's claim of racial discrimination. After careful review, we affirm.

We review *de novo* a district court's grant of summary judgment. *Weeks v. Harden Mfg. Corp.,* 291 F.3d 1307, 1311 (11th Cir.2002). Summary judgment is proper if the movant shows that there is **\*968** no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).

The undisputed facts, for purposes of summary judgment, are these. Ramsey, a white male, was an employee at the Georgia Institute of Technology ("Tech") from 1993 until April 2010, most recently working as a Senior Facilities Manager at Tech's College of Computing. In October 2009, Ramsey met with Tech officials to Report that Larry Beckwith, his supervisor, had violated Tech policies by: (1) ordering Ramsey and another employee, Daron Foreman, to use their Tech Procurement Cards ("PCard") to make improper purchases; (2) ordering Ramsey to improperly dispose of desks that belonged to Tech by giving them to students; and (3) hiring a vendor that Beckwith had worked for. After conducting an investigation, Tech terminated Ramsey for his participation in the PCard violations and in the disposal of the desks. The investigation also found that Foreman had not committed any violations.

After deciding to recommend that Ramsey be terminated, Marita J. Sullivan, the Interim Associate Vice President of the Office of Human Resources at the time, requested information about Ramsey's race. At her deposition, she

asserted that she verified this information to keep track of employee demographic information to ensure that her actions were not having an adverse impact on any particular group. On appeal, Tech's Impartial Board of Review unanimously recommended that Tech's decision to terminate Ramsey be overturned, and that Ramsey be reinstated. Prior to Tech offering Ramsey a conditional reinstatement, Sullivan requested a report that listed every Tech employee, and the list contained race data, which Sullivan stated she believed was part of a standard query. Ramsey rejected the offer for conditional reinstatement, and his termination was upheld.

First, we are not convinced that the district court erred in granting summary judgment on Ramsey's retaliation claim. In order to prevail on a claim of retaliation by a government employer for alleged constitutionally protected speech, the employee must show that: (1) the speech involved a matter of public concern; (2) the employee's free speech interests outweigh the employer's business interests; and (3) the speech played a substantial role in the adverse employment action. *Boyce v. Andrew,* 510 F.3d 1333, 1342 n. 12 (11th Cir.2007). The employer then has the burden of proving by a preponderance of the evidence that it would have made the same decision absent the protected speech. *Id.* The Supreme Court has held that a public employee's speech is not protected when his statements are made pursuant to his official duties, as opposed to when he is speaking as a private citizen on matters of public concern. *Garcetti v. Ceballos,* 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). We have subsequently modified the first prong of the test to determine: (1) whether the employee spoke as an employee or as a citizen; and (2) whether the speech addressed an issue relating to the employer's purpose or a matter of public concern. *Boyce,* 510 F.3d at 1342. To qualify as constitutionally protected under the First Amendment, the speech must be made by a government employee speaking as a citizen and be on a subject of public concern. *Id.* at 1342–43.

In reaching a decision whether an employee's speech relates to his job as opposed to an issue of public concern, a court must examine the content, form, and context of a given statement, as revealed by the record as whole. *Id.* at 1343. An employee may not transform a personal grievance into a matter of public concern **\*969** by invoking the public's interest in the way the institution is run. *Id.* at 1344.

[1] Here, the district court properly granted summary judgment as to Ramsey's First Amendment retaliation claim because Ramsey spoke in his capacity as an employee.

Ramsey admitted that he was familiar with, and had received training for, Tech's PCard policy and disposal policy. Under the PCard policy, Ramsey was responsible and accountable for all transactions on his card, and was prohibited from lending his card to anyone. Under the disposal policy, Ramsey was prohibited from giving the desks to the students without the proper approval or Certificate of Authorization for Destruction. Thus, despite Ramsey's argument that reporting Beckwith's misconduct was outside the scope of his job duties, his report of improper uses of his PCard and improper disposal of property all implicated Tech policies that he was obligated to abide by as an employee. As a result, Ramsey was speaking as a government employee, and his speech was not protected by the First Amendment. *See id.* at 1342–43.

We also find unavailing Ramsey's claim that the district court erred in granting summary judgment on his discrimination claim. Under *McDonnell Douglas,* if a plaintiff makes the requisite showing of a prima facie case of racial discrimination, and the employer articulates a legitimate, nondiscriminatory reason for its actions, then the plaintiff must offer evidence that the employer's alleged reason is a pretext for illegal discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish pretext, the plaintiff must show that: (1) the offered reason was false; and (2) the decision was motivated by some illegal purpose. *Springer v. Convergys Customer Mgmt. Group Inc.,* 509 F.3d 1344, 1349 (11th Cir.2007). If the plaintiff's claim fails under the *McDonnell Douglas* framework, he may still survive summary judgment if the record presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed–Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir.2011) (quotation and footnote omitted). As long as there is circumstantial evidence to raise a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper. *Id.*

**[2]** Here, none of Ramsey's factual assertions made in support of his pretext argument are supported by the record. First, Foreman did not receive favorable treatment relative to Ramsey because Tech determined that Foreman did not commit any violations. Second, Sullivan has offered legitimate reasons for obtaining race data, and there is no evidence to contradict her explanations. Finally, the evidence shows that Tech does not use goals, targets, or preferences with respect to its diversity policy when making employment decisions. Thus, Ramsey's assertions are unsupported by the record, and he has failed to demonstrate that Defendants' offered reason for firing him was false. *See Springer,* 509 F.3d at 1349. To that end, Ramsey has also failed to establish that the circumstantial evidence raises a reasonable inference that Defendants discriminated against him because of his race. *See Smith,* 644 F.3d at 1328. Accordingly, we affirm the district court's grant of summary judgment.

**AFFIRMED.**

**All Citations**

543 Fed.Appx. 966, 301 Ed. Law Rep. 118

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.



Tab 5

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by  Essick v. Fidelity National Information Services, Inc.,  M.D.Fla.,  July 6, 2016

KeyCite Overruling Risk - Negative Treatment

Overruling Risk  Ortiz v. Werner Enterprises, Inc.,  7th Cir.(Ill.),  August 19, 2016

588 Fed.Appx. 965
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or after
Jan. 1, 2007. See also U.S. Ct. of App. 11th Cir. Rule 36-2.
United States Court of Appeals, Eleventh Circuit.

Melissa SMITH, Plaintiff–Appellee Cross Appellant,

v.

CITY OF NEW SMYRNA BEACH, a municipal
corporation, Defendant–Appellant Cross Appellee.

No. 13–13368
|
Non–Argument Calendar
|
Oct. 23, 2014.

**Synopsis**

**Background:** Female firefighter/paramedic brought
employment discrimination action against city under Title
VII and Florida Civil Rights Act (FCRA), alleging that she
suffered years of sex-based workplace hostility before she
was finally terminated based on her sex and on her complaints
of sex-based discrimination. Jury entered verdict in her favor
on all claims and awarded her $244,000 in lost compensation
and $200,000 for emotional pain and mental anguish. The
United States District Court for the Middle District of Florida,
No. 6:11–CV–01110–RBD–KRS, Roy B. Dalton, Jr., J., 2013
WL 5230659, entered judgment on jury verdict and ordered
her reinstatement. City appealed, and plaintiff cross-appealed.

**Holdings:** The Court of Appeals held that:

[1] issue of whether plaintiff suffered sex-based disparate
treatment via tangible employment action was for jury;

[2] issue of whether plaintiff was subject to sexually hostile
work environment was for jury;

[3] issue of whether plaintiff was subject to unlawful
retaliation was for jury;

[4] district court's reasoned decision to exclude in its entirety
arbitration decision upholding employee's termination was
not abuse of discretion;

[5] city invited error by requesting substance of instruction
on causal element of employee's retaliation claim in
discrimination case;

[6] even assuming that issue was properly before court for
review, city was not prejudiced by asserted deficiencies in
pattern instruction; and

[7] pattern instruction that jury could award employee "net
lost wages and benefits" was a correct statement of the law.

Affirmed.

**Procedural Posture(s):** On Appeal.

West Headnotes (7)

[1]    **Civil Rights**       Questions of law or fact
       **Civil Rights**       Employment practices
       Issue of whether female firefighter/paramedic
       was subject to sex-based disparate treatment
       via tangible employment actions was for jury
       in her suit under Title VII and Florida Civil
       Rights Act (FCRA); she presented a "convincing
       mosaic" of circumstantial evidence by which a
       reasonable jury could have inferred that city was
       motivated by discriminatory intent to suspend
       and ultimately terminate her. Civil Rights Act of
       1964, § 703(a)(1), 42 U.S.C.A. § 2000e–2(a)(1);
       West's F.S.A. § 760.10(1)(a).

       20 Cases that cite this headnote

[2]    **Civil Rights**       Questions of law or fact
       **Civil Rights**       Employment practices
       Issue of whether female firefighter/paramedic
       was subjected to sexually hostile work
       environment was for jury in her suit under Title

VII and Florida Civil Rights Act (FCRA); fair-minded jurors could reasonably have concluded that her workplace was sufficiently severe or pervasive to alter terms and conditions of her employment in a discriminatory way. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e–2(a)(1); West's F.S.A. § 760.10(1)(a).

5 Cases that cite this headnote

[3]    **Civil Rights** 🔑 Questions of law or fact

       **Civil Rights** 🔑 Employment practices

       Issue of whether female firefighter/paramedic was subject to unlawful retaliation was for jury in her suit under Title VII and Florida Civil Rights Act (FCRA); reasonable jury could find that the adverse employment action would not have occurred in the absence of the protected activity. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e–3(a); West's F.S.A. § 760.10(7).

       13 Cases that cite this headnote

[4]    **Evidence** 🔑 Discrimination

       In Title VII case, district court's reasoned decision to exclude in its entirety arbitration decision upholding employee's termination was not abuse of discretion; award had little, if any, probative value because arbitrator applied standard that was not easily relatable to Title VII standard and did not discuss employee's sex, and there was significant risk of unfair prejudice and jury confusion in admitting award. Fed.Rules Evid.Rule 403, 28 U.S.C.A.

[5]    **Civil Rights** 🔑 Instructions

       City invited error by requesting substance of instruction on causal element of employee's retaliation claim in discrimination case, precluding city's seeking reversal on basis of incorrect instruction. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e–3(a); West's F.S.A. § 760.10(7).

[6]    **Federal Courts** 🔑 Applicability to issues and evidence

       Even assuming that issue of whether district court's instruction on causal element of retaliation claim improperly allowed jury to find in favor of employee under lesser standard than but-for causation was properly before Court of Appeals for review, employer had not shown that it was prejudiced by asserted deficiencies in pattern instruction so any error was harmless.

       1 Cases that cite this headnote

[7]    **Civil Rights** 🔑 Instructions

       Pattern instruction in employment discrimination case that jury could award employee "net lost wages and benefits" was a correct statement of the law. Civil Rights Act of 1964, § 706(g)(1), 42 U.S.C.A. § 2000e–5(g)(1).

**Attorneys and Law Firms**

***967** Karen Coolman Amlong, William Robert Amlong, Jennifer Daley, Amlong & Amlong, PA, Fort Lauderdale, FL, for Plaintiff–Appellee Cross Appellant.

Douglas True Noah, Gail C. Bradford, William Edward Lawton, S. Renee Lundy, Dean Ringers Morgan & Lawton, PA, Orlando, FL, for Defendant–Appellant Cross Appellee.

Appeals from the United States District Court for the Middle District of Florida. D.C. Docket No. 6:11–cv–01110–RBD–KRS.

Before TJOFLAT, JORDAN, and ROSENBAUM, Circuit Judges.

**Opinion**

PER CURIAM:

Firefighter/paramedic Melissa Smith brought this employment-discrimination action against her employer, the City of New Smyrna Beach ("City"), under Title VII, 42 U.S.C. §§ 2000e–2(a), 2000e–3(a), and the Florida Civil Rights Act of 1992, Fla. Stat. § 760.10(1), (7), alleging that she suffered years of sex-based workplace hostility before she

was finally terminated based on her sex and on her complaints of sex-based discrimination. Following a six-day trial, a jury entered a verdict in Smith's favor on all her claims, and awarded her $244,000 in lost compensation and $200,000 for emotional pain and mental anguish. The district court ordered Smith reinstated as a firefighter.

On appeal, the City argues that the district court erred in denying its renewed motion for judgment as a matter of law and alternative motion for new trial as to Smith's claims. The City contends that the circumstantial evidence presented at trial failed to show that it intentionally discriminated against Smith, that its reasons for terminating her were pretextual, or that the hostility in the workplace was sufficiently "severe or pervasive." The City also argues that the district court abused its discretion in refusing to admit into evidence an arbitration award in which the City was found to have "just cause" for Smith's termination, that the court erred in instructing the jury on the causation element of Smith's retaliation claim, and that the court should have granted the alternative motion for a new trial. In her cross-appeal, Smith argues that the court erred in instructing the jury on the amount of lost wages and benefits that could be awarded as damages.

We begin by explaining the factual and procedural background for this appeal and then address the merits of the parties' claims on appeal.

*BACKGROUND*

## I. Factual Background

Smith was hired by the City in 2003 as a firefighter/ emergency medical technician ("EMT"). She obtained her paramedic license in 2004. She worked as a firefighter/ paramedic from that point until her termination in 2008.

During her initial job interview, Fire Chief Tim Hawver told Smith that he "only really hire[d] men that hunt, fish, or camp," but that he had "heard [she was] a pretty good ballplayer." Chief Hawver **\*968** also told Smith that she reminded him of his daughter, who was a single mother like Smith.

When Smith showed up for work, she found that male firefighters had covered her Standard Operating Procedures Manual with the front of a Cosmopolitan magazine. At that time, the only other woman working at the fire department,

which employed from around 39 to 51 people, was Lieutenant Cindy Richenberg. Smith viewed Richenberg as a mentor. Richenberg's advice to Smith was as follows: "[K]eep your head down and your mouth shut," and, "Be smart about the actions you take, and you'll get through this, but it's going to be difficult." It was difficult for Smith, as the following facts make clear.

In April 2004, Battalion Chief Michael Coats, one of the three battalion chiefs, [1] told Smith that he did not believe women should be in the fire service and that it was her "responsibility to prove it otherwise." Lieutenant Paul Owens nodded his head in agreement. According to the testimony of another male firefighter, Coats "was more than happy to express his disinterest about women being in the fire service," such as comments about women not being able "to pull their own weight or do the job of a man." Owens was more vulgar than Coats, but no less direct, in expressing his hostility to women in the fire service. Owens told Smith, "[W]e [don't] need another split-tail here." The term "split-tail" was explained to be a derogatory reference to the female anatomy.

[1]     Firefighters worked in three rotating 24–hour shifts. The three battalion chiefs were responsible for staffing the four fire stations, with one chief covering each of the rotating shifts. Each station was staffed with a lieutenant, a driver, and a firefighter, one of which was required to be a designated paramedic. Among other responsibilities, the lieutenant ensured compliance with protocols and procedures. Immediately above the battalion chiefs in the hierarchy was Deputy Chief David McCallister, who was immediately below Chief Hawver. Chief Hawver, in turn, reported to the City Manager, John Hagood.

Throughout her tenure with the fire department, Smith was disciplined in ways which led her to believe that the rules were being applied differently to her because she was a woman. For example, Smith was written up by Lieutenant Scott Kirsch for leaving the station to grab lunch with a male firefighter before a meeting, but the male firefighter was not also disciplined. In addition, men at the fire department frequently used the station computer for personal activities and were not written up for it, but Smith was written up for using a social-media website in connection with organizing the firefighters union's upcoming charity auction. [2] Another woman who joined the fire department in 2005, Jami Ryle, also reported experiencing disparate disciplinary treatment.

On one occasion, Ryle was required to write an apology, to be placed in her personnel file, for having her gear on improperly, when multiple male firefighters responding to the same scene also had their gear on improperly but did not have to apologize.

[2]       Smith was elected Secretary of the union in 2006.

When Smith spoke to Lieutenant Richenberg about these and other similar incidents, Richenberg told her that there was nothing to be done because no one would stand up for her. Richenberg stated that she had also reported "gender-related" situations to management, but management, rather than helping, blamed her instead.

After some initial difficult incidents with Coats, Smith complained to Deputy Chief McCallister. While he did not blame **\*969** Smith as Richenberg had warned, McCallister simply told her that she could file a claim for a hostile work environment if she felt strongly about it but that doing so would make her life much more difficult going forward.

Smith married in 2006. Thereafter, Chief Hawver and Deputy Chief McCallister asked her multiple times when she was going to get pregnant. McCallister in particular told Smith that he could not wait for her to get pregnant so that she could work as a secretary rather than as a firefighter. McCallister also told Smith's husband that he could stop by the station "for a few minutes" anytime he wanted, which Smith's husband took as an offensive insinuation that he should get Smith pregnant. Smith did in fact become pregnant in July 2006, and she informed people at the fire department soon after.[3] Smith was told that Hawver was "not happy" about her pregnancy.

[3]       Smith later suffered a miscarriage.

After she became pregnant, Smith was refused any chance to work overtime, which limited her compensation. She was also passed over in favor of male firefighters for "out of class" work—filling in for higher paid driver-engineer positions—even though she was at the top of the promotion list for this type of work. Ryle also reported that Lieutenant Owens would not allow her to perform certain jobs that male firefighters were allowed to perform. At some point, two male firefighters, one of whom had made sexually explicit comments and advances to Smith such as "Oh, I'd like to bend you over," asked not to work with her and their requests were honored.

Things began to escalate during 2007, according to Smith. In April 2007, Smith asked Lieutenant Tyrone Ofide, the supply officer, for new brush-fire pants because her pants exposed about one inch of her skin. Ofide denied her request, responding that Smith was "fat" and "just need[ed] to lose some weight." According to Smith, Ofide had never denied proper gear to male firefighters. Later, in August 2007, Smith was opening a can of tuna for lunch at work when she dropped it and said, "Oh, shit." Ofide heard her and responded, "Ladies shouldn't talk like that. I don't know why your husband puts up with you. I can't wait to retire so I can tell you what I really think of you." Smith reported this to Battalion Chief Wofford, who responded, "Well, that's just Tyrone."

Smith also received several written reprimands throughout 2007 relating to her alleged failure to wash the fire truck. On one occasion, Smith was written up for improperly washing a truck that was not dirty. On another, she was written up even when she returned as ordered to clean the truck after her shift ended. She testified that other male firefighters who had left the fire truck in similar states were not reprimanded. During her next shift, Smith was again written up for failing to clean the truck, this time after she had been ordered not to.

The end to Smith's tenure with the fire department (at least until her eventual reinstatement) began on August 22, 2007. On that day, Smith arrived at the fire station before her shift began wearing the majority of her uniform but also casual shoes. Lieutenant Kirsch, who had written Smith up several times for insubordination, told her that policies would be changing and that she would no longer be able to wear casual shoes to work. Smith responded, "You can kiss my ass. I'm off—not even at work yet." Lieutenant Ofide reported the incident, and Smith was charged with cursing at the fire-department **\*970** administration, although Smith testified she was merely cursing at Kirsch. The on-duty battalion chief, which was Wofford at the time, generally was responsible for investigating such an incident, but the investigation was transferred to Coats, who sustained the allegations. In his report, Coats noted that, during his investigation, Smith stated that she had been verbally abused and discriminated against with sexist remarks fifteen times. Smith was suspended for 24 hours without pay. Numerous firefighters testified at trial that men in the fire department regularly cursed and had never been suspended.

Later in the day on August 22, Smith and two male firefighters responded to a paramedic call. A truck had rear-ended a mass-transit bus. The male firefighters were Ofide, an EMT,

and Gagliardi, a junior firefighter/paramedic. As the lead paramedic responding to the scene, Smith was responsible for making all medical decisions. Because of this, Ofide was subordinate to her with respect to medical issues at the scene of the accident, even though Ofide outranked her.

There appeared to be two serious injuries at the scene. Pinned in the front seat of the truck was a 350–pound man, who was conscious and talking and had no complaints other than that he was stuck. In the bus was an elderly blind man who was slumped in his chair and bleeding from his ear, potentially indicating that he had suffered a serious head injury. The bus driver described the elderly man as "really bad" and "hurt." Based on these initial observations, Smith believed the man on the bus to be more severely injured.

After surveying the injuries at the scene, Smith went to retrieve medical equipment and encountered Ofide. According to Smith, when she told Ofide of the man in the bus, he said, "We need to get this guy out in the truck," which Smith took not as an order but as a comment from he and Gagliardi were working to extract the man from the truck while Smith helped the man on the bus. In contrast, Ofide testified that he had ordered Smith to help him with the man in the truck, but she responded that she was going to assist the man on the bus. Despite the patients' initial appearances, the man on the bus was not severely injured, while the man in the truck died en route to the hospital. Smith had not called a "trauma alert," which alerts the necessary parties that a patient is seriously injured and will require care at a trauma facility. Ofide, Smith, and Gagliardi all had the authority to call an alert, although none did (a paramedic who responded to the scene after Smith and Ofide did).

In the days following the paramedic call, Smith discovered an email from Ofide on the station computer labeled "Sex Tips for Mid–Life Women." The email made Smith uncomfortable, and she submitted a written complaint in addition to asking Ofide to remove the email. In response, Deputy Chief McCallister stated that the email "may have violated city policy" but that it "was published as an educational document." Smith took McCallister's response as a "slap in the face," and she did not believe that Ofide was ever punished.

After discovering the email, Smith learned that Ofide had charged her with insubordination during the August 22 incident for failing to obey his command to help the man in the truck. Coats handled the investigation of the charge and

sustained Ofide's allegations, resulting in Smith's 48–hour suspension without pay.

Around this time, Smith attempted to swap shifts with another firefighter but was told by Coats that she needed her lieutenant's approval, which was not general practice. The lieutenant, Owens, did not approve the change "[b]ecause [he **971** was] not working with two women" and was not going to "baby-sit two girls," and he stated that Smith was not qualified for the change. Smith testified that she was qualified for the change, but was not allowed to cover the shift.

Also around this time, Smith had several conversations with Carol Hargy, the City's Human Resources Director. Smith told Hargy about the hostile work environment she experienced, including being called fat, stupid, and a "split-tail." She also said that Owens referred to her as "kid," and, when Smith asked him to address her properly, he responded, "I'll address you however I want to. You just need to shut up." Smith also told Hargy about having her overtime removed and about how the rules were being applied differently to her than they were to male firefighters.

When Smith returned to work after serving her suspension in October 2007, she was reassigned to a different fire station with Lieutenant Grace. Grace told Smith that now that he was stuck with her, he would have to look after her and make sure she followed the rules because she had "a big target on [her] back." He also said that there were new rules, among them, "girl magazines" such as Cosmopolitan, Glamour, and fashion-based magazines would not be permitted at fire stations, although male firefighters were permitted to have pornographic, hunting, and rifle magazines. Grace also told Smith that she was not permitted to bring tampons into the fire station and would have to change tampons in her car. The no-tampon rule was at the direction of Wofford, who had discovered a box of tampons in a grocery bag at the fire station.

Smith testified that the attitude of men at the fire station changed significantly when she returned from serving her suspension. Grace told her that the men were upset at her for complaining about Ofide. When Smith expressed her displeasure about this, Grace told her that "he'd be more than happy to get rid of [her]" by transferring her to another fire station.

On October 24, 2007, Smith filed a grievance through the union about the way in which the investigations leading to

her suspensions for cursing and insubordination had been conducted. In response, she was investigated for "for making or publishing false, vicious, malicious or unprofessional statements concerning employee department heads, official board members or the commission."

On or around October 26, Deputy Chief McCallister began a second investigation into the August 22 incident—this time charging Smith with willful neglect leading to a patient's death. It was not general practice for the chief or deputy chief to be the investigating officer. Smith was distraught when she learned about the investigation, and she met with HR Director Hargy again to discuss the investigation and the new rules Grace had described. Smith also sought to meet with Chief Hawver, but he refused. The fire department later initiated another investigation into Smith relating to a driver's test, which Smith claimed was retaliatory. She was further written up based on her failure to provide documentation of her complaints about the exam. Smith testified that she became afraid of putting anything in writing for fear that it would be used to initiate another investigation against her.

In December 2007, Smith, along with her union representative, met with Hargy and City Manager John Hagood, during which meeting Smith recounted the history of harassment she had experienced up until that time. Smith also asked for clarification about the no-tampon rule, and Hagood and Hargy told her that they would have to speak to the City's attorney. At a later meeting with Hargy, Smith stated **\*972** that sexual-harassment training was needed, but Hargy said it was not in the budget. Hargy testified that she advised Chief Hawver of Smith's complaints of discrimination in December 2007.

Around this time, Smith also began to have difficulty with other firefighters following her directions. For example, Smith responded to a call in December 2007 as the lead paramedic, along with Lieutenant Owens and David Dearwester, a male firefighter. Dearwester openly complained about Smith's instructions and refused to listen to her medical directions. Smith spoke privately with Owens about Dearwester, and the transport agency who had also responded to the scene said that they would be reporting Dearwester for his "highly unprofessional" conduct. As far as Smith knew, Dearwester was not suspended for his conduct.

In January 2008, Smith began to have panic attacks, became depressed, and had trouble focusing out of fear that she would

somehow violate a work rule. As a result of the stress, she began to have neck spasms and difficulty breathing.

While Smith was on duty on January 16, 2008, every time she entered a room, the other firefighters would leave and slam the door. Distraught, Smith asked if she could go home early because she was not in an emotional state to carry out her duties. Smith testified that Grace told her, "Sure, after you scrub the toilets and make sure you get all the urine off the wall or you're going to do it again." Smith cleaned the toilets and wall in tears while male firefighters stood and watched her. [4]

[4]    The firefighters shared a bathroom; there were not separate facilities for women.

That same day, Volusia County Medical Director Dr. Peter Springer suspended Smith's ability to work as a paramedic, based on Deputy Chief McCallister's representations and his own investigation of the accident on August 22, until she completed three remedial requirements. Dr. Springer described these requirements as serious but "not onerous."

Two days later, on January 18, 2008, Chief Hawver made the decision to suspend Smith indefinitely without pay and forbade her from the premises of the fire stations. A male firefighter later testified that he had been suspended and ultimately terminated but was not similarly barred from fire-department premises.

The letter notifying Smith of her suspension included the results of Deputy Chief McCallister's investigation and Dr. Springer's findings and stated that the minimum requirement for the position of firefighter with the City was an EMT certificate and that she "must present a valid E.M.T. Certificate in order to be considered for active status." Smith was still certified to work as an EMT. When she tried to present her EMT certificate to get back on active duty, she was not permitted onto fire-department premises to do so. Smith also sent copies of her EMT certificate to HR Director Hargy and the president of the firefighters' union, and she informed fire-department management about her active EMT status.

Smith completed two of the three requirements listed by Dr. Springer. But the City did not allow her to complete the third requirement. It refused to admit her onto City property to use the equipment necessary to complete the third requirement, to borrow the equipment to use it elsewhere, or to authorize Dr. Springer to clear Smith. Smith later learned that Deputy Chief

McCallister had reported her to the Department of Health based on the August 22 incident. The Department dismissed the case.

**\*973** On January 31, 2008, Chief Hawver recommended Smith's termination to City Manager Hagood. Smith ultimately was terminated, at which point she filed a Charge of Discrimination with the Equal Opportunity Employment Commission ("EEOC").

Smith appealed her termination through a union grievance procedure, resulting in an arbitration decision finding that the City had "just cause" to terminate her based on the findings from the investigation into the August 22 incident.

### II. Procedural History

Smith brought suit under Title VII and the FCRA against the City in July 2011 in the United States District Court for the Middle District of Florida. She alleged that she was discriminated against on the basis of sex—by being suspended and terminated and subjected to a hostile work environment—and retaliated against for complaining about sex discrimination. The district court denied the City's motion for summary judgment and allowed the claims to proceed to trial.

Pretrial, the parties addressed jury instructions with respect to back-pay damages and Smith's retaliation claim. Regarding back pay, Smith argued that the district court should remove the words "net lost wages" from the pattern jury instructions because such an instruction would effectively result in Smith's being taxed twice on any award of lost wages. The district court overruled Smith's objection. Regarding retaliation, the City proposed the pattern instruction in the Eleventh Circuit. At trial, Smith objected to the retaliation instruction, arguing that it contained "mixed-motive" language that may not be good law in light of the Supreme Court's opinion in *Gross v. FBL Financial Services, Inc.,* 557 U.S. 167, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). [5] The City did not object to the instruction, and the district court overruled Smith's objection. The parties also agreed that the back-pay determination would be made by the jury.

[5] *Gross* held that a plaintiff must show that her age was a "but-for" cause of an adverse action to establish a violation of the Age Discrimination in Employment Act ("ADEA"). The decision in *Gross* was based on the fact that the ADEA, like the Title VII retaliation provision, does not provide that a plaintiff can prevail by showing that a protected characteristic was a "motivating factor" for the decision, which is the more liberal standard applicable to Title VII disparate treatment claims. *See Gross,* 557 U.S. at 173–78, 129 S.Ct. at 2349–51.

After the district court reserved ruling on the City's motion for judgment as a matter of law under Rule 50(a), Fed.R.Civ.P., the City presented its defense. The City elicited testimony from Lieutenants Ofide and Grace, HR Director Hargy, Battalion Chief Wofford, Deputy Chief McCallister, Dr. Springer, and Smith. Ofide, Grace, and Wofford largely presented differing versions of the events described above. Hargy testified that Smith had not made any complaints to her until after the August 22 incident and that she had investigated the no-tampon rule and found that it was different than presented by Smith. She also testified on cross-examination that the first sexual-harassment training the City held since she was hired took place on March 12, 2008.

McCallister testified about the August 22 incident and another incident involving male firefighters who were also charged with willful neglect but not fired, and he stated that he believed Smith never obtained her EMT license, which would have allowed her to continue working. Dr. Springer testified about his report of the August 22 incident and his conclusion that **\*974** Smith performed substandardly by failing to assess properly the severity of the injuries of the man in the truck. He testified on cross-examination that he did not recommend her termination, thought she was a good paramedic aside from the incident, and would have cleared her to return to work if the City had authorized him to do so.

The City also wished to admit into evidence the arbitration-award finding that it had just cause for Smith's termination. The district court noted that it was concerned about the prejudicial effect of the arbitration award because it had the imprimatur of being a judicial or quasi-judicial determination, but it did not result from a Title VII proceeding and was based on a different standard. Ultimately, the court excluded the arbitration award in its entirety, finding that it was not possible to introduce the award in a way that did not risk the jury's being misled or conforming of its judgment to the arbitrator's.

After a six-day trial, a federal jury returned a verdict in favor of Smith on all of her claims and awarded $244,000 for back

pay and $200,000 for pain and suffering. The district court also granted Smith's post-verdict motion for reinstatement and ordered the City to institute anti-discrimination training.

Post-judgment, the City filed a motion for judgment as a matter of law under Rule 50(b), Fed.R.Civ.P., arguing that the evidence was legally insufficient to support Smith's claims. The City alternatively moved for a new trial. The district court denied the City's motion, finding the evidence sufficient for a reasonable jury to find in favor of Smith on her claims. The court also rejected the City's other challenges to the court's refusal to admit the arbitration award and to the jury instructions on the retaliation causation standard. These appeals followed.

*THE CITY'S APPEAL*

**I. Sufficiency of the Evidence**

We review the denial of a motion for judgment as a matter of law *de novo,* applying the same standards as the district court. *Brown v. Ala. Dep't of Transp.,* 597 F.3d 1160, 1173 (11th Cir.2010). Judgment as a matter of law is appropriate only when "the facts and inferences point so overwhelmingly in favor of one party that reasonable people could not arrive at a contrary verdict." *Id.* (citation, quotation marks, brackets, and ellipsis omitted). In making that determination, we review the entire record, but we draw all reasonable inferences in favor of the nonmoving party and do not assume the jury's role of weighing the evidence or making credibility determinations. *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2010)). We will credit evidence supporting the moving party that is uncontradicted and unimpeached, at least if it comes from disinterested witnesses, but "we will disregard all evidence favorable to the moving party that the jury is not required to believe." *Lamonica v. Safe Hurricane Shutters, Inc.,* 711 F.3d 1299, 1312 (11th Cir.2013) (internal quotation marks omitted).

We review the denial of a motion for new trial for an abuse of discretion. *Id.* "New trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Id.* at 1312–13 (quotation marks and brackets omitted).

*A. Disparate Treatment*

**[1]**  Title VII and the FCRA prohibit certain employers from discriminating "against any individual with respect to **\*975** [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1); Fla. Stat. § 760.10(1)(a). [6]  A claim based on this statutory section is referred to as a disparate-treatment claim. *Reeves v. C.H. Robinson Worldwide, Inc.,* 594 F.3d 798, 807 (11th Cir.2010) (*en banc* ).

[6]     Sex discrimination claims under the FCRA are analyzed using the same standards as Title VII. *DuChateau v. Camp, Dresser & McKee, Inc.,* 713 F.3d 1298, 1302 (11th Cir.2013).

Disparate-treatment claims can take two forms: (1) a "tangible employment action," such as a firing or demotion on the basis of a protected characteristic; or (2) a "hostile work environment" resulting in a change to "the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned." *Id.* at 807 (quoting *Hulsey v. Pride Rests., LLC,* 367 F.3d 1238, 1245 (11th Cir.2004)). In this case, Smith proceeded under both theories of disparate treatment, which we address separately below.

Initially, we consider Smith's argument that our review of the City's renewed Rule 50(b) motion for judgment as a matter of law, with respect to Smith's disparate-treatment claims, is only for plain error because the City raised new grounds, such as Smith's failure to show that the City's reasons for terminating her were pretextual, not presented in the original Rule 50(a) motion. We have explained that a Rule 50(b) motion must be based upon the same grounds as the original Rule 50(a) motion because a Rule 50(b) motion is simply a renewal of the prior motion, *Doe v. Celebrity Cruises, Inc.,* 394 F.3d 891, 903 (11th Cir.2004), although we have recognized that the issues raised need not be strictly identical, *Howard v. Walgreen Co.,* 605 F.3d 1239, 1243 (11th Cir.2010). Under the circumstances, we conclude that the City's argument in the Rule 50(a) motion adequately put Smith and the district court on notice of the evidentiary sufficiency issues it was raising, that the arguments later raised in the Rule 50(b) motion were closely related, and that any failures in specificity were excused by the district court's limitation of the amount of argument it heard on the Rule 50(a) motion. *See Howard,* 605 F.3d at 1243–44. Accordingly, we review the denial of the City's Rule 50(b) motion with respect to the disparate treatment claims *de novo.*

*1. Tangible Employment Actions*

A plaintiff can prevail on a Title VII disparate-treatment claim by demonstrating that her sex was "a motivating factor" for a particular adverse employment decision, even if the employer was also motivated by other, even legitimate, factors. 42 U.S.C. § 2000e–2(m).

We often evaluate Title VII claims based upon circumstantial evidence using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1087 (11th Cir.2004). The *McDonnell–Douglas* framework, however, is not the exclusive means of creating a triable issue of fact in an employment-discrimination case.[7]  **\*976** *Smith v. Lockheed–Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir.2011). A plaintiff can also create a triable issue of fact concerning an employer's discriminatory intent by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (quoting *Silverman v. Bd. of Educ.,* 637 F.3d 729, 733–34 (7th Cir.2011)). Various forms of evidence suffice to allow a reasonable inference that the employer fired the employee based on impermissible discrimination. *Id.* It is within this latter framework that the parties present their arguments on appeal.

[7]  Moreover, both the Supreme Court and this Court have recognized that there is a point at which a trial has progressed too far to revisit the question of whether the plaintiff has established a prima facie case of discrimination under the *McDonnell–Douglas* framework, and, at that point, the focus shifts to the ultimate question of whether the plaintiff proved, "more probably than not, that the employer took an adverse employment action against [her] on the basis of a protected personal characteristic." *Collado v. United Parcel Serv., Co.,* 419 F.3d 1143, 1149–51 (11th Cir.2005) (citation and quotation marks omitted).

The City argues that the evidence presented at trial was insufficient to allow the jury to reasonably infer that the City intentionally discriminated against Smith on the basis of her sex. The City relies on the Seventh Circuit's opinion in *Silverman* (cited by *Smith,* 644 F.3d at 1328), which broke down the "convincing mosaic" into three broad categories of circumstantial evidence: (1) suspicious timing, ambiguous statements, similar behavior directed at other members of

the protected group, and "other bits and pieces from which an inference of discriminatory intent might be drawn"; (2) systematically better treatment of those outside the protected class; and (3) pretext in the employer's justification. Without opining on whether the *Silverman* considerations are the only relevant ones for satisfying the "convincing mosaic" standard, we conclude that each of the *Silverman* categories is satisfied here.

First, the City contends that the timing of the multiple investigations into Smith and disciplinary actions leading to her termination were not suspicious, that its reasons for terminating her were not ambiguous, and that Smith did not show that other women were treated similarly.[8]  Assuming that the City's reasons were not ambiguous, the jury could have inferred that the timing of, and reason for, the second investigation into the August 22 incident was suspicious. There was evidence that Deputy Chief McCallister harbored animus against Smith because of her sex, in view of his comments to Smith about her pregnancy and his indifference to her complaints of discrimination, and evidence that he initiated the investigation two days after Smith filed a grievance with the union complaining about the earlier investigations. In addition, the record contains evidence that both Richenberg and Ryle, female firefighters, experienced treatment similar to that of Smith while employed by the City. Specifically, Ryle testified that, as with Smith, work rules were applied differently to her than to male firefighters.

[8]  The City challenges the evidence with respect to Smith's termination only, so we focus our analysis on that decision and deem abandoned any challenge to the other two decisions that the City acknowledged were adverse employment actions: Smith's suspensions for cursing and insubordination.

Other "bits and pieces" tending to show discriminatory intent include sexist and derogatory comments by superiors, such as Chief Deputy McCallister, Battalion Chief Coats, and Lieutenants Owens and Ofide; new rules based on gender, including the no-tampon rule and disallowing what the officers described as "girl magazines"; the lack of seriousness with which superiors took complaints of sex discrimination; and other aspects of the general atmosphere at the fire station, such as the presence of pornographic magazines for men, the placement of a Cosmopolitan magazine cover on Smith's Standard Operating Procedures Manual, the relative paucity of women firefighters, and the lack of **\*977** any sexual-

harassment training. In addition, Chief Hawver focused on Smith's gender during the job interview and later said that he was "not happy" when she became pregnant.

Second, Smith also presented sufficient evidence for the jury to conclude that she was "systematically treated" worse than similarly situated male firefighters. The City asserts that Smith did not present evidence of a similarly situated comparator outside of the protected class who was treated more favorably than she. But Smith presented evidence at trial that Lieutenant Kirsch, like Smith, was the lead paramedic on a three-person team that responded to a medical call and that Kirsch failed to comply with basic medical protocols. Viewing the evidence in the light most favorable to Smith, a reasonable jury could have inferred intentional discrimination from the fact that Kirsch, a male firefighter/paramedic, was charged with willful neglect of duty and received significant penalties, but unlike Smith, was not terminated or even suspended. Similarly, as to the charge of insubordination, Smith presented evidence that Dearwester, a male firefighter, was insubordinate to her during a medical call and acted in a "highly unprofessional" manner, but Dearwester did not receive a formal reprimand for insubordination. On the basis of similar conduct, Smith, on the other hand, received a 48–hour suspension without pay for insubordination.

Additionally, Smith testified that she was not allowed to change shifts, was denied proper gear, and was yelled at or disciplined in situations where male firefighters were not similarly reprimanded. Lieutenant Ofide verbally reprimanded Smith for cursing, and she was written up for saying "kiss my ass," but numerous firefighters testified that male firefighters did not receive any disciplinary action for engaging in similar language. During her suspension, the City instructed Smith that she could not return to the firehouse, but Farmer, a male firefighter, was permitted to go to the firehouse and have dinner following his termination. Therefore, in evidence before the jury were numerous instances of situations in which Smith was treated worse than male firefighters.

Moreover, even if any of these comparators may not have been sufficiently similarly situated to permit comparison for Title VII purposes, the evidence was still enough to permit an inference of discrimination. *See Rioux v. City of Atlanta, Ga.,* 520 F.3d 1269, 1281–82 (11th Cir.2008) (holding that the plaintiff established a prima facie case of racial discrimination when he did not present evidence of a comparator but presented other circumstantial evidence that was sufficient).

In addition, the jury could have inferred that the City's reasons for Smith's termination were pretextual. The City justified Smith's suspension, which then led to her termination, by stating that she was no longer qualified, but evidence at trial indicated that Smith could have continued working as a firefighter/EMT and that she presented her EMT license to the City. Dr. Springer also testified that he would have cleared Smith to return to work as a paramedic if the City had allowed him to do so. The City failed to provide any explanation for the refusal to allow Smith to complete the final performance requirement.

Relying on Dr. Springer's report, the City states that it terminated Smith based on her actions at the scene of the August 22, 2007, accident. Assuming *arguendo* that the jury believed all of Dr. Springer's testimony that Smith performed deficiently on August 22, the jury still would have been permitted to infer that her termination was motivated by discriminatory intent **\*978** based on sex. Indeed, Dr. Springer explicitly testified that he did not recommend Smith's termination and thought that she was a good paramedic aside from the August 22 incident. And, both Deputy Chief McCallister and Chief Hawver, who were the parties most involved in Smith's termination, had made comments demonstrating that they harbored antipathy against women.

The City also justified its termination decision on Smith's prior disciplinary record, which includes a charge of insubordination. Yet the jury reasonably could have inferred that Smith's disciplinary record was the result of previous sex discrimination stemming from a workplace that was hostile to women. For instance, with respect to the insubordination charge resulting from the August 22 incident, Smith established that as the lead paramedic, she was in charge of making medical decisions, so the jury could have found that the insubordination charge was pretextual. And the jury quite clearly had grounds to believe that Coats, who sustained the charge, was motived by discriminatory intent. With respect to her suspension for cursing, numerous firefighters testified that no male had ever been punished for cursing, and the jury was entitled to believe that Smith was cursing at Kirsch rather than the administration. There was also evidence that the relevant decision makers had notice that these two suspensions may have been the product of sex discrimination, given that Smith met with HR Director Hargy and City Manager Hagood to complain about these investigations and the history of what she perceived to be sex discrimination at the fire department,

and Hargy testified that she advised Chief Hawver about these complaints in December 2007, before Smith's suspension and termination.

Based on our review of the record, we conclude that Smith presented a "convincing mosaic" of circumstantial evidence by which a reasonable jury could have inferred that the City was motivated by discriminatory intent to suspend and ultimately terminate Smith. *See Smith,* 644 F.3d at 1328–29. Accordingly, the district court did not err in denying the City's motion for judgment as a matter of law on this issue.

### 2. Hostile Work Environment

**[2]** The City also argues that the evidence was insufficient with respect to the hostile work environment claim because many of Smith's complaints about alleged abusive or hostile conduct were not gender-specific, and the conduct that was gender-specific did not rise to the standard of "severe or pervasive."

To establish a hostile work environment claim under Title VII, the plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (citations and internal quotation marks omitted); *see Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir.2002). In a case alleging sex discrimination, the discriminatory conduct must be "gender-specific," as general vulgarity or harassment, however severe and pervasive, is not prohibited under Title VII unless it discriminates based on a protected category such as sex. *Reeves,* 594 F.3d at 809. "The critical issue ... is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.' " *Id.* at 813 (quoting **\*979** *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998)).

The requirement that the harassment be "severe or pervasive" contains an objective and a subjective component. *Miller,* 277 F.3d at 1276. "Thus, to be actionable, this behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s] ... to be abusive." *Id.* (internal quotation marks omitted). The City does not challenge that Smith subjectively perceived the environment to be abusive.

"In evaluating the objective severity of the harassment, we consider, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller,* 277 F.3d at 1276. We evaluate the evidence of harassment both cumulatively and in the totality of the circumstances. *Reeves,* 594 F.3d at 808; *see Harris,* 510 U.S. at 23, 114 S.Ct. at 371.

With these principles in mind, and after reviewing the entirety of the evidence in the light most favorable to Smith, we hold that fair-minded jurors could reasonably have concluded that Smith's workplace was "sufficiently severe or pervasive" to alter the terms and conditions of her employment in a discriminatory way. *See Harris,* 510 U.S. at 21, 114 S.Ct. at 370; *Miller,* 277 F.3d at 1275. Reasonable jurors could have concluded that, based on the increasing frequency and seriousness of the harassment up until the point of her termination, Smith endured an objectively hostile work environment to which male firefighters were not exposed. *See Reeves,* 594 F.3d at 813; *Jones v. UPS Ground Freight,* 683 F.3d 1283, 1303–1304 (11th Cir.2012) (discussing how the escalation of incidents towards the end of the plaintiff's employment created a jury question on the issue of severity and pervasiveness). Accordingly, the district court did not err in denying the City's motion for judgment as a matter of law.

From the beginning of her employment, when she was only the second woman to work at a fire department with between 39 and 51 employees, Smith, because of her gender, was subjected to an environment at the fire department that undermined her ability to perform as a firefighter. Numerous firefighters expressed their opinions that women were not fit for fire service and that they did not want to work with women. Smith's male superiors asked when she was going to get pregnant; Deputy Chief McCallister expressed the hope that Smith would become pregnant so that she could work as a secretary rather than a firefighter; and Smith lost certain job privileges after she did become pregnant. Smith was also subjected to derogatory comments based on her gender, including being called "split tail." When Smith brought up these issues, she was ignored, told that no one would come to her aid, or generally dissuaded from pursuing further action. Ryle also testified about the discriminatory work environment. *See Reeves,* 594 F.3d at 811 (stating that evidence of discrimination against other members of the protected group may give rise to an inference

of discrimination). Moreover, in this day and age, in light of the other evidence presented, the jury was permitted to consider the nearly complete absence of women firefighter/paramedics from a department the size of New Smyrna Beach's as evidence of the inhospitable working conditions for women at that department. Indeed, it would certainly be reasonable to infer from this evidence that women were unwelcome, **\*980** or, at best, barely tolerated, in the fire department.

Smith's final months of service culminated in actions that the jury could have found objectively humiliating and degrading, particularly when viewed cumulatively with the general atmosphere of hostility. *See Reeves,* 594 F.3d at 808 (harassment evidence is viewed cumulatively). The evidence shows that the frequency and severity of the harassment increased after Smith returned from her suspension in October 2007. According to Smith, male firefighters became more hostile at this time; the fire department instituted new, gender-specific rules, prohibiting so-called "girl magazines" and tampons, a basic feminine-hygiene item; and Smith was told her that she had "a big target on [her] back." Smith informed HR Director Hargy that sexual-harassment training was needed but told, essentially, that it was not worth the cost. Concerned over the no-tampon rule, Smith also spoke directly with City Manager Hagood about whether she could bring tampons to work but received no clarification about this private matter. That she even had to ask such a question about a basic feminine-hygiene item is embarrassing and outrageous. That the situation was not addressed is even more so. And, finally, while on duty on January 16, 2008, the other male firefighters left any room Smith entered and slammed the door. Distraught, Smith asked to leave work because she did not feel capable of performing her duties, and she was ordered to scrub the toilets and clean the urine off the wall before she left. She did so, in tears, while male firefighters watched her.

The harassing environment also affected Smith's ability to perform her job. When Smith complained to her union at the end of October about the discriminatory nature of the investigations resulting in her suspensions, she was subjected to additional investigations based on those complaints. Other complaints Smith made also triggered investigations. She testified that she was scared to put any complaints in writing for fear of retribution. And, when she responded to a paramedic call in December 2007, another male firefighter openly complained about and refused to follow her medical directions, and he was not punished.

The evidence was likewise sufficient for a jury to find that Smith suffered psychological injury as a result of the abusive environment. Smith testified that she developed anxiety and depression as a result of the alleged discriminatory conduct. Although psychological injury is not necessary to establish a hostile work environment claim, it is relevant to the question of whether the environment is sufficiently severe or pervasive. *See Harris,* 510 U.S. at 21, 114 S.Ct. at 370 ("Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct.").

With respect to the City's claim that Smith's evidence was primarily gender-neutral, the jury was permitted to infer that the actions against Smith were, in context, intended to discriminate against Smith on the basis of her gender. *See Oncale,* 523 U.S. at 81–82, 118 S.Ct. at 1003 ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."); *Reeves,* 594 F.3d at 810–11.

Assessing the conduct cumulatively and under the totality of the circumstances, Smith presented sufficient evidence for a reasonable jury to find that she was subjected to a hostile work environment. *See* **\*981** *Harris,* 510 U.S. at 21, 114 S.Ct. at 370; *Miller,* 277 F.3d at 1276.

## C. Retaliation

[3]    The City next contends that Smith failed to show that her protected activity was the but-for cause of her adverse employment action because she allegedly did not demonstrate any evidence of a retaliatory motive on behalf of either Chief Hawver or Hagood, the individuals who actually terminated her.

Title VII prohibits an employer from retaliating against individuals who informally voice complaints to their superiors or otherwise use their employer's grievance procedures regarding prohibited discrimination. *Rollins v. State of Fla. Dep't of Law Enforcement,* 868 F.2d 397, 400 (11th Cir.1989); *see* 42 U.S.C. § 2000e–3(a) (prohibiting discrimination by employers against an employee because an employee "has opposed any practice made an unlawful employment practice" by Title VII). [9] A plaintiff may establish a retaliation claim showing that "(1) she engaged in

statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." *Weeks v. Harden Mfg. Corp.,* 291 F.3d 1307, 1311 (11th Cir.2002). Here, the City challenges only the conclusion that the evidence of causation was insufficient. As with Smith's discrimination claim, we proceed directly to the ultimate question of whether Smith was retaliated against because of her protected activity. *Cf. Smith,* 644 F.3d at 1327–28; *Collado v. United Parcel Serv., Co.,* 419 F.3d 1143, 1149–51 (11th Cir.2005).

9      This is commonly referred to as the "opposition clause" of the Title VII retaliation provision, as opposed to the "participation clause," which requires participation in a more formal investigation or proceeding. *Clover v. Total Sys. Servs., Inc.,* 176 F.3d 1346, 1350 (11th Cir.1999). The City raised only the participation clause in its Rule 50(a) motion, and, therefore, arguably waived review of its challenge to the retaliation claim on appeal other than for plain error. *See Howard,* 605 F.3d at 1243. Nevertheless, we find that the City's arguments fail even under *de novo* review.

We previously have held that a plaintiff can satisfy the causation element by presenting sufficient evidence that the decision-maker was aware of the plaintiff's protected conduct, and a close proximity between this awareness and the adverse employment action existed. *Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir.2004). In 2013, the Supreme Court in *University of Texas Southwestern Medical Center v. Nassar,* 570 U.S. ——, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013), held that a plaintiff must prove but-for causation—that the unlawful retaliation would not have occurred in the absence of the protected activity—to establish a claim of retaliation under Title VII. *Id.* at ——, 133 S.Ct. at 2533–34.

The City contends that the protected activity in this case was not causally related to Chief Hawver's and City Manager Hagood's decisions to suspend and then terminate Smith. Viewing the evidence in the light most favorable to Smith, however, we conclude that Smith presented sufficient evidence for a reasonable jury to find that the adverse employment action would not have occurred in the absence of the protected activity. Accordingly, the district court did not err in denying the City's motion for judgment as a matter of law on this basis.

Evidence was presented that Smith reported gender discrimination at the fire department to her superiors on

numerous occasions. Indeed, early in her tenure, Smith complained to Deputy Chief McCallister about some initial difficult incidents with Coats, and McCallister warned Smith **\*982** that filing a claim for a hostile work environment would make her life much more difficult going forward. Put simply, Deputy Chief McCallister effectively cautioned Smith that engaging in protected activity would result in retaliation against her. And it did. In particular, in October 2007, Smith filed a grievance with her union about the investigations which led to her suspensions. She was written up based on the content of her grievance, and then soon after received notice that she was being investigated again in relation to the August 22 incident. At about the same time, Smith also was told that she had "a big target on [her] back." These investigations, by the City's own admission, eventually led to Smith's suspension and termination.

Significantly, Smith met with City Manager Hagood and HR Director Hargy in December 2007, recounting the entire history of harassment she had experienced at the fire department. Hargy testified that she informed Chief Hawver of Smith's complaints of discrimination in December 2007. During this same period, Hagood and Hawver made the decision to place Smith on suspension, prevented her from returning to work, and ultimately terminated her —purportedly based largely on the consequences of the investigation into Smith's performance during the August 22, 2007 incident. As explained above in the discussion of Smith's disparate treatment claims, however, there was more than enough evidence for the jury to find that the City's stated reasons for Smith's termination were pretextual.

Based on the strong temporal proximity between Smith's protected activity and the investigations and disciplinary activity that led to her eventual termination, as well as the evidence that the City's reasons were pretextual and McCallister's admission that a complaint about discrimination would lead to retaliation, a reasonable jury could have concluded that Smith would not have been terminated in the absence of her protected activity. *See Weeks,* 291 F.3d at 1311.

*D. Motion for New Trial*

For the reasons that we have previously discussed, the evidence at trial was sufficient for a reasonable jury to find in favor of Smith as to her claims of disparate treatment, hostile work environment, and retaliation. Based on our review of the evidence in this case, we also cannot conclude that the district court abused its discretion in denying the City's motion for a new trial on the basis that the jury's verdict was against the

great weight of the evidence. *See Lamonica,* 711 F.3d at 1312–13.

## II. Arbitration Award

[4]    The City argues that the court should have admitted evidence of the existence of the arbitration decision upholding Smith's termination because it carried significant probative weight, and the risk of prejudice could have been minimized with limiting instructions.

We review evidentiary rulings under Rule 403 for abuse of discretion. *United States v. Fortenberry,* 971 F.2d 717, 721 (11th Cir.1992). We afford broad discretion to the district court's assessment of the probative value of the proffered evidence weighed against other factors counseling against admissibility. *Sprint/United Mgmt. Co. v. Mendelsohn,* 552 U.S. 379, 384, 128 S.Ct. 1140, 1144–45, 170 L.Ed.2d 1 (2008). The district court did not abuse its discretion in excluding the arbitration award. The arbitration award had little, if any, probative value because the arbitrator applied a standard that is not easily relatable to the Title VII standard and did not discuss Smith's sex. Furthermore, the **\*983** City presented evidence at trial that it used to argue that its bases for taking disciplinary action against Smith were justified, so the arbitration award itself would have been cumulative of this evidence.

Moreover, there was significant risk of unfair prejudice and jury confusion in admitting the award. As the district court noted, if arbitration award had been admitted, the jury may have attempted to conform its decision to the arbitrator's, despite the differing standard and issues. The district court's reasoned decision to exclude the arbitration award in its entirety in this case was not an abuse of discretion. *See Mendelsohn,* 552 U.S. at 384, 128 S.Ct. at 1144–45.

## III. Jury Instructions

[5]    The City argues that the district court's instruction on the causal element of Smith's retaliation claim improperly allowed the jury to find in favor of Smith under a lesser standard than but-for causation, as required by *Nassar,* and thereby prejudiced the City's defense.

We ordinarily review statements of law in jury instructions *de novo. Carlson v. United States,* 754 F.3d 1223, 1226

(11th Cir.2014). Although review is *de novo,* the standard is deferential, and we will reverse only "where we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *State Farm Fire & Cas. Co. v. Silver Star Health & Rehab,* 739 F.3d 579, 585 (11th Cir.2013) (quotation marks omitted). When a party fails to object to the jury instruction it challenges on appeal, though, we review for plain error only. *See Maiz v. Virani,* 253 F.3d 641, 676 (11th Cir.2001). And when a party invites an error by requesting the substance of a given instruction, we generally will not review any claim of error on appeal. *Id.* at 677.

In *Nassar,* the Supreme Court held that Title VII retaliation claims required proof of but-for causation. 570 U.S. at ——, 133 S.Ct. at 2533–34 ("The text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.").

Having requested the incorrect jury instruction given by the district court, the City may not now seek reversal on this basis. Although the City had a nonfutile basis for requesting an instruction that strictly and expressly required but-for causation, specifically the Supreme Court's decision in *Green,* the City did not object to the pattern instruction that it had proposed. As in *Maiz,* we decline to carve out an exception to the invited-error doctrine, despite the intervening change in the governing law. *See Maiz,* 253 F.3d at 676–77.

[6]    In any case, even assuming that this issue were properly before us for review, the City has not shown that it was prejudiced by the asserted deficiencies in the pattern instruction. Specifically, the jury verdict form asked, "Do you find from a preponderance of the evidence that the plaintiff would have been discharged or otherwise adversely affected for other reasons even in the absence of this statutorily protected activity?" and the jury answered, "No." Therefore, the jury affirmatively found that the protected activity was a but-for cause of the adverse employment action, so any error in the instructions was harmless. *See State Farm Fire & Cas. Co.,* 739 F.3d at 585.

## SMITH'S CROSS–APPEAL

[7]    On cross-appeal, Smith argues that the district court erred in instructing the **\*984** jury that it could award Smith "net lost wages and benefits," as opposed to instructing

the jury that a damages award would undercompensate her because it would be further reduced by the amount of taxes taken out of the award. The Supreme Court has held that Title VII back-wages awards are taxable as ordinary income, according to Smith, and by instructing the jury as it did, the district court left her less than whole while rewarding the losing party.

Under Title VII, a defendant who engages in unlawful employment discrimination may be held liable for back pay, which is to be reduced by "[i]nterim earning or amounts earnable with reasonable diligence by the person or persons discriminated against." 42 U.S.C. § 2000e–5(g)(1).

The district court did not err in using the pattern jury instruction that included the phrase "net lost wages" because the instruction was a correct statement of the law. The statute that authorizes the payment of back-wages defines back-pay as the earnings denied as a result of the unlawful employment practice less any amounts that the plaintiff actually earned or could have earned through reasonable diligence. *See id.* Thus, in this context, the amount of earnings denied less any amounts earned or that reasonably could have been earned in the interim represents the plaintiff's "net" earnings. Smith misunderstood "net" to refer to the net amount of earnings as reduced by taxes, but this interpretation is unsupported by the statute. *See id.*

So to the extent that the jury awarded Smith less based on taxes that she would have paid on her earnings, it did so because Smith's counsel specifically calculated her damages for the jury at around $244,000. We find it difficult in these circumstances to say that Smith was prejudiced by the instruction. Nor does the jury instruction appear to preclude Smith from requesting the wages that she would have earned before taxation. Consequently, because the jury instruction itself was correct and did not misstate the law or mislead the jury, giving the instruction was not error. *See State Farm Fire & Cas. Co.,* 739 F.3d at 585.

### CONCLUSION

In sum, with respect to the City's appeal, we affirm the district court's denial of the City's motion for judgment as a matter of law and alternative motion for a new trial on all claims, the court's refusal to admit the arbitration award, and the court's giving of the retaliation instruction. With respect to Smith's cross-appeal, we affirm the district court's giving of the lost wages instruction.

**AFFIRMED.**

**All Citations**

588 Fed.Appx. 965, 124 Fair Empl.Prac.Cas. (BNA) 1603

---

End of Document                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.



Tab 6

KeyCite Yellow Flag - Negative Treatment

Disagreement Recognized by   King v. ST Aerospace Mobile, Inc.,
S.D.Ala.,   June 11, 2013

KeyCite Overruling Risk - Negative Treatment

Overruling Risk   Ortiz v. Werner Enterprises, Inc.,   7th Cir.(Ill.),   August
19, 2016

644 F.3d 1321
United States Court of Appeals, Eleventh Circuit.

William SMITH, et al., Plaintiffs,

Anthony Mitten, Plaintiff–Appellant,

v.

LOCKHEED–MARTIN CORPORATION,
d.b.a. Lockheed–Martin Aeronautics
Company, Defendant–Appellee.

No. 09–15428
|
June 30, 2011.

**Synopsis**

**Background:** In "reverse" discrimination case under Title
VII, and § 1981, white male claimed that his former
employer discriminated against him on account of his race
in terminating his employment. The United States District
Court for the Northern District of Georgia, No. 06-01774-CV-
BBM-1, Beverly B. Martin, J., granted summary judgment in
favor of employer, and employee appealed.

**[Holding:]** The Court of Appeals, Tjoflat, Circuit Judge,
held that genuine issue of material fact existed as to whether
employer only fired white supervisor, who distributed racially
insensitive "joke" email in violation of zero tolerance policy,
only because he was white.

Vacated and remanded.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (4)

**[1]** **Civil Rights** 🔑 Disparate treatment

To be an adequate comparator in employment
discrimination case, the preferentially treated
individual from outside the plaintiff's protected
class has to be similarly situated to the plaintiff
in all relevant respects; in order to be considered
"similarly situated," the compared employees
must have been involved in or accused of
the same or similar conduct, yet disciplined in
different ways for that conduct. Civil Rights Act
of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et
seq.

530 Cases that cite this headnote

**[2]** **Civil Rights** 🔑 Disparate treatment

Differences in job ranks are not, in and of
themselves, dispositive as to whether the two
individuals may be compared for the purposes
of evaluating a discrimination claim, but they
can matter because the relevant inquiry is
whether the employer subjected differently
ranked employees to the same or different
employment policies; if the same policies
were applied differently to similarly ranked
employees, those employees may be compared.
Civil Rights Act of 1964, § 701 et seq., 42
U.S.C.A. § 2000e et seq.

65 Cases that cite this headnote

**[3]** **Civil Rights** 🔑 Race, color, ethnicity, or
national origin

**Civil Rights** 🔑 Presumptions, Inferences, and
Burden of Proof

Preferentially treated black employees in non-
supervisory positions were not valid comparators
for purposes of establishing presumption of
race discrimination under McDonnell Douglas
based on more severe discipline of white
supervisory employee for forwarding racially
insensitive "joke" email; employer showed that
its zero tolerance policy required supervisors
to undertake a more proactive role than non-
supervisors in trying to extinguish workplace
discrimination and harassment. Civil Rights Act
of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et
seq.

232 Cases that cite this headnote

**[4]**    **Federal Civil Procedure** 🔑 Employees and Employment Discrimination, Actions Involving

Given evidence suggesting that employer's justification for firing white supervisor was a pretext for racial animus, that employer had a substantial incentive to discipline white employees more harshly than black employees, and that employer consciously injected race considerations into its discipline decisionmaking without an adequate explanation for doing so, genuine issue of material fact existed as to whether employer only fired white supervisor, who distributed racially insensitive "joke" email in violation of zero tolerance policy, only because he was white, precluding summary judgment in favor of employer of supervisor's Title VII and § 1981 claims. 42 U.S.C.A. § 1981; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

307 Cases that cite this headnote

## Attorneys and Law Firms

**\*1322** Daniel M. Klein, John Franklin Beasley, Jr., Edward Daniel Buckley, III, Buckley & Klein, LLP, Atlanta, GA, for Appellant.

Joshua H. Viau, Richard M. Escoffery, Stanford G. Wilson, Elarbee, Thompson, Sapp & Wilson, LLP, Atlanta, GA, for Appellee.

Appeal from the United States District Court for the Northern District of Georgia.

Before TJOFLAT, CARNES and REAVLEY, [*] Circuit Judges.

[*]    Honorable Thomas M. Reavley, United States Circuit Judge for the Fifth Circuit, sitting by designation.

## Opinion

**\*1323** TJOFLAT, Circuit Judge:

In this "reverse" discrimination case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981, Anthony Mitten, a white male, claims that his former employer, Lockheed–Martin Aeronautics Company ("Lockheed"), [1] discriminated against him on account of his race in terminating his employment. The district court granted Lockheed summary judgment, and Mitten appealed. Our task, consequently, is to determine whether the district court misapplied the summary judgment standard to the evidence presented. Holding that it did, we vacate the district court's judgment and remand the case for further proceedings.

[1]    Lockheed, which designs and manufactures military aircrafts, is a subsidiary of Lockheed–Martin Corporation, a Maryland corporation with its principal place of business in Bethesda, Maryland. Lockheed is one of Lockheed–Martin Corporation's four core business units. Lockheed is headquartered in Fort Worth, Texas, and has additional locations in Palmdale, California; Pinellas Park, Florida; Marietta, Georgia; Meridian, Mississippi; Johnstown, Pennsylvania; Greenville, South Carolina; and Clarksburg, West Virginia. In 2005, when Mitten was fired, Lockheed had approximately 26,000 employees.

### I.

### A.

Lockheed prohibits workplace discrimination and harassment under a workplace-conduct rule it calls its "zero tolerance policy." The zero tolerance policy provides notice to employees that Lockheed's department of Human Resources ("HR") will discipline anyone who, at work, engages in an act of discriminatory "harassment [2] based on a legally protected status such as race ... when it has the effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment." This includes using Lockheed email accounts "in ways that are disruptive, abusive, obscene, or degrading, or offensive to others," such as the distribution or "*transmission of ethnic slurs or racial comments.*" (Emphasis added). [3]

[2]    Discriminatory harassment is defined under the zero tolerance policy to include an employee's use of "racial slurs, ethnic jokes, sexual or lewd jokes, negative or derogatory stereotypes, names, or labels that a reasonable person would find offensive."

[3]    Therefore, if an employee receives, on the employee's Lockheed email account, an email containing racially insensitive content, the employee violates the zero tolerance policy if the employee subsequently "transmits" the harassing email—through electronic forwarding or any other form of distribution.

HR frequently learns of violations of the zero tolerance policy through employees, as Lockheed requires its employees to aid HR in policing the workplace-conduct rule. The expectations placed on employees vary based on their employment rank. Employees having no supervisory responsibilities ("non-supervisors"), for instance, must ensure only their own compliance with the policy and inform their supervisors or HR whenever they discover a violation. Those with supervisory responsibilities ("supervisors"), however, must be more proactive,[4] including "[r]eport[ing] promptly to [HR] any act of harassment which is personally witnessed or suspected or reported by [an] employee."

[4]    For example, supervisors must: (1) "[m]aintain an atmosphere free of harassment"; (2) "ensure that work areas are free of explicit and implicit conduct that would violate th[e] [zero tolerance] policy"; and (3) "[t]ake immediate action to address reported, observed, or suspected" threats to workplace security, such as acts of "harassment" and acts that create a "hostile and intimidating work environment."

 *1324  Once HR learns of a possible infraction of the zero tolerance policy, it initiates an investigation. If its investigation concludes that an employee breached the zero tolerance policy, HR, through an empaneled disciplinary review committee, fashions discipline, up to and including termination.

It is against this background that Mitten's case arises.

B.

On March 29, 2005, Mitten, then a supervisor at Lockheed's plant in Marietta, Georgia,[5] received a racially insensitive "joke" email.[6] The email, entitled "Top Ten Reasons Why There are No Black NASCAR Drivers" (the "NASCAR email"), featured a top-ten list of derogatory stereotypes, all of which portrayed black people as criminals, pimps, and gang members. Two of the list's entries, as illustration, claimed there are no blacks in NASCAR racing because a "[p]istol won't stay under the front seat" and because there is "[n]o passenger seat for the ho."

[5]    Mitten's job title was Associate Manager; he had worked for Lockheed for 11 years.

[6]    Michael Porterfield, an hourly employee, sent the email to Mitten. Porterfield was not attempting to report the email, as required by the zero tolerance policy, by sending it to Mitten as a supervisor. Instead, Porterfield and Mitten were friends, and Porterfield believed that Mitten would find the email humorous.

After Mitten received the NASCAR email, he transmitted it in violation of the zero tolerance policy by forwarding it to his supervisor.[7] He did not report any of this to HR. HR, however, learned of Mitten's actions and, following an investigation, fired Mitten on May 5, 2005.

[7]    As discussed in part III.A.3.b, *infra,* although Mitten forwarded the email to his supervisor, he, like Porterfield, did so only to share it with the supervisor as a friend, not to report the email, as the zero tolerance policy required.

Mitten later learned that, within two months of his termination, HR discovered that two black non-supervisors at the Marietta plant had also violated the zero tolerance policy by transmitting racist emails targeting whites. These black employees, however, merely received temporary suspensions as discipline for their conduct.

After learning of this more-lenient treatment for black employees, Mitten concluded that he had been fired—in lieu of a temporary suspension—because he is white.

## II.

Mitten brought this lawsuit against Lockheed on July 28, 2006, [8] in the United States District Court for the Northern District of Georgia. [9] The complaint was framed in two counts: the first under Title VII of the Civil Rights Act of 1964, [10] and the second under 42 U.S.C. § 1981. [11] Both counts alleged that Lockheed terminated **\*1325** Mitten's employment due to his race and, as remedy for the wrong, sought reinstatement, back pay, and compensatory and punitive damages. [12] Lockheed answered the complaint, denied liability, and, after discovery closed, moved the district court for summary judgment. The court referred Lockheed's motion to a magistrate judge, who issued a report recommending that the motion be granted. [13] The magistrate judge—and later the district court—rejected Mitten's claim of race discrimination after analyzing it under the three-step burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973). [14]

[8]    Four other white former Lockheed employees fired for distributing the NASCAR email—Herbert Gann, William Smith, James Nichols, and Martin Yerby—joined Mitten as plaintiffs; only Mitten's appeal is currently before us. Therefore, we treat Mitten as if he were the sole plaintiff and indicate in footnotes the dispositions of his co-plaintiffs' claims.

[9]    Mitten and his co-plaintiffs exhausted their administrative remedies before filing suit. On October 21, 2005, Mitten filed charges of race discrimination with the Equal Employment Opportunity Commission ("EEOC"), and, on April 27, 2006, the EEOC mailed him notice of his right to sue.

[10]    *See* 42 U.S.C. § 2000e–2(a)(1) (declaring it unlawful for an employer "to discharge any individual ... because of such individual's race").

[11]    *See* 42 U.S.C. § 1981(a)-(b) (protecting an individual's right to be free from racial discrimination in the "making, performance, modification, enforcement, and termination" of contracts).

[12]    The complaint also sought attorneys' fees.

[13]    The magistrate judge also recommended that the district court grant Lockheed summary judgment on Gann's and Smith's claims, but not on Yerby's and Nichols's.

[14]    Title VII and § 1981 have the same requirements of proof and utilize the same analytical framework. *See Brown v. Am. Honda Motor Co.,* 939 F.2d 946, 949 (11th Cir.1991) ("The Supreme Court has held that the test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment causes." (citing *Patterson v. McLean Credit Union,* 491 U.S. 164, 185–87, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989))).

The first step of the *McDonnell Douglas* framework requires the plaintiff to make out a case sufficient to withstand a motion for summary judgment (or a motion for judgment as a matter of law)—i.e., a "prima facie case." When, as here, the plaintiff claims that his employer discharged him on account of his race, he must establish four elements: (1) that he is a member of a protected class (here, Caucasian [15]); (2) that he was qualified for the position he held; (3) that he was discharged from that position; and (4) that in terminating his employment, his employer treated him less favorably than a similarly situated individual outside of his protected class (here, an African–American). [16] *E.g., Maynard v. Bd. of Regents,* 342 F.3d 1281, 1289 (11th Cir.2003) (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824). If the plaintiff makes this showing, he raises a presumption that his race motivated his employer to treat him unfavorably. *See Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

[15]    We note that, in "reverse" discrimination cases like this one, some circuits, in applying the framework from *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), require majority-member plaintiffs to establish that "*background circumstances* support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Parker v. Balt. & Ohio R.R. Co.,* 652 F.2d 1012, 1017 (D.C.Cir.1981) (emphasis added). We, however, have rejected a background circumstances requirement. *See Bass v. Bd. of*

*Cnty. Comm'rs,* 256 F.3d 1095, 1102–03 (11th Cir.2001), *overruled in part on other grounds by Crawford v. Carroll,* 529 F.3d 961 (11th Cir.2008) ( "Discrimination is discrimination no matter what the race, color, religion, sex, or national origin of the victim.").

16    In most cases, the second and third elements are a given: the plaintiff was qualified for the position he held and was discharged. Here, Lockheed admitted that those two elements had been established. (Clearly, since all races are protected, there was no question that the first element, too, was satisfied.)

Once this presumption is raised, "[t]he burden then shifts to the employer to rebut [it] by producing evidence that [the employer's] action was taken for some legitimate, non-discriminatory reason." *EEOC v. Joe's Stone Crabs, Inc.,* 296 F.3d 1265, 1272 (11th Cir.2002) (citing *Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094). If the employer meets its burden of production, the presumption of discrimination **\*1326** raised by the plaintiff's prima facie case is rebutted and thus disappears.

Once the presumption of discrimination is rebutted, the inquiry " 'proceeds to a new level of specificity,' " whereby the plaintiff must show the employer's proffered reason to be a pretext for unlawful discrimination. *Id.* at 1272–73 (citing *Burdine,* 450 U.S. at 255–56, 101 S.Ct. at 1095–96). It is at this stage that the plaintiff's "burden ... merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. Thus, if a jury reasonably could infer from the evidence presented that the employer's legitimate justification is pretextual, the question becomes whether the evidence, considered in the light most favorable to the plaintiff, yields the reasonable inference that the employer engaged in the alleged discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 146–48, 120 S.Ct. 2097, 2108–09, 147 L.Ed.2d 105 (2000) (explaining that, depending on the facts of the case, the jury may, but need not, infer discriminatory intent from a plaintiff's showing of pretext). If such an inference is raised by the record, it precludes summary judgment (or judgment as a matter of law). *Id.*

[1]    Here, the magistrate judge concluded—and the district court subsequently agreed—that Mitten could not benefit from the *McDonnell Douglas* presumption of discrimination because the evidence was insufficient to raise

the presumption. This was because Mitten did not satisfy the fourth element of a prima facie case; he failed to show that he was disciplined less favorably under the zero tolerance policy than a similarly situated black employee, i.e., a "comparator." [17] Although Mitten pointed to certain preferentially treated black employees in non-supervisory positions, he failed to identify a more favorably treated black supervisory employee.

17    To be an adequate comparator, the preferentially treated individual from outside the plaintiff's protected class has to be similarly situated to the plaintiff in all relevant respects. *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997) (citations omitted). If this is not the case, "the different application of workplace rules does not constitute illegal discrimination." *Lathem v. Dep't of Children & Youth Servs.,* 172 F.3d 786, 793 (11th Cir.1999) (citing *Nix v. WLCY Radio/Rahall Commc'ns,* 738 F.2d 1181, 1186 (11th Cir.1984)). In order to be considered "similarly situated," the compared employees must have been "involved in or accused of the same or similar conduct," yet "disciplined in different ways" for that conduct. *Holifield,* 115 F.3d at 1562 (citations omitted).

[2]    [3]    This was significant. "[D]ifferences in job ranks ... are not, in and of themselves, dispositive as to whether the two individuals may be compared for the purposes of evaluating a discrimination claim," *Rioux v. City of Atlanta,* 520 F.3d 1269, 1281 (11th Cir.2008) (citations omitted), but they can matter. This is because the relevant inquiry is whether the employer subjected differently ranked employees to the same or different employment policies. *Lathem v. Dep't of Children & Youth Servs.,* 172 F.3d 786, 793 (11th Cir.1999) (citing *Nix v. WLCY Radio/Rahall Commc'ns,* 738 F.2d 1181, 1186 (11th Cir.1984)). If the same policies were applied differently to similarly ranked employees, those employees may be compared. Here, however, Lockheed showed that the zero tolerance policy required supervisors to undertake a more proactive role than non-supervisors in trying to extinguish workplace discrimination and harassment. [18] Consequently, the **\*1327** magistrate judge—and the later the district court —deemed non-supervisors inadequately similar to Mitten, a supervisor; thus a comparison could not yield a presumption of race discrimination under *McDonnell Douglas.* [19]

[18]    *See supra* part I.A (discussing in detail the disparate expectations Lockheed places on supervisors and non-supervisors under the zero tolerance policy).

[19]    On the same basis, the magistrate judge recommended dismissal of Gann's and Smith's claims.

Mitten objected to the magistrate judge's recommendation.[20] He argued that, even though he failed to identify a black supervisor as a comparator, a jury nonetheless could find from circumstantial evidence in the record that Lockheed discharged him because of his race. Mitten cited, among other things, Lockheed's more severe discipline of white employees than black employees for zero tolerance policy violations. The district court considered this circumstantial evidence but found it non-probative of Lockheed's allegedly discriminatory motive for firing Mitten, and, consequently adopted the magistrate judge's recommendation and granted Lockheed summary judgment.[21]

[20]    Gann and Smith also objected to the magistrate judge's recommendation.

[21]    The district court granted Lockheed summary judgment on Gann's and Smith's claims on the same basis. The court accepted the magistrate judge's recommendation that Lockheed's motion be denied as to Yerby's and Nichols's claims because, as non-supervisors, Yerby and Nichols had identified black comparators who had been treated more favorably than they had and thus had created a material issue of fact as to the legitimacy of Lockheed's motivation for terminating their employment.
Yerby and Nichols ultimately settled their claims against Lockheed, and, on October 19, 2009, judgment was entered against Mitten, Gann, and Smith, the remaining plaintiffs. Therefore, we have jurisdiction to entertain Mitten's appeal under 28 U.S.C. § 1291.

Mitten has appealed.[22] In his brief to this court, he repeats the argument he presented to the district court—that he does not need a black supervisor comparator because the record contains sufficient circumstantial evidence to create a triable issue of fact as to whether Lockheed fired him because he is white. We agree and find that the district court erred in granting Lockheed summary judgment.[23]

[22]    Smith and Gann also were parties to this appeal. (Smith died during the litigation, but his wife —the executor of his estate—was substituted as plaintiff.) However, after they reached settlements with Lockheed, Smith and Gann, joined by Lockheed, each submitted separate joint motions for dismissal of his appeal with prejudice. We granted those motions: Smith's on May 16, 2011, and Gann's on May 31, 2011.

[23]    We review the district court's grant of summary judgment *de novo. Weeks v. Harden Mfg. Corp.,* 291 F.3d 1307, 1311 (11th Cir.2002). We must view all the evidence and all factual inferences reasonably drawn from that evidence in the light most favorable to the nonmoving party—in this case, Mitten—and we must resolve all reasonable doubts about the facts in his favor. *Rioux v. City of Atlanta,* 520 F.3d 1269, 1274 (11th Cir.2008) (citations omitted).

III.

The district court, in dismissing Mitten's claim of race discrimination, did as federal courts routinely do in disposing of cases, like this, in which the plaintiff claims that his employer applied a workplace-conduct rule in violation of Title VII: the court used *McDonnell Douglas*'s burden-shifting framework. In so doing, the district court focused on whether Mitten's termination for his violation of the zero tolerance policy was more severe than the discipline Lockheed imposed on similarly situated black comparators. Mitten's comparators were deemed not "similarly situated," so the court found no tenable claims of race discrimination. If the record contained no **\*1328** circumstantial evidence from which a jury could otherwise infer that Mitten was fired because of his race,[24] our discussion would end here, and we would affirm the district court's judgment.

[24]    There is no direct evidence that Lockheed discharged Mitten because he is white. Mitten's case, instead, relies entirely on circumstantial evidence.

However, establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case. Accordingly,

USCA11 Case: 22-11462    Document: 23    Date Filed: 09/07/2022    Page: 100 of 129

the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case.

Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. *See Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997) (declaring that, in cases where a plaintiff cannot establish a prima facie case, summary judgment only will be "appropriate where no other evidence of discrimination is present." (citations omitted)); *Silverman v. Bd. of Educ.,* 637 F.3d 729, 733 (7th Cir.2011) ("To avoid summary judgment ... the plaintiff must produce sufficient evidence, either direct or circumstantial, to create a triable question of intentional discrimination in the employer's decision."). A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer [ 25 ] intentional discrimination by the decisionmaker." *Silverman,* 637 F.3d at 734 (citations and internal quotation marks omitted); *see also James v. N.Y. Racing Ass'n,* 233 F.3d 149, 157 (2d Cir.2000) ("[T]he way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove—particularly discrimination.").

25      "[A]n inference, is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact ...." *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 448 (2d Cir.1999) (citations and internal quotation marks omitted).

A plaintiff may raise a reasonable inference of the employer's discriminatory intent through various forms of circumstantial evidence. *Rioux v. City of Atlanta,* 520 F.3d 1269, 1281 (11th Cir.2008) (holding that the plaintiff established a prima facie case of racial discrimination when he did not present evidence of a comparator but presented other circumstantial evidence that was sufficient); *see also Alvarez v. Royal Atl. Developers, Inc.,* 610 F.3d 1253, 1264 (11th Cir.2010) (stating that the circumstantial evidence necessary to present a Title VII case of discrimination under *McDonnell Douglas* is "flexible and depend[s] on the particular situation" (citations omitted)); *cf. Burke–Fowler v. Orange County, Fla.,* 447 F.3d 1319, 1325 (11th Cir.2006) (affirming the district court's grant of summary judgment because plaintiff "failed to establish valid comparators and presented *no other circumstantial evidence suggesting racial discrimination*" (emphasis added)). Yet, no

matter its form, so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.

Here, Mitten did not need to rely on the *McDonnell Douglas* presumption to establish a case for the jury. As the following discussion explains, the record contained sufficient evidence to allow a jury to infer that Lockheed fired Mitten because he is white. We begin by presenting the facts **\*1329** shown by the evidence. We then explain why those facts could yield the reasonable inference that Lockheed fired Mitten because of his race.

### A.

The record evidence, construed in a light most favorable to Mitten, establishes the following facts:

### 1.

In 2001, Tom Heiserman became Lockheed's Vice President of HR, the highest-ranking HR position at Lockheed. One function of this role is to enforce Lockheed's workplace-conduct rules, including the zero tolerance policy. Thus, Heiserman and his HR staff are charged with disciplining employees who have violated the policy.

### 2.

Less than two years after taking over Lockheed's HR operations, Heiserman and his staff began to face public criticism over their enforcement of the zero tolerance policy in the wake of a July 2003 mass-shooting spree at the company's plant in Meridian, Mississippi. The shooter, a Lockheed employee named Doug Williams, killed five Lockheed employees and himself and wounded eight others. [26] In the shooting spree's wake, it became public that Williams had been a white supremacist—a fact he had made clear to his black coworkers—and some groups, including in the news media, began to label the shootings as a "hate crime" targeting black Lockheed employees. Of more concern to Lockheed, however, was that some groups also began to blame the shootings on company HR officials, claiming that those officials knew of Williams's racist propensities long before

the shootings transpired, but did little to curb his harassing ways.

26    The morning of July 8, 2003, Williams arrived at the Meridian plant with an assortment of firearms in his truck. Shortly after the start of a mandatory training course he was attending in a building separate from the main plant, Williams exited the building, retrieved a shotgun and a semiautomatic rifle from his truck, and reentered the building where the training course was ongoing. Williams opened fire, shooting at least five persons attending the training course. Williams then exited that building and went into the main plant where he shot more victims before killing himself. *Bailey v. Lockheed Martin Corp.,* 432 F.Supp.2d 665, 666–67 (S.D.Miss.2005).

a.

These allegations initially arose in various civil suits brought by victims and deceased victims' families against Lockheed—the first was filed soon after the shootings in 2003, but some proceeded well beyond. *E.g., Bailey v. Lockheed Martin Corp.,* 432 F.Supp.2d 665, 669–71 (S.D.Miss.2005); *Tanks ex rel. Estate of Willis v. Lockheed–Martin Corp.,* 332 F.Supp.2d 953 (S.D.Miss.2004), *rev'd in part by,* 417 F.3d 456 (5th Cir.2005).

According to the plaintiffs in these cases—which asserted race discrimination claims under Title VII and § 1981 and sought millions of dollars in compensatory damages for injuries arising from the shootings [27]—Lockheed HR officials knew that Williams was a racist who harassed his black coworkers. The plaintiffs in *Tanks* and *Bailey,* for example, alleged, among other things, that Lockheed officials knew that: (1) in 2001, Williams had made threatening remarks to black coworkers; and (2) on June 12, 2003, "Williams removed his white boot covering, placed it on his head and mimicked a Ku Klux Klan member to intimidate his **\*1330** black coworkers." *E.g.,* Compl. at 4, *Tanks,* No. 4:03–cv–408LN (S.D.Miss. Dec. 16, 2003). In light of this knowledge, the plaintiffs claimed, HR officials tortiously did too little to curb Williams's harassing conduct. *See, e.g., Bailey,* 432 F.Supp.2d at 669–71 n. 1 (" 'Due [to] their knowledge ... of the nature and depth of Williams' racial hatred and threats toward African–American and other employees, the supervisory personnel knew or were charged

with knowledge, or both, that it was only a matter of time before Williams resorted to the type [of] harmful ... action that occurred.' "); *Tanks,* 332 F.Supp.2d at 955 (explaining the plaintiffs' claims of " 'intentional and negligent acts of Lockheed' based on ... allegation[s] that Lockheed[ ] had actual and constructive notice and knowledge of Williams' violent nature and his hatred of blacks [and] 'intentionally failed to provide a reasonably safe work environment' for its employees by protecting them"). [28]

27    The plaintiffs in these cases sought to recover tort damages from Lockheed for such injuries as lost income, pain and suffering, emotional distress, loss of companionship, and loss of value of life.

28    The plaintiffs in *Tanks ex rel. Estate of Willis v. Lockheed–Martin Corp.,* 332 F.Supp.2d 953 (S.D.Miss.2004), *rev'd in part by,* 417 F.3d 456 (5th Cir.2005), and *Bailey,* 432 F.Supp.2d at 669–71, raised these claims to argue that they fell within the intentional tort exception to Mississippi's Workers' Compensation Act, Miss.Code Ann. § 71–3–1 *et seq.*

b.

On the heels of several of the initial civil lawsuits, the EEOC, in July 2004, made similar allegations against Lockheed HR officials. Following an investigation into the Meridian shootings, the EEOC prepared a report that expressly faulted Lockheed's HR for having fostered a workplace environment in Meridian that was hostile to black employees. While the EEOC acknowledged that Williams, alone, had created a racially hostile work environment through his threatening comments to black coworkers, its investigation concluded that Lockheed had allowed this hostility to intensify by not adequately responding to these known race-based threats. Moreover, the EEOC suggested, such hostility toward black employees still festered over a year after the shootings, as HR had yet to remedy it.

c.

Then, in the spring of 2005, less than a year after the EEOC issued its report and while many of the civil cases remained ongoing, Lockheed learned that ABC News planned to produce a report commemorating the second anniversary of

the Meridian shootings. The special report was to be aired on the network's investigatory-newsmagazine show, "Primetime Live."

Lockheed first became aware of ABC News's intentions on March 15, 2005, when ABC filed a Motion to Intervene in the *Tanks* litigation. ABC, in its memorandum in support of its motion, requested to intervene in the case to oppose any court order that would restrict public access to or seal documents of proceedings in the case. Mem. of ABC in Supp. of Mot. to Intervene 1, *Tanks,* No. 4:03–cv–408LN (S.D.Miss. Mar. 15, 2005). ABC argued that "[t]he causes of the shooting and precautions that were taken or could have been taken are of significant public interest and, therefore, of great importance to [ABC] in its newsgathering function on behalf of the public." *Id.* ABC claimed further that it should be permitted to intervene to "protect its interest and that of the public to access the file and proceedings in th[e] case," which it argued could have "obvious implications for the safety of workers not only at [the Meridian] facility but at other plants across the United States." *Id.* Lockheed responded in opposition to ABC's motion on March 29. **\*1331** *See generally* Resp. of Lockheed–Martin Corp. to Mot. of ABC, Inc., to Intervene, *Tanks,* No. 4:03–cv–408LN (S.D.Miss. Mar. 29, 2005).

Around this time, [29] ABC News also began making "repeated requests" to interview Lockheed management officials for the purposes of its upcoming "Primetime Live" report. [30] ABC News wanted to provide Lockheed officials an opportunity to respond to the charges against them. Lockheed, however, denied all of these interview requests.

[29]   The record does not state whether ABC News began making its interview requests before or after its March 15, 2005 motion to intervene in *Tanks.*

[30]   The record is unclear as to which specific Lockheed officials ABC News requested to interview.

Lockheed management became concerned about what ABC News had planned for its upcoming report. This worry is best evidenced in the record by testimony that, some time during the spring of 2005, Lockheed management made the HR staff at Lockheed's Marietta, Georgia plant—and presumably at other facilities—explicitly "aware that [the ABC News report] was coming" and even required the Marietta HR employees to attend meetings with in-house counsel to discuss the significance of the upcoming news piece.

3.

It was in April 2005, as Lockheed was growing concerned about ABC's intentions, that HR officials at the Marietta plant learned of the NASCAR email and Mitten's involvement.

a.

On April 5, Nelson Phillips, a black hourly employee at the Marietta plant, was shown a copy of the NASCAR email by another black hourly employee, Marvin Armstead. [31] The email's racial content upset Phillips—who, for some time, had made it known vociferously that he felt victimized by intolerance of black employees at Lockheed—and he immediately retained counsel.

[31]   Lockheed investigators determined that Armstead showed the email to both Phillips and Anthony Young, who was Armstead's Shop Steward and union representative, because, after Armstead had read the email, he had decided that "it didn't seem right."

The next day, April 6, Phillips emailed Dorie Tuggle, who held the HR position of Senior Manager of Diversity and Equal Opportunity Programs, [32] to report the NASCAR email and to notify her that he had hired an attorney. [33] Tuggle quickly asked that Phillips call her office, and Phillips called as requested. During their conversation, however, Phillips displayed an air of combativeness and litigiousness by insisting that, in lieu of resorting to Lockheed's internal complaint procedures, he would handle the entire matter through his attorney and stressing that he would not meet with Tuggle in any manner until she heard from his lawyer.

[32]   Notably, in this role, Tuggle was part of the on-site response team that assisted in the wake of the Meridian shootings.

[33]   Specifically, Phillips's email to Tuggle said: "I need your business mailing address please, to send you a letter from my attorney's office regarding an e-mailed letter entitled **'Top 10 reasons why there are no black NASCAR drivers ...'** found in my break area." (Emphasis and omissions in original).

USCA11 Case: 22-11462    Document: 23    Date Filed: 09/07/2022    Page: 103 of 129

Phillips's assertiveness persisted when, the next day, Treena Hancock, another member of Lockheed's HR department, contacted Phillips. Hancock requested that Phillips meet with her in her office to discuss the incident. Phillips responded, **\*1332** "No!" He then exclaimed that he was sick of all the "racially motivated things that go on around here" and that he would only discuss the NASCAR-email matter with Tuggle, and then only after she heard from his attorney.

On April 14, Tuggle finally received communication from Phillips's attorney. The attorney sent Tuggle a letter of protest that demanded that Lockheed investigate the sources of the NASCAR email in order to "assist[ ] in obtaining the cessation of racially motivated discrimination" within Lockheed's Marietta facility. [34] The letter mentioned that Phillips was "very concerned regarding [the email's] discovery, as this [was] not his first encounter with racial discrimination at his place of employment."

[34]    The letter was signed by Bridget N. Summerour, for the law firm of Deming, Parker, Hoffman, Green & Campbell, LLC.

b.

Phillips's complaint was the first HR had received about distribution of racially insensitive emails. Tuggle, consequently, took it—and Phillips's attorney's demands—seriously. She quickly referred the matter to Lockheed's Security and Emergency Services ("SES") department for a formal investigation. [35]

[35]    Tuggle notified SES on April 7, 2005; however, the investigation was stalled until she heard from Phillips's attorney.

Sandra Bohner, who was employed as an HR Business Partner [36] at the Marietta location, [37] oversaw the SES investigation, which began on April 18. The investigation was conducted by J.R. Reynolds, SES's Marietta "Site Lead." [38] SES, in performing the investigation, conducted forensic examinations of employees' computers to trace the NASCAR email chain. Although these forensic exams never identified the NASCAR email's original source—i.e., whether it originated within or without Lockheed—twenty-one employees were identified as "subjects," since they either had sent or received the email through their Lockheed email accounts.

[36]    At Lockheed, an HR Business Partner—also known in the company as a member of the multifunction HR representative staff—simply refers to an employee who is a human resources generalist. Thus, Bohner had various HR responsibilities, and did not specialize in any one area. She had been employed in this role since 1998. Bohner reported directly to Calvin Coolidge Bryant, the Senior Manager for HR at the Marietta plant.

[37]    Bohner, like Tuggle, was part of the on-site response team that assisted after the Meridian shootings in 2003.

[38]    Reynolds was the head of SES operations within the Marietta plant.

Upon completion of SES's forensic tests, Bohner, during a period from April 25–28, interviewed all twenty-one "subjects." Of the twenty-one employees interviewed, only eight—including Mitten—were found to have violated the zero tolerance policy's prohibition against distribution of racially insensitive material. Seven of the eight were white employees, none of whom had informed HR of their conduct. (The only black employee found to have distributed the email was Marvin Armstead, who had shown it to Phillips as well as his union representative.)

Along with Mitten, the six other white employees who distributed the NASCAR email were Michael Porterfield, Herbert Gann, William Smith, Scott Vinson, James Nichols, and Martin Yerby. Like Mitten, Gann, Smith, and Vinson held salaried, supervisory positions. [39] Yerby, Nichols, **\*1333** and Porterfield, however, were employed as non-supervisors—Yerby and Nichols held salaried positions; Porterfield held an hourly position. [40]

[39]    When terminated, Gann held the position of Flight Line Supervisor and had worked for Lockheed for 25 years; Smith held the position of Production Flight Supervisor and had been with Lockheed for over 30 years.

[40]    Porterfield was as the only hourly employee discharged and, thus, was the only fired employee in the union, which intervened on Porterfield's behalf. The union challenged Porterfield's

termination as violative of his collective bargaining rights and as too severe a punishment based on his actions. The case went to arbitration, and, in May 2006, the arbitrator ruled in Porterfield's favor. The arbitrator concluded that Porterfield had, indeed, violated Lockheed's zero tolerance policy, but that termination was too severe in light of (1) his non-management role, (2) his previously clean discipline record, and (3) the fact that Lockheed had never before fired anyone for sending racially offensive emails. As a result, Porterfield's termination was rescinded and he was reinstated with full seniority and pay.

Each of the seven white employees fully cooperated during Bohner's interviews. That cooperation enabled Bohner and SES to unravel how each employee received the NASCAR email and the manner in which he subsequently distributed it.

For instance, the investigation revealed that Mitten, on March 29, received the NASCAR email from Porterfield, who had received it from Yerby that same day. Mitten then forwarded the email to his own supervisor, Vinson. He did so, however, not to raise a complaint about the email, but merely to share it with Vinson, who Mitten believed would find it humorous. [41] Mitten and Vinson both "chuckled [about the email] but [also] discussed the dangers of such items in the workplace and that this was not good," which led Mitten to email Porterfield to say he "should not be sending this [type of email] and he needed to be careful about sending such emails."

[41]     Vinson told SES and Bohner that Mitten was not trying to report the email.

Gann, another supervisor, also received the NASCAR email from Porterfield. Afterward, he both forwarded the email to his home email account and printed it to share with his friend and coworker, Gerald Waites—a black hourly employee—who found the email funny and inoffensive.

Smith, the third supervisor implicated, also received the email from Porterfield; however, unlike Gann and Mitten, he did not send the email to anyone within Lockheed. Porterfield worked under Smith's supervision and had forwarded the email to Smith while Smith was on vacation—Smith had given his computer password to Porterfield so that Porterfield could forward some information about the progress of a work project. [42] Smith saw the NASCAR email from Porterfield upon his return to work. Since he had been out of the office for a prolonged period, Smith had an "ungodly amount of

email backed up in his inbox." To save time, he read only a few lines of the NASCAR email and then forwarded it—along with several other emails he planned to read later—to his daughter's home email address, which was his personal account as well.

[42]     Porterfield sent the NASCAR email to Mitten and Gann, amongst others, using Smith's account.

As for Yerby and Nichols, the salaried non-supervisors implicated, Yerby received the NASCAR email from Hal Bauguss, [43] a Lockheed employee in a salaried, non-supervisory position. Yerby then forwarded the email from his Lockheed email account to eighteen people—six Lockheed employees at their Lockheed email addresses, including Porterfield, and another twelve **\*1334** individuals at external email addresses. Nichols received the email from Yerby and then, like Smith, forwarded the email to his personal email address. He also attempted to forward the email to an outside email account, which turned out to be inoperable and the delivery failed. [44]

[43]     That Yerby received the email from Bauguss, a salaried employee of Lockheed, was not discovered during Lockheed's investigation; rather, the information came out at Yerby's deposition during discovery in this case.

[44]     The record reveals that the disciplinary review committee, in fashioning a recommended discipline for Nichols, initially took into account that he had forwarded the email only to one functional email address—his personal account. The committee noted that one of the accounts to which Nichols had sent the email was a "bum" email address and, based on this, initially suggested that a discipline less harsh than termination was appropriate. The record suggests, however, that Heiserman, the HR director, persuaded the committee that termination nevertheless was preferable.

Additionally, the investigation and interviews disclosed that Phillips, as he had with Tuggle, often displayed a combative, litigious nature in his interactions with his white supervisors. It was learned that, for about ten years, Phillips had made a multitude of combative threats to file reports with the EEOC's Atlanta District Office to report his white supervisors as

discriminatory because they had given him job assignments he did not want. [45]

[45]    For example, Vinson disclosed to Bohner that, on April 27, 2005, Phillips, in an effort to have Vinson improve Phillips's job assignment, threatened EEOC action based on a theory of retaliation for his NASCAR-email complaints. Phillips allegedly asked Vinson, "Do you understand the Company and Federal policies about retaliation against an individual that has filed a complaint such as I have?" He then exclaimed, "[Y]ou know I will push it to the full extent." Similarly, another "subject" of the investigation interviewed told Bohner that he assumed Phillips was the one who reported the NASCAR email because "he knew [Phillips] and [that] he would make a big deal about it," since "he had never met a more prejudiced person than Phillips."

The investigation and interviews concluded on April 28. Bohner then began preparing for HR a summary report of the inquiry's findings, including the foregoing information.

c.

Meanwhile, also on April 28, Lockheed officials' learned, for certain, that ABC News's upcoming special on the Meridian shootings would raise the same accusations raised in federal court and by the EEOC: that Lockheed HR tolerates white-on-black discriminatory harassment. This time, however, the allegations would be presented to a far more public audience —national primetime television viewers.

On that date, Brian Ross, ABC News's Chief Investigative Correspondent and a featured reporter on "Primetime Live," confronted the Chief Executive Officer of Lockheed–Martin Corporation (Lockheed's parent corporation), Robert Stevens, at the corporation's annual shareholders meeting in Albuquerque, New Mexico. The exchange between Ross and Stevens proceeded as follows: [46]

[46]    This is how the interview was presented on "Primetime Live."

[Brian Ross:] This is Brian Ross with ABC News, "Primetime Live." How are you? Nice to see you. We're doing a story about what happened at your Meridian plant, and I want to ask you, *do you find the word nigger offensive?*

[Robert Stevens:] Brian, I am surprised that you would even ask me a question such as that.

[Ross:] *Why was it tolerated so long at your plant if you find it offensive?*

.... [ [47] ]

[47]    At this point in the dialogue, Ross narrated to the television audience that Stevens, during the interview, had called the shootings an unspeakable tragedy but one unconnected to racial discrimination at the plant.

**\*1335**  [Stevens:] The shooting in Meridian, Mississippi was the act of a single person. And relative to ...

[Ross:] Who had threatened to kill Blacks for more than a year and a half. He used the term nigger on a regular basis on the floor plant. *Your people were aware of it at the plant management level. We've seen the notes from your own people.* He even had this hat. He had it like this as a Ku Klux Klan cap he wore. *What about your zero tolerance policy?* Why was that permitted?

[Stevens:] Lockheed Martin has a zero tolerance policy ...

[Ross:] So, why was that permitted?

[Stevens:] Actions like that are not permitted in Lockheed Martin.

[Ross:] *Yet Lockheed's own documents from December 2001 show Williams was permitted to stay on the job long after the company became aware of death threats against Black co-workers.*

[Stevens:] There is zero tolerance in Lockheed Martin.

[Ross:] *So why was Doug Williams still employed there after he threatened Blacks, he called them niggers all the time?*

[Stevens:] I'm not going to elaborate any further discussion with you today on the situation at Meridian.

(Emphasis added).

USCA11 Case: 22-11462    Document: 23    Date Filed: 09/07/2022    Page: 106 of 129

d.

The day after this encounter, April 29, Bohner finalized her investigation report and delivered it to the Marietta facility's disciplinary review committee for their use. The empaneled disciplinary review committee consisted of four senior managers from the Marietta plant: [48] Dorie Tuggle; Jack Lambert, the Marietta Site Director of HR and the head of the committee; [49] Calvin Coolidge Bryant, the Senior Manager for HR; [50] and J.R. Reynolds, [51] the SES head. [52]

[48] The composition of the disciplinary review committee was based on certain company practices in place at the Marietta plant that established who was to serve on the committee.

[49] As Marietta's HR "Site Director," Lambert, the chief HR official in the plant, was in charge of HR generalists, like Bohner, as well as HR members in Lockheed's Equal Employment Opportunity office, like Tuggle. Lambert only reported to Heiserman at company headquarters in Fort Worth. Lambert originally took this position in September 2000.

[50] Bryant, in this role, directly oversaw the HR generalists, or HR Business Partners, like Sandra Bohner. Bryant was Lambert's subordinate and Tuggle's peer.

[51] Reynolds was Lambert's equivalent within SES. Security is considered a separate capacity within the HR department at Lockheed and, thus, has a distinct organizational structure from those in charge of general HR duties like Lambert, Bryant, and Bohner.

[52] Lambert and Reynolds are white. Tuggle and Bryant are black.

The committee's final decision would serve merely as a recommendation; ultimate disciplinary decision-making authority rested with Heiserman. Although he was in Texas, Heiserman desired to stay fully abreast of the investigation, so he remained in almost daily contact with members of the disciplinary review committee. [53] He also continually briefed Lockheed's President, Ralph Heath, on the ongoing investigation. [54]

[53] For example, as discussed in note 44, *supra,* the disciplinary review committee originally only wanted to suspend Nichols. They made this clear to Heiserman through email. Heiserman replied, "We can talk next week. Need to hold line." Eventually, the committee held the line that Heiserman preferred and recommended Nichols's termination.

[54] During this time, Meridian, most likely due to knowledge of the upcoming ABC News report, weighed heavily on Heiserman's mind. Indeed, at one point, in an email exchange with the disciplinary review committee, Heiserman mistakenly referred to the NASCAR email investigation as the "Meridian investigation."

**\*1336** e.

Once the disciplinary review committee was convened, Lambert, to aid the committee's—and Heiserman's—decision making, had Bryant prepare a spreadsheet, which committee members called a "matrix," summarizing the pertinent information contained in Bohner's investigation report. The "matrix," listed criteria deemed significant to the committee and Heiserman's discipline decisions: (1) the name of each employee known to have been involved with the NASCAR email's distribution; (2) the employee's role with Lockheed, i.e., whether he held a supervisory, non-supervisory, or hourly position; (3) the actions taken by that employee after his receipt of the email; (4) the specific Lockheed policy or policies the employee violated; and (5) the committee's recommended discipline for that employee.

The "matrix" also included a column reflecting each employee's race. [55] The employees, including Mitten, were recorded as either a "W," for white, or a "B," for black. Lockheed has represented that it had no policy in place calling for HR to account for an employee's race in this fashion; instead, Bryant has supported his tracking of race as merely a decision of personal convenience, intended to aid his putative future reporting of that information to external authorities. Evidence in the record contradicts Bryant's stated reason, however. Indeed, according to other HR officials—including Heiserman—there simply was no "possible [HR] reason" or "legitimate ... business purpose for Lockheed to be" monitoring the race of employees in the course of a discipline investigation.

55     The employee's sex also was recorded.

Moreover, Bryant has claimed that employee race did not play any role in the ultimate discipline decisions made, despite appearing on the "matrix" as a key consideration in those discipline determinations. That is, Bryant has stated, it was understood that Lockheed's principal decisionmakers would "close one eye [to the race entry]" when looking at the "matrix."

f.

Utilizing the "matrix," the disciplinary review committee, on May 3, recommended that Mitten (and the other six white employees who distributed the NASCAR email) be discharged.[56] As for Marvin Armstead, however, the committee recommended only delivery of "a letter to report such materials in the future" because he was found to have attempted to report the email.

56     As discussed in notes 44 and 53, *supra,* during the course of the investigation, the disciplinary review committee had recommended that Nichols receive a suspension, since he only had sent the email to one operable email address—his home account. Nonetheless, Nichols ultimately was terminated, as preferred by Heiserman.

Later that same day, Bryant emailed Heiserman a final "matrix," upon which Bryant noted the committee's recommendations. Heiserman reviewed the matrix and made no changes to the punishments. As a result, on May 5, Lockheed informed Mitten and the other six white employees that they would be fired for distributing the racist email.[57]

57     Lockheed gave the employees the option to resign in lieu of termination. Mitten refused to resign, so he formally was fired.

g.

Soon after Mitten and the other white employees were fired for distributing the **\*1337** NASCAR email, Heiserman reviewed and approved a letter, written under the signature of Lockheed's President, Ralph Heath, to be emailed to all Lockheed employees on May 9. The letter notified Lockheed

staff that "an offensive message with racial overtones was sent to a small number of employees through company e-mail," and that seven employees had lost their jobs as a result because such conduct violated the zero tolerance policy. Beyond that, however, the letter disclosed little specifics of the violations or the resulting investigation; it simply warned that distributing racist emails would not be tolerated by Lockheed management. Future similar conduct, the letter declared, must be reported to management, after which the incident would be "investigated, and the appropriate action, up to and including termination, [would] be taken." The letter also offered employees an opportunity to enroll in voluntary additional training on Lockheed's anti-harassment policies.

4.

On May 12, 2005, one week after the NASCAR email firings, ABC News aired its "Primetime Live" report on the Meridian shootings. ABC News's report, as anticipated, was highly critical of Lockheed's HR department. Calling the Meridian shootings "the worst hate crime against African–Americans since the civil rights movement," the report focused on the lingering questions about HR's meager enforcement of the zero tolerance policy against Doug Williams, who HR knew was a white supremacist and a threat.[58] Like the civil litigants and the EEOC before it, ABC News told its audience that HR officials' tolerance for harassment of black Lockheed employees created an environment that ultimately permitted Williams's shootings to occur.

58     For example, the ABC News report stated that HR officials knew that "Williams fumed when blacks at the plant complained about his racial slurs or received better-paying jobs," and that he "once wore the bootie of a white protective suit on his head in the shape of what black workers said looked like a Ku Klux Klan hood."

For example, the report included an interview with Aaron Hopson, a black employee who claimed that Williams threatened to kill him in 2001—an allegation alluded to in the *Tanks* complaint. According to Hopson, "[Williams] said, 'You know, one of these days, I'm goin' to come in here and kill me a bunch of niggers and then I'm goin' to kill myself.' " This threat, ABC News claimed, "was reported to the plant managers and a company equal employment officer was sent to Meridian to investigate the matter in December 2001";[59] yet, despite the company's zero tolerance policy, Williams

USCA11 Case: 22-11462    Document: 23    Date Filed: 09/07/2022    Page: 108 of 129

kept his job and merely had to undergo anger management counseling. [60]

[59]    The report stated that "Lockheed company documents obtained by ABC News show[ed] that[ company equal employment officer] Darold Sawyer, based at Lockheed's offices in Marietta, Ga., interviewed several workers in Meridian and took extensive notes detailing Williams' threats to kill black workers."

[60]    Darold Sawyer's investigation notes, according to the ABC News report, also showed that one of Williams's victims, Lynette McCall, had reported to management that Williams told her he saw " 'a race war coming,' and that she 'was on his list too.' " The news report would go on to say that "[o]n the day of the killings, Williams stalked his way to McCall's work station where witnesses say he taunted her before shooting her at point-blank range."

Based on this, ABC News emphasized that Lockheed failed in its responsibility to avoid a hostile work environment for black employees, "a workplace where people aren't threatened with death and called 'nigger,' " and that "[i]t's beyond any kind of description why they allowed this to **\*1338** take place. They could have stopped it." (Internal quotation marks omitted).

From there, the report exhorted that, if proven, such tolerance for race discrimination against blacks placed Lockheed in a precarious financial and public relations position. To make this point, ABC News interviewed the lead lawyer in the ongoing *Tanks* litigation, who noted that if race discrimination did not motivate the shootings, " 'then all you have is a workmen's compensation claim. Maybe an insurance claim here or there .... So both for economic reasons, for public relations reasons, the company would be unwilling to have someone say [the shootings were] racial if they could avoid doing so.' " (Omissions in original). Moreover, the report ominously warned that "$25 billion in [federal] government contracts" were in peril for the "largest defense contractor in the country." This is because, ABC News explained, " '[i]f the federal government wanted to, the federal government could review their contracts, ... [a]nd there is a provision under which contracts could be debarred' " based on findings that the company tolerates discrimination against black employees.

5.

In June 2005, a month after the NASCAR email firings and the ABC News story's airing, Lockheed officials addressed new violations of the company's zero tolerance policy. In this case, employees at both the Marietta and Fort Worth, Texas facilities were found to have distributed a different racially insensitive email. The content of this new email targeted the white race, however.

a.

On June 20, 2005, Sharron Jones, a black, salaried non-supervisor at the Marietta plant, [61] used her Lockheed email account to forward to eight other Lockheed employees an email containing a video clip entitled "How to Dance Like a White Guy" (the "White Guy Video"). [62] The video made various derogatory references about whites, referring to them as "cracker[s]," "whit[ies]," "honk[ies]," and "homo[s]." [63]

[61]    In June 2005, Jones was employed as a Senior Logistics Management Analyst.

[62]    Lockheed does not argue that there is any material difference in the level of racial offensiveness between the White Guy Video and the NASCAR email.

[63]    The video also contained sexually explicit references to masturbation and female genitalia and portrayed Adolf Hitler.

Jones forwarded the White Guy Video email, which she had been sent by a "very good" friend from outside of Lockheed, after returning to work from a prolonged vacation. Her email box was very full and she forwarded the email to the eight employees without much thought. Seven of the eight recipients were black and one was white. [64] One of the black recipients was Eric Saxon, a salaried, non-supervisory employee at the Marietta facility.

[64]    The white recipient found the email funny and was not offended.

Another of the black recipients of Jones's forwarded email sent an email reply to Jones to warn her that the White Guy Video might be considered offensive to some people.

This warning made Jones—who had received Ralph Heath's May 9 letter and even attended some of the additional zero tolerance policy training courses offered in the wake of those firings—highly worried that she may have jeopardized her employment. To protect herself, Jones sent a follow-up email to all eight of her original recipients. In that follow-up, Jones expressed some regret for forwarding the video only because it "MAY be considered offensive ... not to me of course." She asked that each recipient delete the email without any further forwarding. **\*1339** [65] Jones then visited her recipients personally to ensure that the email, indeed, was deleted and to advise them to notify their respective supervisors in order to avoid discipline.

[65]    Jones's email read:
          I wasn't thinking when I may have sent an e-mail entitled "how to dance" ... someone advised me that it MAY be considered offensive ... not to me of course
          However, please don't forward it ... please delete tanx [sic]
        (Omissions in original).

On June 21, Jones, hoping to save her own job, informed her manager about her email message and apologized for sending it.

After Jones self-reported, her manager relayed her disclosure to HR. And, starting on June 22, Sandra Bohner oversaw yet another SES investigation. The investigation revealed the preceding information about Jones's conduct and that the only employees implicated, other than Jones, were her recipients. Saxon was the only other employee who, aside from Jones, had distributed the email; he, like Smith and Nichols earlier, had merely forwarded the email to his personal account. Saxon never reported his conduct to HR or his supervisor.

A disciplinary review committee met in the latter part of July 2005 to consider discipline for the employees implicated. As with the NASCAR email incident, the new disciplinary review committee for the White Guy Video email included Lambert, Bryant, Reynolds, and Tuggle; Heiserman, however, again had final say on the ultimate disciplinary action taken and thus was kept informed of the investigation's progress. The disciplinary review committee once again created a "matrix" to summarize pertinent information. The newest matrix, as before, recorded the investigated employee's name, the employee's position within Lockheed, a summary of the employee's conduct and whether it violated

Lockheed conduct policies, and, finally, a recommendation for disciplinary action. This time, however, the "matrix" for the eight employees implicated—seven of whom were black—did not include a notation for employee race.

The disciplinary review committee, utilizing the "matrix," recommended that Jones and Saxon each only receive a temporary suspension. With respect to Jones, the committee felt that a letter of reprimand and a thirty-day, unpaid suspension would suffice in light of the evidence that she: (1) was cleaning out her email inbox after her vacation and sent the White Guy Video without malice; (2) took swift action in reaching out to the recipients of her email upon being notified that the email might be considered offensive; and (3) apologized to her superiors after being so notified. For Saxon, the committee recommended only a two-week, unpaid suspension because he had merely sent the email home.

On or around August 4, 2005, Bryant emailed the disciplinary review committee's recommendations and the new "matrix" to Heiserman. Once again, Heiserman approved the committee's recommendations without change; Jones and Saxon were thus suspended as the committee had recommended. [66]

[66]    Prior to granting his approval to the recommendations, Heiserman displayed some worry about the committee's recommendation not to discharge Jones because her conduct so closely resembled that of the men fired for distributing the NASCAR email. Indeed, Heiserman's reluctance is shown in an August 4, 2005 email reply to Bryant, in which Heiserman wrote: "Has legal reviewed/ agreed [to the Jones-discipline recommendation]? I am uneasy, but will support [the recommended discipline] if legal feels that it doesn't hurt the outstanding cases." It reasonably can be inferred that the "outstanding cases" referred in part to the firings of the white employees who had forwarded the NASCAR email, in addition to the ongoing litigation related to the Meridian shootings.

**\*1340**  b.

In addition to the events at the Marietta facility, in June 2005, around the time that Jones forwarded her racist email, two non-black Lockheed employees were discovered to have violated the zero tolerance policy by also forwarding the

White Guy Video to several other employees.[67] The violators were Joe DeLeon and Clifford Wood, both non-supervisors employed at the Forth Worth plant.[68]

[67]      Additionally, although scarce, the record contains some evidence that, in mid-May 2005—prior to the Jones and Saxon investigation—Lockheed had discovered that Denny Tucker, a white, salaried non-supervisor at the Marietta facility, had received and distributed to an individual outside of Lockheed an email containing the "White Guy Video." Tucker, like Jones, self-reported his conduct to two supervisors. Although there is some evidence to suggest that Tucker's self-reporting occurred before anyone from Lockheed had confronted him, we give it little weight because, unlike Jones, Tucker self-reported *after* Lockheed's investigation into his conduct had started, and there is nothing in the record to rebut the inference that he only self-reported because he knew he was under investigation. Ultimately, although Jack Lambert recommended that Tucker receive only a one-week, unpaid suspension, Tucker was fired for his conduct.

[68]      DeLeon and Wood each received the email from a source outside of Lockheed.

There were many similarities between DeLeon's and Wood's cases and Jones's. For instance, after forwarding the video, DeLeon and Wood, like Jones, received warning from one of their emails' recipients that the attached video might be considered offensive. And, as a result, like Jones, each subsequently contacted the recipients of his email—DeLeon apologized to his recipients; Wood asked his not to open the video attachment and, instead, to delete the email altogether. Notwithstanding these similarities to Jones's case, DeLeon and Wood were both terminated for breaching the zero tolerance policy.

Michael Hester, the Senior Manager of HR at Lockheed's Fort Worth facility,[69] coordinated the DeLeon and Wood investigation and served as the head of their disciplinary review committee. Oddly, from the outset, Hester characterized their offenses as racist against blacks. Specifically, notwithstanding that all involved, including Sharron Jones, viewed the White Guy video as, possibly, offensive toward whites, Hester characterized it oppositely, as "mocking the Black race."[70] Moreover, in reviewing

their cases, Hester did not consider DeLeon's and Wood's actions in notifying and apologizing to their emails' recipients as mitigating factors in fashioning discipline—this despite the fact that he admits he was in constant correspondence with officials in Marietta in an attempt to ensure consistent outcomes in the dual White Guy Video investigations.

[69]      Hester was Calvin Bryant's counterpart at the Fort Worth location.

[70]      Hester made this characterization in an email sent to other HR officials in Fort Worth.

Although Hester led the disciplinary review committee, Heiserman, yet again, had ultimate authority on discipline. Consequently, like his peers in the previous investigations, Hester remained in constant communication with Heiserman throughout the inquiry into DeLeon's and Wood's conduct. In the course of their communications, Heiserman made it abundantly clear to Hester that he preferred that DeLeon and Wood be fired for their actions.[71]

[71]      For example, in an email he sent to a subordinate, Hester stated that, no matter what support DeLeon and Wood received from other employees—including their own supervisor—Heiserman's mind was set on termination: "I [Hester] just came from Heiserman's office and he still feels that this is grounds to proceed with Termination. Please work up two Termination Summary Documents ASAP." DeLeon and Wood were fired soon thereafter, in August 2005.

**\*1341** B.

 [4]   The foregoing circumstantial facts preclude summary judgment in this case as a jury reasonably could infer that Lockheed only fired Mitten because he is white. The evidence yields this inference because it: (1) suggests that Lockheed's justification for firing Mitten is a pretext for racial animus; (2) shows that Lockheed had a substantial incentive to discipline white employees more harshly than black employees in the summer of 2005; and (3) indicates clearly that Lockheed consciously injected race considerations into its discipline decision making without an adequate explanation for doing so.

1.

Lockheed asserts that Mitten was fired because he was employed as a supervisor, not because he is white; however, record evidence permits a jury to infer reasonably that this justification merely is a pretext for a discriminatory motive. *See, e.g., Silverman,* 637 F.3d at 734 (stating that circumstantial evidence that the employer's offered justification for an adverse employment action is pretextual could permit a reasonable jury to infer the employer's discriminatory intent). The evidence shows that Tom Heiserman, in the summer of 2005, discriminatorily fired white employees employed in non-supervisory positions who, like Mitten, distributed racially insensitive emails. Although these other fired white employees were not supervisors, a jury reasonably could conclude that Heiserman, having discriminatorily fired white employees for similar conduct around the time of Mitten's discharge, also discriminated against Mitten. *See Goldsmith v. Bagby Elevator Co.,* 513 F.3d 1261, 1286 (11th Cir.2008) (finding evidence of other acts of discrimination by the same decisionmaker against other employees in the plaintiff's protected group to be admissible under Fed.R.Evid. 404(b) because that evidence is probative of the decisionmaker's discriminatory intent). [72]

[72]    The district court improperly dismissed this Fed.R.Evid. 404(b) basis for considering such evidence. The court, displaying just how beholden it was to *McDonnell Douglas* analysis, claimed that Heiserman's other acts of discrimination were irrelevant to Mitten's case because, "[u]ltimately, [Mitten is] charged with locating comparators *outside* of [his] protected class, who received different treatment [and] [l]ocating comparators *in the same* protected class who received the same treatment cannot be a substitute." (Emphasis in original).

a.

In the summer of 2005, Heiserman fired four white, salaried non-supervisors who violated the zero tolerance policy by sending racist emails: James Nichols, Martin Yerby, Joe DeLeon, and Clifford Wood. During that time, Heiserman more leniently disciplined similarly situated black employees who engaged in virtually identical conduct: Eric Saxon and Sharron Jones. [73]

[73]    Heiserman, himself, recognized that the actions of the employees who distributed the NASCAR email and those of Jones and Saxon were nearly identical. As described in note 66, *supra,* Heiserman specifically asked Calvin Bryant to have Lockheed's internal legal department review the preliminary decisions not to fire either Jones or Saxon because Heiserman was "uneasy" about that decision. It is reasonable to infer that Heiserman's uneasiness stemmed from concerns about treating the black employees more favorably, which, in turn, shows that he viewed the cases as indistinguishable.

For example, Nichols's case closely mirrors Saxon's in all ways except the respective punishment each garnered. As discussed in part III.A.3.b, *supra,* Nichols, after receiving the NASCAR email, forwarded it to his personal email address **\*1342** and an inoperable external email account; Nichols never informed a supervisor or HR of his actions. Saxon, similarly, after receiving the White Guy Video, forwarded it to his personal email address and never reported his conduct to anyone at Lockheed. [74] Despite Nichols and Saxon's almost analogous conduct, [75] Heiserman fired Nichols, the white employee, and merely suspended for two weeks the black employee, Saxon. [76]

[74]    Saxon and Nichols (and also Smith, whose conduct was almost identical) likely did not believe that they needed to disclose their actions in forwarding home a racist email. Although Lockheed's zero tolerance policy does impugn all "transmissions" of racist emails—a term that can be read to include the forwarding of a racist email to a personal account—its purpose and spirit suggests a far more limited reach. The policy, a workplace-conduct rule, seeks to prevent employees from engaging in harassing or discriminating conduct to avoid "unreasonabl[e] interfer [ence] with [another] individual's work performance or creating an intimidating, hostile or offensive work environment" for other employees. This language suggests that, to violate the zero tolerance policy, an employee's conduct must somehow injure or put at risk of injury another employee(s). Sending an email home in order to view it privately during off-work hours, without

more, does not easily fall within the spirit of such a workplace-conduct rule.

Nichols, consequently, it can be inferred had no notice that, by forwarding the NASCAR email home, he would be found to have engaged in harassing or discriminatory conduct—an inference strengthened by the disciplinary review committee's desire to merely suspend him for such conduct. The same likely holds true for Saxon; the record does not indicate that Saxon, although he knew about Nichols's firing from Ralph Heath's May 9, 2005 letter, ever was aware of precisely to whom Nichols had forwarded the NASCAR email. Without that it is reasonable to conclude that Saxon, too, lacked sufficient notice that simply forwarding an email home was a breach.

[75] The district court noted, and we agree, that Nichols's additional action of attempting to forward the email to another, albeit inoperable, email account was a "minor distinction" between his conduct and Saxon's and thus "insignificant." The district court based this conclusion on the evidence that members of the disciplinary review committee had recognized the fact that Nichols's email was forwarded to a bad email account and had considered it both relevant and favorable to his discipline. In light of these considerations, members of the disciplinary review committee recommended initially that Nichols should receive discipline less severe than termination. *See supra* notes 44 and 53.

[76] It is reasonable to infer that Saxon's preferential treatment largely was due to the lack of notice the zero tolerance policy provides employees about sending offensive emails to a personal email account for off-work viewing, *see supra* note 74. Such actions do not clearly violate the zero tolerance policy, which is a workplace-conduct rule aimed at preventing employees' harassment of and discrimination against *other* employees. Thus, the evidence reasonably suggests that Lockheed HR read the zero tolerance policy broadly in order to punish Nichols, a white employee, for sending the NASCAR email to his personal email account. It correspondingly suggests that the same decisionmakers who fired Nichols—including Heiserman—essentially applied a rule of

lenity in fashioning discipline for Saxon because they feared that they could not apply the zero tolerance policy in such a draconian way to discipline a black employee without risking new civil rights litigation alleging that his termination was discriminatory.

Likewise, the actions of Yerby, DeLeon, and Wood tracked closely with those of Jones, yet the disciplines they received varied distinctively. [77] Yerby, for instance, forwarded the NASCAR email to six Lockheed employees, eighteen people in total, without informing a supervisor or HR of his conduct. Jones similarly forwarded the White Guy Video to eight Lockheed employees. Jones, unlike Yerby, did attempt to correct her misconduct; however, **\*1343** she did so only on the heels of a warning from a friend that the email might offend white employees. Moreover, Jones, in contrast to Yerby, had advance warning that her actions could lead to her termination. That is, Jones made her decision to forward the White Guy Video email despite the fact that she: (1) knew of the firings stemming from the NASCAR-email incident; (2) had received Ralph Heath's May 9, 2005 letter reifying the zero tolerance policy and warning that the company would not tolerate distribution of racially insensitive emails; and (3) had attended training courses on the zero tolerance policy that Lockheed held in response to the NASCAR-email incident. Again, Heiserman fired the white employee, Yerby, but only suspended the black employee, Jones.

[77] The district court, in reviewing Yerby's claims, agreed that his conduct was "nearly identical" to Jones's.

DeLeon and Wood also forwarded the White Guy Video email to several Lockheed employees around the time Jones did. After sending the video, DeLeon and Wood, like Jones, received warnings from recipients that the video might offend some white employees and responded quickly to correct their error. [78] Much like Jones, DeLeon and Wood contacted their recipients to warn of the video's racial content and either to apologize for sending the email or to ask that the email be deleted without viewing.

[78] DeLeon and Wood also had the same benefit of notice that Jones had from the NASCAR-email firings and Heath's May 9, 2005 letter.

The record shows that, in response, Lockheed initiated dual, yet coordinated, investigations at the Fort Worth (for DeLeon and Wood) and Marietta (for Jones) plants.

USCA11 Case: 22-11462    Document: 23    Date Filed: 09/07/2022    Page: 113 of 129

Both investigations were overseen by Heiserman, again the final arbiter of all three employees' discipline. In spite of the coordinated nature of the contemporaneous investigations, Heiserman did not credit DeLeon's and Wood's attempts to correct and make apologies for their conduct, yet Heiserman favorably viewed Jones's similar proactive responses in fashioning her discipline. This proved significant, as Heiserman, once again, fired the white employees, DeLeon and Wood, but suspended the black employee, Jones. [79]

[79]    Lockheed argues that Wood's and DeLeon's stricter discipline was justified based on their having not self-reported to a supervisor or HR, unlike Jones. This explanation, however, is quite tenuous—or as the district court stated, "slices the difference very close." Moreover, it fails to explain why Heiserman, and other decisionmakers, saw Jones's responsive actions as exculpatory and DeLeon's and Wood's as irrelevant. The circumstances were so virtually identical, and the investigation and discipline so disparate, that a jury could view it as raising yet another inference of Heiserman's intent to discipline white employees more harshly than black employees.

The great discrepancies in the punishments received by the white non-supervisors in these cases, in contrast to their black peers, yields a reasonable inference that, in the summer of 2005, Heiserman intentionally discriminated against them because they are white. *See, e.g., Osram Sylvania, Inc. v. Teamsters Local Union 528,* 87 F.3d 1261, 1265 (11th Cir.1996) ("Disparate treatment exists when similarly situated workers are treated differently even though they have committed similar acts.").

b.

Mitten was fired at the time Heiserman was committing these reasonably inferrable acts of discrimination against white non-supervisors. Lockheed claims that race, however, had nothing to do with his termination, and that, instead, he was fired because he was employed as a supervisor held to a higher standard of conduct under the zero tolerance policy. A jury certainly **\*1344** could find this justification valid, as the record makes clear that Lockheed, indeed, does impose heightened expectations on supervisors.

Nevertheless, the evidence simultaneously supports the alternative inference that Lockheed, in this case, is using rank as a pretext for Heiserman's discriminatory motivation for firing Mitten. Because the record lacks any evidence that Lockheed fired a black supervisor for sending racist emails during the summer of 2005, [80] a jury could infer that the racial animus that drove Heiserman to fire the white non-supervisors during this time also led him to fire white supervisors, including Mitten. *See Hasan v. Foley & Lardner LLP,* 552 F.3d 520, 529 (7th Cir.2008) (stating that, so long as the evidence is closely related to the plaintiff's circumstances, evidence of "behavior toward or comments directed at other employees in the [same] protected group is one type of circumstantial evidence that can support an inference of discrimination" (internal quotation marks and citations omitted)).

[80]    Lockheed says that it has fired all supervisors, including black supervisors, for similar violations of the zero tolerance policy. To evidence this, Lockheed points to the firings of two black supervisors in March 2008 for their forwarding of a racist email entitled "Where's My Change?" The inherent weakness with this argument, however, is that, temporally, the firings occurred almost three years after the NASCAR email and White Guy Video incidents. Thus, the same time had elapsed since the ABC News "Primetime Live" special had aired; four years had elapsed since the EEOC had issued its accusatory report; and the civil lawsuits arising from the Meridian shootings were mostly closed, having been adjudicated in Lockheed's favor. As discussed in part III.B.2, *infra,* these circumstances contribute to a reasonable inference that, in the summer of 2005, Lockheed was intent on disciplining whites more severely if they engaged in conduct that could be viewed as discriminatory, but those pressures were not at play in March 2008. Moreover, the lawsuit before us was ongoing in March 2008. Such exculpatory actions by a defendant already in or facing litigation are "equivocal in purpose, motive, and permanence" and, thus, not a sufficient grounds for summary judgment. *Jenkins v. United Gas Corp.,* 400 F.2d 28, 33 (5th Cir.1968). Therefore, although Lockheed may apply its zero tolerance policy equally to blacks and whites now, that does not prevent a reasonable inference here—or

a potential ultimate finding at trial—that Lockheed discriminated against Mitten.

### 2.

The inference that Mitten's termination was the result of Heiserman's racial animus toward whites is bolstered further by evidence that Heiserman, during the summer of 2005, had incentive to fire white employees, but not black employees, who engaged in racially discriminatory conduct. [81]

[81]    Michael Hester, in investigating DeLeon's and Wood's actions in distributing the White Guy Video email, characterized the video as racist against blacks. It is therefore reasonable to infer that DeLeon's and Wood's actions were viewed by Lockheed as discriminatory against blacks.

By May 2005, as Heiserman deliberated over how best to discipline Mitten, he faced a considerable dilemma. For nearly two years, he had listened as civil-suit plaintiffs and the federal government accused his staff of tolerating white employees who discriminated against their black coworkers—to such an extent that it led to a race-based mass-shooting tragedy. He also knew that these accusations soon would soon reach a fevered pitch, as ABC News imminently was going to deliver them to a primetime television audience in light highly unflattering to Lockheed and Lockheed management. And, with all this circling in the background, Heiserman now had to address yet another act of white-on-black racism at the company. A jury, in **1345** turn, reasonably could infer that Heiserman believed that much rode on how he handled the incident.

That is, a jury reasonably could find that Heiserman recognized that, if he were to impose a discipline that appeared too lenient on the white employees guilty of distributing the NASCAR email, the appearance of permissiveness simply would lead to increased economic and public-relations pressures on him, [82] his staff, and the company as a whole. For example, it could be inferred that Heiserman was worried that the plaintiffs in the ongoing and potentially lucrative civil lawsuits would use evidence of a mild discipline for the NASCAR email to bolster their claims that Lockheed HR officials, in much the same way, tolerated Doug Williams's racist ways.

[82]    It is reasonable for a jury to infer that Heiserman would face job pressures if his response to the NASCAR email led to backlash. As the man in charge of HR operations and, thus, enforcement of the zero tolerance policy, he likely would be the one held accountable for his staff's showing tolerance for white-on-black racial harassment.

Alternatively, it could be inferred that Heiserman was concerned over Nelson Phillips's quarrelsome and litigious nature. That is, he may have feared that Phillips could respond to a perceived too-lenient punishment by bringing his own civil rights suit, or, as he had many times before threatened to do, an EEOC complaint. If Phillips were to pursue either of these routes, Heiserman likely realized, valuable federal government contracts could be in peril.

Finally, it could be inferred that Heiserman simply anticipated that ABC News would use the new evidence of favorable treatment of white employees to add to its upcoming report's shock value. New reports of tolerance for white-on-black racism would make the incidents in Meridian appear endemic to the whole company. [83]

[83]    As discussed in note 54, *supra,* the evidence shows that Heiserman, during the course of the NASCAR email investigation, had Meridian on his mind, even referring to the investigation as the "Meridian investigation." This slip, a jury reasonably could infer, was because he was focused on the looming ABC News special on Meridian.

In light of such concerns, a jury reasonably could infer that Heiserman felt inclined to emphatically prove that Lockheed and his staff were committed to curbing racism aimed at black employees. He chose to do this, it could be inferred further, by ensuring that all white employees who distributed racist emails were fired for their conduct. [84] Similar concerns did not, however, factor into his consideration of discipline for black employees guilty of the same or similar conduct.

[84]    Notably, the district court did not consider how this evidence generated from the fallout from the Meridian shootings—the EEOC report, the ongoing civil litigation, or the ABC News special—might have impacted Heiserman's decision making. Rather, the district court assessed only the effect of the "occurrence of the Meridian tragedy," and whether that, standing alone, raised an

inference of discrimination. Because it was an over two-year-old occurrence at a different Lockheed plant, the court found the Meridian shooting spree non-probative of Lockheed's discriminatory intent here. As a consequence, in ruling that Mitten had not raised an inference of discrimination, the court simply ignored his best evidence as to why Lockheed, in the summer of 2005, may been motivated to terminate white, but not black, employees.

### 3.

The discipline "matrix," on which Mitten's race was tracked, strengthens the reasonableness of the inference that Heiserman sought to fire all whites who distributed racist emails and, thus, fired Mitten because of his race. The disciplinary **\*1346** review committee and Heiserman relied on the "matrix" to reach their discipline decisions, including Mitten's. On its face, the "matrix" indicates that race was pertinent to the discipline decisions made, and Lockheed has not explained satisfactorily why this was legitimate. [85] Therefore, although the district court entirely ignored this fact, [86] Lockheed's injection of race into its decision-making process yields an unavoidable inference that the employee's race impacted the discipline determination, and it is a jury's province to decide whether race actually bore on the decision to terminate Mitten. *See, e.g., Williams v. Lindenwood Univ.,* 288 F.3d 349, 356 (8th Cir.2002) ("[I]njecting racial language at all into the decision-making process creates the inference that race had *something* to do with the decision-making process."). [87]

[85] It plainly defies reason to believe, and a jury, in turn, reasonably could discount, Bryant's implausible claim that race, notwithstanding its presence on the "matrix," was not considered by the disciplinary review committee or Heiserman because those decisionmakers were expected to "close one eye" to the employee's race when looking at the "matrix."

Likewise, Bryant's statement that he recorded race on the "matrix" only to gather that information for later "reporting requirements" has been called into question, as Heiserman and Michael Hester have undermined the validity of Bryant's justification. Heiserman said that there is no "legitimate ... business purpose for Lockheed to be" monitoring the race of employees in the course of such an investigation. Hester stated that there never would be any reason for HR to report an employee's race during an investigation into, or disciplinary review of, a zero tolerance policy violation. Moreover, a jury could reasonably conclude that the lack of race information on the "matrix" used in investigating Sharron Jones's (and Eric Saxon's) conduct in distributing the White Guy Video email further signifies the dubiousness of Bryant's justification. That is, a jury reasonably could infer that employee race information, if it were necessary to aid future reporting, would have been recorded consistently by Bryant in all cases—in the same way that Bryant consistently noted an employee's rank.

[86] Yet, in the same opinion, the district court found that the "*inclusion of race in the spreadsheet contributes to the finding of an issue of fact as to whether race was a consideration in the discipline [Mitten] received.*" (Emphasis added). The district court made this finding, however, in assessing Yerby's and Nichols's claims at the pretext stage of the *McDonnell Douglas* framework, and thus *after* the court had dismissed Mitten's claim.

This ruling is anomalous. As noted in part II, *supra,* at *McDonnell Douglas* 's third step, the pretext stage, the plaintiff's "burden ... merges with his ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981) (citations omitted). Stated simply, a court merely uses the pretext inquiry to guide its determination of the ultimate issue at summary judgment—i.e., whether the evidence yields a reasonable inference of the employer's discrimination. If Lockheed's inclusion of race on the "matrix" raised an inference that Lockheed discriminated against Yerby and Nichols based on their race, the district court should have recognized that it did the same for Mitten.

[87] Bolstering the reasonableness of this inference is the fact that the matrix composed in the Marietta White Guy Video investigation did not record race. That incident only implicated one white employee, but the investigation revealed that employee had not distributed the email and thus would not be subject to discipline under the zero

tolerance policy. Indeed, only two employees—Sharron Jones and Eric Saxon—were found to need disciplining. In light of the small numbers of employees at issue, it could be inferred that race was not tracked because it was already known that both employees to be disciplined, Jones and Saxon, were black and, therefore, would not be terminated for their conduct.

### 4.

Based on the totality of the foregoing circumstances, we find that the record contains sufficient circumstantial evidence from which a jury could infer that Lockheed **\*1347**

displayed a racially discriminatory animus toward Mitten when it fired him in May 2005. Mitten, consequently, presented a case sufficient to withstand Lockheed's motion for summary judgment. Therefore, the judgment of the district court is VACATED, and the case is REMANDED for further proceedings.

SO ORDERED.

**All Citations**

644 F.3d 1321, 112 Fair Empl.Prac.Cas. (BNA) 1119, 23 Fla. L. Weekly Fed. C 64

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.



Tab 7

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by  Change v. Midtown Neurology, P.C.,   N.D.Ga.,   March 26, 2021

701 Fed.Appx. 865

This case was not selected for
publication in West's Federal Reporter.

See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or after
Jan. 1, 2007. See also U.S. Ct. of App. 11th Cir. Rule 36-2.

United States Court of Appeals, Eleventh Circuit.

Frank VOUDY, Plaintiff-Appellant,

v.

SHERIFF OF BROWARD COUNTY
FLORIDA, Defendant-Appellee.

No. 16-12059
|
(July 13, 2017)

**Synopsis**

**Background:** White deputy in county sheriff's office filed action against sheriff alleging race discrimination in violation of Title VII and Florida Civil Rights Act arising from sheriff's failure to promote him to sergeant. The United States District Court for the Southern District of Florida, No. 0:15-cv-60129-WPD, granted summary judgment in favor of sheriff.

**Holdings:** The United States Court of Appeals for the held that:

[1] white deputy was not required to show black deputies who received promotion were equally or less qualified to establish prima facie case of race discrimination under Title VII;

[2] white deputy established prima facie case of race discrimination under Title VII; and

[3] county sheriff failed to produce evidence that denial of promotion to white deputy in favor of black deputies was taken for legitimate, non-discriminatory reason, and thus sheriff failed to rebut white deputy's prima facie case of race discrimination.

Reversed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (3)

**[1]      Civil Rights** 👉 Promotion, demotion, and transfer

At least at the prima facie case stage of a race discrimination case under Title VII based on failure to promote, a plaintiff need not show that the candidate who received the promotion was equally or less qualified than the plaintiff. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

5 Cases that cite this headnote

**[2]      Civil Rights** 👉 Race, color, ethnicity, or national origin

White sheriff's deputy, who was denied promotion to sergeant, established prima facie case of race discrimination under Title VII based on county sheriff's failure to promote him in favor of two black deputies; by performing sufficiently well on sergeant's exam, deputy was eligible for promotion and was at least minimally qualified for position he sought, and deputy was nonetheless rejected as discretionary pick for sergeant by county sheriff in favor of black deputies. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

3 Cases that cite this headnote

**[3]      Civil Rights** 👉 Race, color, ethnicity, or national origin

County sheriff failed to produce evidence that its action in denying promotion of white sheriff's deputy to rank of sergeant, in favor of two black deputies who scored lower on sergeant's exam, was taken for legitimate, non-discriminatory reason, and thus sheriff failed to rebut white deputy's prima facie case of race discrimination under Title VII; no sheriff's office employee identified any reason why black deputies were promoted or white deputy was not, colonel

who oversaw promotion process was unable to recall anything about why white deputy was not promoted or weighing of criteria in decision to promote black deputies, nor was second colonel, another decision maker, able to identify reason. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

3 Cases that cite this headnote

## Attorneys and Law Firms

**\*866** Jeffrey Mitchell Goodz, Richard D. Tuschman, Goodz & Tuschman, PLLC, Plantation, FL, for Plaintiff-Appellant

Carmen Maria Rodriguez, Law Offices of Carmen Rodriguez, PA, Palmetto Bay, FL, for Defendant-Appellee

Appeal from the United States District Court for the Southern District of Florida, D.C. Docket No. 0:15-cv-60129-WPD

Before MARCUS, JILL PRYOR, and SILER,[*] Circuit Judges.

[*]    Honorable Eugene E. Siler, United States Circuit Judge for the Sixth Circuit, sitting by designation.

## Opinion

PER CURIAM:

Appellant Frank Voudy, a white deputy in the Broward County Sheriff's Office, appeals the district court's grant of summary judgment to Sheriff Scott Israel on Voudy's claim that the Sheriff discriminated against him on the basis of race when the Sheriff failed to promote him to Sergeant. The district court determined that Voudy failed to make out a *prima facie* case of discrimination. Because Voudy did in fact make out a *prima facie* case of discrimination and the Sheriff failed to articulate a legitimate, non-discriminatory reason for Voudy's non-promotion, we reverse the district court's judgment.

## I. BACKGROUND

Frank Voudy is a white officer in the Broward County Sheriff's Office (BSO). Voudy has been a Deputy Sheriff

since 1997 and has been eligible for a promotion to Sergeant since 2002 but has never been promoted. In 2012, Voudy took the Sergeant's Exam, which consisted of a multiple-choice test, a structural interview, and an oral presentation. The scores of each segment were added together and each eligible individual taking the exam was ranked based on his or her total score. Voudy ranked 20th of the 56 individuals eligible for promotion to Sergeant. Thirty promotions were made based on the 2012 eligibility list. Of those, 23 were white, three were Hispanic, three were black, and one was multi-racial. Voudy was the second highest ranked officer who was not ultimately promoted.

The Collective Bargaining Agreement (CBA) between BSO and the Police Benevolent Association governed the promotion process. The CBA required that five out of every six Sergeant openings be filled from the then-existing top five scores on the Sergeant's exam. This was called the Rule of Five. For Rule of Five picks, every time a new Sergeant was selected, the next highest person on the eligibility list moved into the top five. It is therefore possible that a candidate may be passed over continuously **\*867** even though he or she scored very highly on the Sergeant's Exam. The sixth position is filled at the Sheriff's discretion without regard for the Rule of Five.

Colonel John Dale oversaw the 2012-2014 promotion process at BSO. He explained that the committee determining promotions followed the Rule of Five and that for every sixth pick, Sheriff Israel ultimately made the final choice from the entire list of eligible officers, as opposed to the top five scorers remaining on the list. Dale testified that for the sixth pick, BSO "looked at it as a flat list" without regard for ranking. He explained that for the sixth pick, BSO considers each officer's file and the comments of his or her supervisors. BSO also considers each officer's training record, which to BSO indicates that the employee is interested in developing his or her skill set, as well as the officer's last three performance evaluations, attendance, and disciplinary history. Dale further testified that in making promotion decisions, BSO neither had an indication of each officer's race or ethnic background nor looked at photographs.

Two black officers ranked lower than Voudy based on their total scores on the Sergeant's Exam—Jeremiah Cooper and Berthill Thomas—were promoted over him as "sixth picks" by the Sheriff. They were ranked 47th and 50th, respectively.[1] Although Voudy scored better than Cooper and Thomas on the Sergeant's Exam and had substantially

more law-enforcement experience, Cooper and Thomas had better qualifications than Voudy with regard to some of BSO's considerations. Nonetheless, Dale could not recall the reasons why Thomas and Cooper were promoted over Voudy, explaining that it is difficult to remember why any individual promotion decision was made because so many promotions —to Sergeant, but also to Captain, Major, and Lieutenant— are determined around the same time.

[1]    We note that the ranking allowed for ties between two officers—for example, there were two officers ranked seventh, with another officer ranked eighth. So Voudy's ranking of 20th does not mean that there were only 19 officers ranked higher than he was. The precise number of officers with a higher rank than Voudy, Cooper, or Thomas is immaterial to Voudy's claim, however: there is no doubt that Voudy was ranked substantially higher than Cooper or Thomas.

Voudy had a more extensive disciplinary history than either Cooper or Thomas. Internal Affairs had lodged three cases against Voudy in his time on the force, two in 2000 and one in 2004. Each resulted in a written reprimand. By contrast, Thomas had been disciplined twice in his time on the force, both times resulting in counseling and training. Cooper had been disciplined once, resulting in counseling.

Moreover, unlike Voudy, Cooper and Thomas had specialized training certifications. Thomas had cross-certification in Law Enforcement and Detention/Corrections and successfully completed a Police Motorcycle Operator Course. Cooper was certified as a Field Training Officer after extensive coursework and also completed several months of training in the District Criminal Investigations Unit.

Thomas also had more positive performance evaluations than Voudy. Voudy's 2010-2013 performance evaluations showed an approximately even mix of "Exceeds Expectations" ratings and "Meets Expectations" ratings. By contrast, in 2011-2012 and 2012-2013, Thomas received "Exceeds Expectations" ratings for 8 of 10 categories, and in 2010-2011 he received "Exceeds Expectations" in all 10 categories. Cooper's last three performance evaluations were on par with Voudy's. Neither **868 Cooper's nor Thomas's performance evaluations contained negative comments from their supervisors, but Voudy's 2011-2012 performance evaluation noted that he could "increase his initiative and work output in the area of FI cards and arrests," and his 2012-2013 evaluation provided that Voudy's "pro-activity is

not high as it pertains to arrests and traffic enforcement." Voudy Performance Evaluations, Doc. 21-16 at 3, 5. [2]

[2]    Citations to "Doc. ——" refer to numbered docket entries in the district court record in this case.

Voudy filed suit against the Sheriff alleging that Cooper and Thomas were selected over him because of race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), and the Florida Civil Rights Act (FCRA), Fla. Stat. § 760.10 et seq. [3]    The district court granted summary judgment to the Sheriff, concluding that Voudy failed to establish a *prima facie* case of discrimination. Voudy now appeals.

[3]    Voudy also raised age discrimination claims against the Sheriff under the Age Discrimination in Employment Act and FCRA. The district court granted summary judgment to the Sheriff on these claims. Voudy does not appeal that decision.

## II. STANDARD OF REVIEW

"This court reviews a district court's grant of summary judgment de novo, applying the same legal standards used by the district court." *Galvez v. Bruce*, 552 F.3d 1238, 1241 (11th Cir. 2008). We view the evidence and all factual inferences arising from the evidence in the light most favorable to the nonmoving party. *See id.* Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Mere speculation is insufficient to create a genuine dispute of material fact. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

## III. DISCUSSION

Because Voudy has provided no direct evidence of discrimination, we assess his Title VII claim under the burden shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). [4]    "Under the *McDonnell Douglas* framework, a plaintiff first must show an inference of discriminatory intent, and thus carries the initial burden of establishing a *prima facie* case of discrimination." *Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006). "The plaintiff's successful assertion of a *prima facie* case

creates a rebuttable presumption that the employer unlawfully discriminated against h[im]." *Id.* (internal quotation marks omitted). "Second, if the plaintiff successfully demonstrates a *prima facie* case, the burden then shifts to the employer to produce evidence that its action was taken for a legitimate, non-discriminatory reason." *Id.* "[O]nce the employer meets its burden of production by proffering a legitimate, non-discriminatory reason, thereby rebutting the presumption of discrimination, [ ] [our] inquiry proceeds to a new level of specificity, in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." *Id.* (internal quotation marks omitted).

4    We evaluate Voudy's FCRA claim under the same standards as his Title VII claim. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1271 (11th Cir. 2010).

The district court determined that Voudy failed at the first stage—that is, it ruled that Voudy failed to make out a *prima facie* case of discrimination. In doing so, **\*869** however, the district court applied the incorrect legal standard. The district court required Voudy to show that (1) he was a member of a protected class, (2) he was qualified and applied for the promotion, (3) he was rejected despite his qualifications, and (4) other equally or less qualified employees outside of the protected class were promoted. D. Ct. Op., Doc. 33 at 4. It then concluded that Voudy failed to make out a *prima facie* case because he failed to show that he was equally or more qualified than Cooper or Thomas.

 [1]   This was error. In *Walker v. Mortham*, 158 F.3d 1177, 1186 (11th Cir. 1998), we addressed conflicting panel opinions concerning the elements of a *prima facie* case in failure to promote cases. While a number of our decisions employed the standard used by the district court in this case—requiring plaintiffs to show, at the *prima facie* case stage, that other equally or less qualified employees were promoted over them—other cases required plaintiffs to show only that the position was filled with a person outside the plaintiff's protected class. *Id.* We determined that both our prior precedent rule and an independent assessment of which standard best comported with Supreme Court precedent required only that a plaintiff show that the position was filled by someone outside his protected class. *Id.* at 1193. [5] At least at the *prima facie* case stage, a plaintiff need not show that the candidate who received the promotion was equally or less qualified than the plaintiff.

5    We recognize that a number of our decisions continued to apply the incorrect *prima facie* case test even after *Walker*. Nonetheless, *Walker's* thorough assessment of the appropriate standard is controlling.

 [2]   Consequently, to make out a *prima facie* case, Voudy was required to show that: (1) he was a member of a protected class; (2) he sought and was qualified for a promotion; (3) despite his qualifications he was rejected; and (4) after his rejection, his employer either continued to attempt to fill the positions or in fact filled the positions with persons outside of his protected class. *Id.* at 1186. Voudy has established each of these elements. By virtue of performing sufficiently well on the Sergeant's Exam, Voudy was eligible for promotion and therefore was at least minimally qualified for the position he sought. Voudy, who is white, was nonetheless rejected as a "sixth pick" in favor of Thomas and Cooper, who are black. Consequently, the district court erred in finding that Voudy failed to make out a *prima facie* case of discrimination.

 [3]   Voudy having made a *prima facie* case, the burden then shifted to the Sheriff "to produce evidence that its action was taken for a legitimate, non-discriminatory reason." *Brooks*, 446 F.3d at 1162. "The defendant need not persuade the court that it was actually motivated by the proffered reason, but need only present evidence raising a genuine issue of fact as to whether it discriminated against the plaintiff." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010). "However, the defendant's response must frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Id.* (internal quotation marks omitted). "The defendant may not satisfy its burden by presenting a hypothetical reason for the employment decision in question." *Walker*, 158 F.3d at 1184.

Although the Sheriff's burden is "exceedingly light," *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 770 (11th Cir 2005) (internal quotation marks omitted), we conclude that he failed to adequately articulate a legitimate, non-discriminatory **\*870** reason for promoting Thomas and Cooper over Voudy. No BSO employee has identified *any* reason why Thomas and Cooper were promoted or Voudy was not promoted. Dale was unable to recall anything about why Voudy was not promoted:

Q. Okay.... [C]an you state as to whether or not Deputy Cooper was more qualified for this position than Deputy Voudy?

A. I don't recall the conversation on the list or—you know, I'll be honest with you, I only recognize probably a handful of names off the list. So in a side-by-side comparison, again, it's considered to be a flat list. The contract allows the Sheriff to pick basically anyone he wants. ...

Q. Well, in this particular case can you give me any parameters as to the factors indicate influencing the command staff decision that Deputy Cooper was chosen over Deputy Voudy?

A. We've had many of these conversations. Again, the names don't mean a lot to me because I don't know many of them individually. We'll typically pick multiple sergeants in one list along with lieutenants, and then we'll have other meetings on, you know, captains and majors, so I don't recall the individual conversation as to when we were discussing Mr. Voudy or Mr. Cooper.

Dale Dep., Doc. 22-2 at 14, 19. Nor was Colonel Alvin Pollock, another decision maker, able to identify a reason that Thomas and Cooper were promoted over Voudy:

Q. Okay.... [C]an you, sitting here today, can you give me any reason as to why Deputy Voudy was not promoted as part of the promotion selection process?

A. No, I could not, sir.

Pollock Dep., Doc. 22-3 at 17.

Instead, Dale testified to various criteria that BSO considered when determining promotions, including: education, training, assignments and certifications, disciplinary history, ranking on the Sergeant's Exam, performance evaluations, law-enforcement experience, and attendance. But neither Dale nor any other witness explained how these criteria were weighted or which ones were a factor in the decision to promote Thomas and Cooper over Voudy. It appears from the record that some of the criteria militated in favor of promoting Voudy over Thomas and Cooper. For example, Voudy ranked higher than both Thomas and Cooper on the Sergeant's Exam and Voudy had 11 more years of experience in BSO's Department of Law Enforcement than Cooper. But other criteria—training, certifications, disciplinary history, and performance evaluations—appear to cut against Voudy in comparison to

Thomas and/or Cooper. For other considerations that Dale identified, such as education and attendance, we simply have no evidence or insufficient evidence in the record. Without any evidence indicating how the identified criteria were weighed or considered in Voudy's case, we can do no more than speculate as to why Thomas and Cooper were promoted while Voudy was not.

It is not enough for the employer to say that general categories provide a backdrop for its decision-making process, but not tell us which categories were relied upon in this particular case. "[A]bstract terms as to what might have motivated the decision-maker" are insufficient to meet the defendant's burden of articulation. *Walker*, 158 F.3d at 1181 n.8; *see also Increase Minority Participation by Affirmative Change Today of Nw. Fla., Inc. v. Firestone*, 893 F.2d 1189, 1193-94 (11th Cir. 1990) (rejecting the notion that "evidence showing dissimilarities in two applicants' records" suffices to meet a defendant's burden of articulation). In the absence of any statement from the employer or its **\*871** decision makers explaining the reasons for its decision, we cannot hypothesize the employer's reasons and then use that speculation to find that the employer carried its burden of articulating a "clear and reasonably specific non-discriminatory basis for its actions." *Vessels*, 408 F.3d at 770 (internal quotation marks omitted).

Because Voudy established a *prima facie* case of discrimination and the Sheriff failed to rebut it by articulating a legitimate, non-discriminatory reason for Voudy's non-promotion, the district court erred in granting summary judgment to the Sheriff.

### IV. CONCLUSION

For the foregoing reasons, we reverse the district court's grant of summary judgment to the defendant and remand for proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

**All Citations**

701 Fed.Appx. 865, 2017 Fair Empl.Prac.Cas. (BNA) 241,919



Tab 8

777 Fed.Appx. 451
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or after
Jan. 1, 2007. See also U.S. Ct. of App. 11th Cir. Rule 36-2.
United States Court of Appeals, Eleventh Circuit.

Khalil WILLIAMS, Plaintiff - Appellant,

v.

HOUSING OPPORTUNITIES FOR PERSONS
WITH EXCEPTIONALITIES, Defendant - Appellee.

No. 18-13600
|
Non-Argument Calendar
|
(July 15, 2019)

**Synopsis**

**Background:** Employee brought action against his employer,
alleging that employer discriminated against him based on
his race when it terminated him, in violation of Title VII and
§ 1981. The United States District Court for the Northern
District of Alabama, No. 2:17-cv-00468-ACA, Annemarie
Carney Axon, J., 2018 WL 3631695, granted summary
judgment in favor of employer. Employee appealed.

**Holdings:** The Court of Appeals held that:

[1] employee failed to show that he was fired because of his
race, and

[2] even if employer's proffered explanation for employee's
termination was false, that would not establish intentional
discrimination based on race.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (2)

[1]    **Civil Rights**  🔑  Discharge or layoff

Employee failed to show that he was fired
because of his race, in violation of Title VII and §
1981, where statement by employer's executive
director evincing discriminatory animus bore no
relation to termination decision and was, by
employee's own account, out of character for her,
and executive director filled employee's position
with people of same race. Civil Rights Act of
1964 § 703, 42 U.S.C.A. § 2000e-2(a)(1); 42
U.S.C.A. § 1981.

3 Cases that cite this headnote

[2]    **Civil Rights**  🔑  Weight and Sufficiency of
Evidence

Even if employer's proffered explanation for
employee's termination, namely, that he was
terminated when he abandoned his job and
stopped showing up for work, was false, that
would not establish discrimination in violation
of Title VII and § 1981, absent showing of
prima facie case of race discrimination under
*McDonnell Douglas* or stronger evidence of
intentional discrimination. Civil Rights Act of
1964 § 703, 42 U.S.C.A. § 2000e-2(a)(1); 42
U.S.C.A. § 1981.

2 Cases that cite this headnote

**Attorneys and Law Firms**

Jon C. Goldfarb, L. William Smith, Wiggins Childs Pantazis
Fisher & Goldfarb, LLC, Birmingham, AL, for Plaintiff-
Appellant

Christoffer Peter Bolvig, Whitaker Mudd Luke & Wells, LLC,
Birmingham, AL, for Defendant-Appellee

Appeal from the United States District Court for the Northern
District of Alabama, D.C. Docket No. 2:17-cv-00468-ACA

Before WILLIAM PRYOR, JILL PRYOR and GRANT,
Circuit Judges.

**Opinion**

PER CURIAM:

**\*452**  Khalil Williams appeals the district court's grant of summary judgment to his former employer, Housing for Persons with Exceptionalities ("HOPE"), on his claim that HOPE discriminated against him based on his race when it terminated him. The district court ruled that Williams failed to introduce sufficient evidence to support a reasonable inference that HOPE's decision to terminate him was based on his race. Williams argues on appeal that the district court erred by failing to decide that race was at least a motivating factor in HOPE's termination decision. We disagree. After careful review, we affirm the district court.

## I. BACKGROUND

Williams, who is African-American, worked for HOPE as a direct care provider. [1]  In that position, he was responsible for supervising three group home residents with special needs and administering their medication. Williams worked each weekend during the night shift, although HOPE also expected him to work additional shifts, depending on his availability. While he worked weekend nights at HOPE, Williams spent his weekdays studying air conditioning and refrigeration at a local community college.

[1]  Because we are reviewing the district court's grant of a motion for summary judgment, we recite the facts in the light most favorable to Williams, the nonmovant. *See Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir. 1990).

The sequence of events leading to Williams's termination began when HOPE's executive director, Debra Sokol, called Williams to ask whether he could cover another employee's scheduled shift after that employee had called out. Williams responded that he could not cover the shift because that evening he planned to celebrate his graduation from the community college program. Sokol replied to Williams, "either you come in or don't come back." Doc. 18-1 at 10. [2]

[2]  Citations in the form "Doc #" refer to the numbered entries on the district court's docket.

Sokol called Williams the next morning to remind him that he had signed an agreement in which he promised as a condition of his employment to cover extra shifts when he was available. The two agreed to meet in HOPE's office later that day to review the agreement. As the two conferred and Sokol read the agreement aloud to Williams, he interrupted her to

say that she should not expect him to cover the extra shift at issue based on that provision because he had a legitimate excuse as to why he was unavailable.

Sokol responded to Williams with a profanity-laced tirade lasting two or three minutes. She first told him: "I can't stand your black ass." *Id.* at 11. Williams then asked Sokol for a copy of the agreement but she refused his request. She instructed him to instead memorize the document based on her recitation. After uttering various profanities, Sokol returned the document to a file cabinet and directed Williams to leave the premises by saying: "[G]et out of here. Get out of this office." *Id.* at 14. Sokol ran into her office to hide from him under her desk. He then told her, "you have made your decision," before he left the office as instructed with the belief that Sokol's instruction amounted to her termination of his employment. He accordingly elected not to report for his remaining scheduled shifts.

Williams sued HOPE in federal district court alleging a single claim of racial discrimination under Title VII and  **\*453**  42 U.S.C. § 1981 arising from his alleged termination. The complaint alleged that Williams "may prevail under a mixed-motive theory, as even if [HOPE] had legitimate reasons for terminating him, race was at least a motivating factor in the adverse employment actions [it] took against him, up to and including termination." Doc. 1 at ¶ 18. HOPE answered the complaint.

After discovery, HOPE filed a motion for summary judgment. HOPE argued that Williams voluntarily resigned. It further argued that, assuming it did fire Williams, the record lacked evidence from which a reasonable juror could find that its decision to fire him evinced discriminatory intent. HOPE pointed to evidence in the record militating against a finding of discriminatory intent, including Williams's testimony that Sokol's racial remark was "very much out of character," Doc. 18-1 at 13, and interrogatory answers showing that immediately after Williams's separation, Sokol filled his position with people of the same race as his.

In response, Williams argued that he was terminated when he left the office following his confrontation with Sokol. According to Williams, a reasonable jury could find that race was at least a motivating factor in HOPE's decision to fire him because Sokol told him, "I can't stand your black ass," right before his termination. He further argued that his strong work performance, HOPE's lack of a reason for firing him, the falsity of Sokol's explanation that he stopped showing up

for work, and her testimony that he was not required to work on the night of his graduation all supported an inference of racial discrimination.

The district court granted HOPE's motion. The court ruled that under *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011), Williams failed to present a convincing mosaic of circumstantial evidence that would allow a reasonable jury to infer that HOPE fired him because of his race.

This is Williams's appeal.

## II. STANDARD OF REVIEW

We review *de novo* a district court order granting a motion for summary judgment, viewing the facts and all reasonable inferences drawn therefrom in favor of the non-moving party. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1291-92 (11th Cir. 2012). Summary judgment is appropriate when a movant shows that there is "no genuine dispute as to any material fact," such that "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of a material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505.

## III. DISCUSSION

Williams argues on appeal that the district court erred in ruling that he failed to introduce sufficient evidence from which a reasonable jury could find that HOPE's decision to terminate him was based on his race. Title VII prohibits employers from terminating an employee "because of ... race." 42 U.S.C. § 2000e-2(a)(1). An employer runs afoul of this prohibition whenever race was at least "a motivating factor" for the termination decision, "even though other factors also motivated" it. *Id.* § 2000e-2(m). Section 1981 similarly "prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." **\*454** *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999). As a general rule, discrimination claims brought pursuant to Title VII and

§ 1981 "are subject to the same standards of proof and employ the same analytical framework." *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009). [3]

> [3]
> The fit between the standards that apply to claims and defenses arising under the two statutes is nevertheless inexact. We have held that "the 1991 mixed-motive amendments to Title VII do not apply to § 1981 claims." *Mabra v. United Food & Commercial Workers Local Union No. 1996*, 176 F.3d 1357, 1358 (11th Cir. 1999). We do not address this issue, however, because it does not affect our disposition of this appeal.

We typically evaluate employment discrimination claims by applying the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). We do not apply that framework here, however, because Williams concedes in his brief that he "does not rely on establishing a traditional *McDonnell Douglas* prima facie case." Appellant's Br. at 36. But, as we have recognized, "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion." *Lockheed-Martin*, 644 F.3d at 1328. Rather, a "plaintiff will always survive summary judgment" by "present[ing] circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." [4] *Id.* (internal quotation marks omitted).

> [4]
> In his opening brief, Williams consistently conflates the standards that we apply under *McDonnell Douglas*, *Lockheed-Martin*, and a third case, *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016). *McDonnell Douglas* and *Lockheed-Martin* set forth alternative frameworks for analyzing "single-motive claims[,] ... also known as 'pretext[, which] require a showing that bias was the true reason for the adverse action." *Quigg*, 814 F.3d at 1235. In contrast, we apply the framework described in *Quigg* to "mixed-motive" employment discrimination claims, which require a showing that "illegal bias, such as bias based on [race] or gender, 'was a motivating factor for' an

adverse employment action, 'even though other factors also motivated' the action." *Id.* (quoting 42 U.S.C. § 2000e-2(m)). The district court analyzed Williams's claim under *Lockheed-Martin,* and Williams raised no argument in his opening brief that the district court's application of *Lockheed-Martin* was error. He has therefore abandoned the argument that the mixed-motive "motivating factor" standard should apply instead. *See Sapuppo v. Allstate Floridian Ins. Co.,* 739 F.3d 678, 681-65 (11th Cir. 2014). We accordingly treat his claim as a "single-motive" claim.

In his reply brief, Williams argues that we should avoid comparing his evidence to a mosaic. We do not consider arguments raised for the first time in a reply brief. *Id.* at 682. We note nonetheless that the term " 'convincing mosaic' is not a legal test." *Ortiz v. Werner Enters., Inc.,* 834 F.3d 760, 764-65 (7th Cir. 2016). Rather, the phrase "was designed as a metaphor to illustrate why courts should not try to differentiate between direct and indirect evidence." *Id.*

Williams argues that a reasonable jury could find that HOPE fired him because of his race because Sokol told him, "I can't stand your black ass," just before she fired him. Appellant's Br. at 23. Williams also argues that a reasonable jury could find intentional discrimination from the falsity of HOPE's explanation of his separation. We address each of these arguments in turn.

## A. Williams Has Failed to Present Sufficient Evidence to Show That He Was Fired Because of His Race.

[1] Williams argues that he has shown intentional discrimination based on his testimony **\*455** that Sokol told him, "I can't stand your black ass." Doc. 18-1 at 11. We disagree. Her comment evinces discriminatory animus and is unbefitting of any workplace. But a reasonable jury could not find that she fired him because of his race based only on that statement because its content bears no relation to the termination decision. *Cf. Scott v. Suncoast Beverage Sales, Ltd.,* 295 F.3d 1223, 1229 (11th Cir. 2002) ("Although a comment unrelated to a termination decision may *contribute* to a circumstantial case for pretext, it will usually be insufficient absent some additional evidence supporting a finding of pretext." (citation omitted)). Further, other evidence in the record counsels against a finding that Sokol fired Williams because of his race. He testified that her comment was "very much out of character," Doc. 18-1 at 13,

and after his separation, she filled his position with people of the same race. The record evidence is thus insufficient for Williams to withstand HOPE's motion for summary judgment. [5]

[5] Williams also argues that another encounter between him and Sokol shows her discriminatory intent: her refusal of his request to use the restroom inside her home while he was there to paint her deck pursuant to an agreement between them that was unrelated to his employment at HOPE. In the district court, Williams recounted that incident in the facts section of his brief opposing summary judgment but raised no argument that the incident evidenced intentional discrimination. The district court nonetheless explained that evidence of that encounter failed to show that Williams was fired because of his race:

Sokol did not tell ... Williams that he could not use the restroom inside her house because he is African-American, and ... Williams has submitted no evidence demonstrating that ... Sokol allowed Caucasian individuals doing work at her house to use the restroom inside. Therefore, this evidence does not give rise to an inference of intentional race discrimination. In the absence of other evidence suggesting that ... Sokol prohibited ... Williams from using her restroom because he is African-American, a reasonable jury cannot infer discriminatory intent from this facially neutral act that is removed in time and place from the employment decision.

Doc. 22 at 16. We agree with the district court. On appeal, Williams argues that Sokol's refusal of his request shows discriminatory animus because it exemplifies the historical mistreatment of African-American workers in the South. But Williams did not raise that argument in the district court, and we therefore decline to address it here. *Access Now, Inc. v. Sw. Airlines Co.,* 385 F.3d 1324, 1331 (11th Cir. 2004) ("This Court has repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court." (internal quotation marks omitted)).

We disagree with Williams's argument that *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354 (11th Cir. 1999), requires us to decide that his evidence is sufficient to support

a finding of intentional discrimination. There, two former supermarket employees brought an age-discrimination suit against the supermarket, their former employer, after a district manager terminated them. *Damon*, 196 F.3d at 1357-58. Within one year of assuming the district manager position, the manager fired or demoted "five older, more experienced [workers]," including the plaintiffs, "and replaced them with [employees] who were younger and less experienced." *Id.* at 1358. One of the younger replacements testified that the district manager had told him immediately after terminating one of the two plaintiffs (and three months after terminating the other) that "what the company needed was aggressive *young* [people] like [the younger replacement] to be promoted." *Id.* at 1359, 1363 (internal quotation marks omitted). We decided based on this and other evidence in the record that the two former supermarket employees survived summary judgment. *Id.* at 1366.

Williams contends that *Damon* supports his case because there the district manager's **\*456** statement was considered as probative circumstantial evidence that the manager impermissibly discriminated against the plaintiff whom the manager fired three months before making the statement. *See id.* at 1363. Williams argues that the closer temporal proximity between Sokol's statement and his termination suggests that he too should survive summary judgment. But this argument misses the mark because Williams has presented much weaker evidence of intentional discrimination than the *Damon* plaintiffs did. Most significantly, the district manager's statement in *Damon* was more closely related to the termination decision because it implied that the protected characteristic generally affected the manager's personnel decisions. *See id.* at 1362 ("The comment ... arguably suggests that [the manager] had an ageist preference for young managers. Given the *substance, context, and timing* of [the] comment, if credited, we find it to be a significant piece of circumstantial evidence." (emphasis added)). In contrast, Sokol's statement does not imply that race had any influence on Sokol's personnel decisions, as a general matter or in Williams's case. Accordingly, temporal proximity aside, without additional evidence, we must conclude that Sokol's remark was unconnected to her termination decision.

For similar reasons, Williams's reliance on *Mora v. Jackson Mem'l Found., Inc.*, 597 F.3d 1201 (11th Cir. 2010), is misplaced. There, a plaintiff sued her former employer, alleging that its chief executive fired her because of her age. *Mora*, 597 F.3d at 1202. When the chief executive fired the

plaintiff, the executive stated, "I need someone younger I can pay less ... I need an Elena [Quevedo, a 25 year old employee]." *Id.* at 1203 (internal quotation marks omitted). The executive further told the plaintiff, "[Y]ou are very old, you are very inept. What you should be doing is taking care of old people. They really need you. I need somebody younger that I can pay less and I can control." *Id.* (internal quotation marks omitted). In speaking about the plaintiff to a different employee, the executive also said that the plaintiff "is too old to be working here anyway." *Id.* (internal quotation marks omitted). We concluded that a reasonable jury could take these statements "at face value" and find that the chief executive fired the plaintiff because of her age. *Id.* at 1205. But in the instant case, unlike in *Mora*, I cannot conclude that Sokol based her termination decision on Williams's race simply by taking Sokol's statement "at face value." *See id. Mora* therefore offers Williams little help.

### B. A Reasonable Jury Could Not Find Intentional Discrimination Based on The Falsity of HOPE's Explanation of His Separation.

[2]   As an alternative to relying solely on Sokol's remark, Williams argues that under *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), we may find intentional discrimination from the falsity of HOPE's explanation that he was terminated when he abandoned his job and stopped showing up for work. Appellant's Br. at 32. Even if we were to agree with Williams that HOPE's explanation of his resignation is unworthy of credence, we would still conclude that the record lacked sufficient evidence from which a reasonable jury could find that he was fired because of his race.

The *Reeves* Court, applying *McDonnell Douglas*, recognized that "a plaintiff's prima facie case [under *McDonnell Douglas*], combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097 (emphasis added). But Williams **\*457** has presented much weaker evidence of intentional discrimination than would a plaintiff who had established a prima facie case under *McDonnell Douglas*. To establish a prima facie case under the *McDonnell Douglas* burden-shifting framework, a plaintiff must show: "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated similarly situated employees outside her class more favorably." *Lewis v. City of Union City*, 918 F.3d

1213, 1220-21 (11th Cir. 2019) (en banc) (internal quotation marks omitted). [6] Establishing the prima facie case "raises an inference of discrimination," but it does so "only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (internal quotation marks omitted). Williams's evidence is weaker than that offered by a plaintiff who has established a prima facie case under *McDonnell Douglas* because, as we have explained, the record contains a paucity of evidence to prove that Sokol's decision to fire Williams was based on his race. Though we acknowledge the possibility that a plaintiff who makes no attempt to establish a prima facie case under *McDonnell Douglas* may nonetheless survive summary judgment based in part on proof that the employer's proffered justification is false, we conclude that such a plaintiff would need stronger evidence of intentional discrimination than Williams has offered in the instant case. *See Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1337-38 (11th Cir. 2015) (concluding that a plaintiff failed to offer sufficient evidence to prove "a causal connection between his race and his termination" when the plaintiff showed that the defendant's justification for his termination "may have been pretext of *something*" but did not show that the justification "was pretext of *discrimination on the basis of his race*"). [7]

[6] "If the plaintiff succeeds in making out a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination." *Id.* at 1221.

[7] We make no attempt to demarcate the quantum of evidence necessary in such a case to go to trial, we merely decide that Williams's evidence is insufficient.

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's order granting HOPE's motion for summary judgment.

**AFFIRMED.**

**All Citations**

777 Fed.Appx. 451, 2019 Fair Empl.Prac.Cas. (BNA) 259,959

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.